JOSEPH H. HUNT
Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director

ERIC WOMACK
Assistant Director

JAMES J. GILLIGAN
Special Litigation Counsel

U.S. Department of Justice, Civil Division
1100 L Street, N.W., Room 11200
Washington, D.C. 20005
Phone: (202) 514-3358
Fax: (202) 616-8470
Email: james.gilligan@usdoj.gov

*Attorneys for the Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DÉJÀ VU-SAN FRANCISCO, LLC, *et al.*, | Case No. 3:20-cv-03982-JSW |
| Plaintiffs, | **DEFENDANTS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITON TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER PRELIMINARY INJUNCTION** |
| v. | |
| UNITED STATES SMALL BUSINESS ADMINISTRATION, *et al.*, | Hearing Date: July 30, 2020 Courtroom B, 15th Floor |
| Defendants. | Magistrate Judge Laurel Beeler |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

COUNTERSTATEMENT OF ISSUES PRESENTED ................................................... xii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 3

    The Small Business Administration and Its Disaster Loan Programs ....................... 3

    Size Determinations of Affiliated Businesses and Franchises ................................. 4

    Ineligible Business Types Under 13 C.F.R. §§ 123.201 and 123.301 ..................... 6

    The Coronavirus Aid, Relief, and Economic Stimulus (CARES) Act .................... 7

    Plaintiffs and Their Claims ..................................................................................... 9

LEGAL STANDARDS ................................................................................................... 12

ARGUMENT .................................................................................................................. 13

I.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS. ............................ 13

    A.     Plaintiffs Lack Article III Standing, Because They Cannot Show That
           Their Claimed Injuries Will Likely Be Redressed by the Relief Sought ............... 13

        1.     Principles of Article III standing ............................................................. 13

        2.     Plaintiffs cannot establish redressability, because they cannot show that
              they are likely to be found eligible for EIDL loans as a result of the
              injunctive relief requested ...................................................................... 14

        3.     Alternatively, the Court should hold these proceedings briefly in
              abeyance pending an SBA review of the affiliation issues among
              Plaintiffs and Déjà Vu ............................................................................ 16

    B.     The CARES Act Does Not Bar Application of § 123.201(f). .............................. 17

    C.     Plaintiffs' Arbitrary and Capricious Claim Also Lacks Merit ............................ 22

    D.     Plaintiffs' Constitutional Claims Are Also Unlikely to Succeed ......................... 24

        1.     Section 123.201(f) is not a content- or viewpoint-based
              restriction on speech ............................................................................... 25

        2.     Section 123.201(f) is not unconstitutionally overbroad ........................... 28

        3.     Section 123.201(f) need not conform to constitutional standards
              governing prohibitions of obscenity ....................................................... 30

        4.     Section 123.201(f) does not violate the doctrine of
              unconstitutional  conditions ................................................................... 30

**PAGE**

     5.    Section 123.201(f) does not impose a prior restraint. ..................................... 33

     6.    Section 123.201(f) is not impermissibly vague. ............................................... 34

   E.    Section 123.201(f) Easily Meets Fifth Amendment Requirements. ........................ 37

   F.    The Small Business Act Provides That "No Injunction" Shall Issue Against the SBA. ........................................................................................................... 39

II.    PLAINTIFFS HAVE NOT ADDUCED EVIDENCE OF IRREPARABLE HARM. ..... 40

III.   A PRELIMINARY INJUNCTION WOULD BE CONTRARY TO THE PUBLIC INTEREST. ............................................................................................................ 41

CONCLUSION ................................................................................................................. 42

**TABLE OF AUTHORITIES**

**PAGE(S)**

**CASES**

*Acosta v. City of Costa Mesa,*
718 F.3d 800 (9th Cir. 2013) ................................................................................. 28

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
570 U.S. 205 (2013) .......................................................................... 31, 32, 35

*Alexander v. United States,*
509 U.S. 544 (1993) .................................................................................. 33, 34

*Allgeyer v. St. of La.,*
165 U.S. 578 (1897) ................................................................................... 39

*Am. Ass'n Political Consultants v. SBA,*
2020 WL 1935525 (April 21, 2020) .................................................................. *passim*

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.,*
650 F.2d 1470 (9th Cir. 1985) ............................................................................ 40

*Atrium Med. Ctr. v. HHS,*
766 F.3d 560 (6th Cir. 2014) ............................................................................. 23

*Bellevue Hosp. Ctr. v. Leavitt,*
443 F.3d 163 (2d Cir. 2006) .............................................................................. 23

*Bowen v. Am. Hosp. Ass'n,*
476 U.S. 610 (1986) ....................................................................................... 24

*Broadrick v. Oklahoma,*
413 U.S. 601 (1973) ....................................................................................... 29

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962) ....................................................................................... 24

*Camelot Banquet Rooms, Inc. v. SBA,*
2020 WL 2088637 (E.D. Wis. May 1, 2020) .................................................... 22, 40

PAGE(S)

*Cammarano v. United States,*
  358 U.S. 498 (1959) ................................................................................................ 25

*Camp v. Pitts,*
  411 U.S. 138 (1973) ................................................................................................ 23

*Chevron, U.S.A., Inc. v. NRDC,*
  467 U.S. 837 (1984) ............................................................................................ 17, 18

*City of Arlington v. FCC,*
  569 U.S. 290 (2013) ............................................................................................ 17, 18

*City of Erie v. Pap's A.M.,*
  529 U.S. 277 (2000) ............................................................................................ 39, 42

*City of Los Angeles v. Alameda Books, Inc.,*
  535 U.S. 425 (2002) ................................................................................................ 38

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................................................................ 13, 14

*Corley v. United States,*
  556 U.S. 303 (2009) ................................................................................................ 20

*CTIA - The Wireless Ass'n v. City of Berkeley,*
  928 F.3d 832 (9th Cir.), *cert. denied,* 140 S. Ct. 658 (2019) ................................ 41

*Ctr. For Fair Pub. Policy v. Maricopa Cty.,*
  336 F.3d 1153 (9th Cir. 2003) ................................................................................ 38

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ................................................................................................ 14

*Davenport v. Wash. Educ. Ass'n,*
  551 U.S. 177 (2007) ................................................................................................ 26

*Defy Ventures, Inc. v. SBA,*
  2020 WL 3546873 (D. Md. June 29, 2020) ............................................................ 19

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  2020 WL 3271746 (U.S. June 18, 2020) ................................................................ 24

|  | PAGE(S) |
|---|---|
| *Diocese of Rochester v. SBA*, |  |
| 2020 WL 3071603 (W.D.N.Y. June 10, 2020) | 18, 20, 22 |
| *Driskill, Inc. v. Abdnor*, |  |
| 901 F.2d 383 (4th Cir.1990) | 40 |
| *DV Diamond Club of Flint, LLC v. SBA*, |  |
| 2020 WL 2315880 (E.D. Mich. May 11, 2020) | 22, 40 |
| *Elrod v. Burns*, |  |
| 427 U.S. 347 (1976) | 40 |
| *Engquist v. Oregon Dep't of Agric.*, |  |
| 478 F.3d 985 (9th Cir. 2007) | 39 |
| *Enplanar, Inc. v. Marsh*, |  |
| 11 F.3d 1284 (5th Cir.1994) | 39 |
| *FCC v. Beach Communc'ns, Inc.*, |  |
| 508 U.S. 307 (1993) | 38 |
| *FDA v. Brown & Williamson Tobacco Corp.*, |  |
| 529 U.S. 120 (2000) | 18, 22 |
| *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, |  |
| 654 F.3d 989 (9th Cir. 2011) | 12, 13 |
| *FW/PBS, Inc. v. City of Dallas*, |  |
| 493 U.S. 215 (1990) | 34 |
| *Gallinger v. Becerra*, |  |
| 898 F.3d 1012 (9th Cir. 2018) | 37, 38 |
| *Gammoh v. City of La Habra*, |  |
| 395 F.3d 1114 (9th Cir. 2005) | 38 |
| *General Media Communications v. Cohen*, |  |
| 131 F.3d 273 | 28, 36, 37 |
| *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, |  |
| 559 U.S. 280 (2010) | 17 |

PAGE(S)

*Grayned v. City of Rockford,*

    408 U.S. 104 (1972) ...................................................................................................... 34

*Heller v. Doe,*

    509 U.S. 312 (1993) ................................................................................................. 38, 39

*Herb Reed Enter., LLC v. Fla. Entm't Mgmt., Inc.,*

    736 F.3d 1239 (9th Cir. 2013) ................................................................................. 13, 40

*I.N.S. v. Aguirre-Aguirre,*

    526 U.S. 415 (1999) ...................................................................................................... 18

*In re Bunyan,*

    354 F.3d 1149 (9th Cir. 2004) ...................................................................................... 17

*In re Hidalgo Cty. Emer. Serv. Found.,*

    2020 WL 3411190 (5th Cir. June 22, 2020) ............................................................... 40

*Jackson Water Works, Inc. v. Pub. Utilities Comm'n of State of Cal.,*

    793 F.2d 1090 (9th Cir. 1986) ...................................................................................... 38

*Jones v. United States,*

    526 U.S. 227 (1999) ...................................................................................................... 22

*Kahawaiolaa v. Norton,*

    386 F.3d 1271 (9th Cir. 2004) ................................................................................. 37, 39

*Keyishian v. Bd. of Regents Univ.,*

    385 U.S. 603- (1967) .................................................................................................... 34

*Leathers v. Medlock,*

    499 U.S. 439 (1991) ................................................................................................. 25, 26

*Living Well Med. Clinic, Inc. v. Becerra,*

    901 F.3d 1168 (9th Cir. 2018) ...................................................................................... 13

*Lopez v. Candaele,*

    630 F.3d 775 (9th Cir. 2010) ........................................................................................ 14

*M.S. v. Brown,*

    902 F.3d 1076 (9th Cir. 2018) ................................................................................. 14, 16

|   | | PAGE(S) |
|---|---|---|

*Machoka v. City of Collegedale*,
2019 WL 1768861 (E.D. Tenn. Apr. 22, 2019) ........................................................ 39

*Mayfield v. United States*,
599 F.3d 964 (9th Cir. 2010) ................................................................. 14, 15

*SBA v.McClellan*,
364 U.S. 446 (1960) .................................................................................... 3

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ............................................................................. 39, 42

*Members of City Coun. of Los Angeles v. Taxpayers for Vincent*,
466 U.S. 789 (1984) ....................................................................... 28, 29, 30

*Miles v. Apex Marine Corp.*,
498 U.S. 19 (1990) .................................................................................. 19

*Miller v. California*,
413 U.S. 15 (1973) .................................................................................. 30

*Munaf v. Geren*,
553 U.S. 674 (2008) ............................................................................ 12, 16

*N.W. Coal. for Alternatives. to Pesticides v. EPA*,
544 F.3d 1043 (9th Cir. 2008) ..................................................................... 24

*N.Y. State Club Ass'n v. City of N.Y*,
487 U.S. 1 (1988) ................................................................................... 29

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007) ............................................................................ 18, 24

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ....................................................................... 26, 35, 36

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................................ 13, 41

*Ostrom v. O'Hare*,
160 F. Supp. 2d 486 (E.D.N.Y. 2001) .............................................................. 35

| | PAGE(S) |
|---|---|
| *Perry v. Sinderman*, | |
| 408 U.S. 593 (1972) | 32 |
| *Pharaohs GC, Inc. v. SBA*, | |
| 2020 WL 3489404 (W.D.N.Y. June 26, 2020) | *passim* |
| *PMG Int'l Div. L.L.C. v. Rumsfeld*, | |
| 303 F.3d 1163 (9th Cir. 2002) | 27, 28 |
| *Reed v. Town of Gilbert*, | |
| 135 S. Ct. 2218 (2015) | 26 |
| *Regan v. Taxation With Representation of Washington*, | |
| 461 U.S. 540 (1983) | *passim* |
| *Ridley v. Mass. Bay Transp. Auth.*, | |
| 390 F.3d 65 (1st Cir. 2004) | 36 |
| *Rust v. Sullivan*, | |
| 500 U.S. 173 (1991) | *passim* |
| *SEC v. Chenery Corp.*, | |
| 332 U.S. 194 (1947) | 24 |
| *Silvers v. Sony Pictures Entm't, Inc.*, | |
| 402 F.3d 881 (9th Cir. 2005) | 21 |
| *Small v. United States*, | |
| 544 U.S. 385 (2005) | 21 |
| *Spokeo, Inc. v. Robins*, | |
| 136 S. Ct. 1540 (2016) | 13 |
| *Steel Co. v. Citizens for a Better Env't*, | |
| 523 U.S. 83 (1998) | 14, 17 |
| *Town of Chester, N.Y. v. Laroe Estates, Inc.*, | |
| 137 S. Ct. 1645 (2017) | 14 |
| *Townley v. Miller*, | |
| 722 F.3d 1128 (9th Cir. 2013) | 14, 16 |

| | PAGE(S) |
|---|---|
| *Tradeways, Ltd. v. Dep't of the Treasury,* | |
| 2020 WL 3447767 (D. Md. June 24, 2020) ....................................... *passim* | |
| *Ulstein Mar., Ltd. v. United States,* | |
| 833 F.2d 1052 (1st Cir.1987) ....................................................... 40 | |
| *United States v. Am. Library Ass'n,* | |
| 539 U.S. 194 (2003) ................................................................ *passim* | |
| *United States v. Lanier,* | |
| 520 U.S. 259 (1997) ....................................................................... 34 | |
| *United States v. Nat'l Training & Info. Ctr., Inc.,* | |
| 532 F. Supp. 2d 946 (N.D. Ill. 2007) ............................................. 36 | |
| *United States v. Playboy Entm't Grp., Inc.,* | |
| 529 U.S. 803 (2000) ..................................................................... 26 | |
| *United States v. Salerno,* | |
| 481 U.S. 739 (1987) ..................................................................... 28 | |
| *United States v. Vallee,* | |
| 677 F.3d 1263 (9th Cir. 2012) ...................................................... 19 | |
| *United States v. Williams,* | |
| 553 U.S. 285 (2008) ................................................................ 28, 29 | |
| *United States v. Wilson,* | |
| 290 F.3d 347 (D.C. Cir. 2002) ..................................................... 19 | |
| *Virginia v. Hicks,* | |
| 539 U.S. 113 (2003) ................................................................ 28, 29 | |
| *Warth v. Seldin,* | |
| 422 U.S. 490 (1975) ..................................................................... 14 | |
| *Wash. State Grange v. Wash. St. Republican Party,* | |
| 552 U.S. 442 (2008) ..................................................................... 28 | |
| *Whitman v. American Trucking*, Assocs., | |
| 531 U.S. 457 (2001) ..................................................................... 22 | |

**PAGE(S)**

*Winter v. Nat. Res. Def. Council, Inc.*,

  555 U.S. 7 (2008) .................................................................... 12, 13, 40

*Ysursa v. Pocatello Educ. Ass'n*,

  555 U.S. 353 (2009) ....................................................................... 25, 37

## CONSTITUTION

U.S. Const. Art. I .................................................................................. 31

## STATUTES

5 U.S.C. § 901 ........................................................................................ 3

10 U.S.C. § 2489a ............................................................................... 27

15 U.S.C. § 631 ................................................................................. 3, 38

15 U.S.C. § 632 ................................................................................. 4, 5

15 U.S.C. § 633 ............................................................................ 3, 7, 19

15 U.S.C. § 634 ......................................................................... xiii, 3, 39

15 U.S.C. § 636 ............................................................................. *passim*

15 U.S.C. § 9009 ........................................................................... *passim*

18 U.S.C. § 922 .................................................................................. 21

Coronavirus Aid, Relief, and Economic Security ("CARES") Act,

  Pub. L. No. 116-136, 134 Stat. 281 (2020 ............................... xiii, 8

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

13 C.F.R. § 120.1 ................................................................................. 3

13 C.F.R. § 121.101 ......................................................................... 4, 5

13 C.F.R. § 121.102 ......................................................................... 4, 5

13 C.F.R. § 121.103 ......................................................................... 5, 6

13 C.F.R. § 121.300 ............................................................................. 4

13 C.F.R. § 121.301 ............................................................... 5, 6, 12, 16

**PAGE(S)**

13 C.F.R. § 123.2 ..................................................................................................... 4

13 C.F.R. § 123.5 ..................................................................................................... 3

13 C.F.R. § 123.101 ...................................................................................... 7, 19, 21

13 C.F.R. § 123.200 ................................................................................................. 4

13 C.F.R. § 123.201 ........................................................................................ *passim*

13 C.F.R. § 123.300 ................................................................................................. 4

13 C.F.R. § 123.301 ...................................................................................... 7, 20, 21

13 C.F.R. § 123.302 ................................................................................................. 4

13 C.F.R. § 123.303 ........................................................................................... 4, 22

13 C.F.R. § 123.303 ................................................................................................. 4

16 C.F.R. § 436.1(h) ......................................................................................... 6, 15

60 Fed. Reg. 64,356 (Dec. 15, 1995) ............................................................... 7, 23

61 Fed. Reg. 3226 (Jan. 31, 1996) ......................................................................... 7

63 Fed. Reg. 46,643 (Sept. 2, 1998) ............................................................... 7, 23

85 Fed. Reg. 7622 (Feb. 10, 2020) ......................................................................... 5

**OTHER AUTHORITIES**

Presidential Proclamation 9994, Declaring a National Emergency Concerning the Novel

    Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020),

    https://www.govinfo.gov/ content/pkg/DCPD-202000156/pdf/DCPD-202000156.pdf. ............ 8

**COUNTERSTATEMENT OF ISSUES PRESENTED**

The Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281 (2020), appropriated to the United States Small Business Administration ("SBA") additional monies and temporarily enhanced its authority to fund economic injury disaster loans (EIDLs) for small businesses suffering economic injury as a result of the COVID-19 crisis. In administering this temporary loan program, the SBA has adhered to pre-existing regulations that identify certain types of businesses as ineligible for EIDL assistance, including 13 C.F.R. § 123.201(f), under which businesses that present live performances of a "prurient sexual nature" are ineligible to receive SBA disaster loans. Plaintiffs allege they were denied EIDL loans because of SBA's application of § 123.201(f), and moved for a temporary restraining order and a preliminary injunction. The issues presented are:

(1) Whether Plaintiffs lack a probability of success on the merits on their claims because they lack Article III standing to contest the lawfulness of § 123.201(f) on any basis;

(2) Whether Plaintiffs lack a probability of success on their individual claims that application of § 123.201(f) is unlawful because it is (a) not authorized by the CARES Act; (b) arbitrary and capricious within the meaning of the Administrative Procedure Act; (c) a content- and viewpoint-based restriction on speech; (d) unconstitutionally overbroad; (e) inconsistent with the *Miller* obscenity test; (f) an unconstitutional condition on the receipt of a government benefit; (d) a prior restraint; (e) impermissibly vague; and (f) inconsistent with principles of Equal Protection and Due Process;

(3) Whether Plaintiffs lack a probability of success because injunctive relief against the SBA is barred under the Small Business Act, 15 U.S.C. § 634(b)(1);

(4) Whether Plaintiffs lack evidence to support their claims of irreparable harm; and

(5) Whether a preliminary injunction would be contrary to the public interest.

## INTRODUCTION

Plaintiffs attempt to portray themselves in this litigation as independent establishments struggling to cope with the economic dislocation of the COVID-19 crisis, yet denied financial assistance by the Small Business Administration ("SBA") that Congress intended them to receive. In fact, significant evidence in the public domain indicates that Plaintiffs are part of "a massive international chain of hundreds of adult theaters and bookstores" operated by Déjà Vu Services, Inc. ("Déjà Vu "), the self-described "#1 Erotic Entertainment Chain in the World," with over 10,000 employees. The evidence of Plaintiffs' affiliation with Déjà Vu, and each other, calls into serious question their status as independent "small" businesses eligible for the SBA disaster loans they desire, even under the enlarged size limits temporarily prescribed by Congress under the Coronavirus Aid, Relief, and Economic Stimulus ("CARES") Act. These questions of affiliation and size would have to be resolved before the SBA could determine the Plaintiffs' loan eligibility, even if this Court were to grant them the judicial relief they seek.

Plaintiffs are establishments engaged in the business of presenting nude and sometimes "topless" "female performance dance entertainment." In addition, a number of them offer lap dances to their patrons, in private rooms. They challenge the legality of a regulation, issued by the SBA over 20 years ago, providing that certain categories of businesses are not eligible for SBA economic injury disaster loans ("EIDLs"). Among these ineligible businesses, as relevant here, are businesses engaged in selling products or services, or presenting depictions or live performances, of a "prurient sexual nature." 13 C.F.R. § 123.201(f). The rule codifies SBA policy adopted in furtherance of its statutory mandate to consider the public interest when directing its limited resources, without abridging the freedom of such establishments to use their own funds to operate their businesses and express (as Plaintiffs put it) their "message of eroticism." Plaintiffs nevertheless contend that reliance on this longstanding rule to deny EIDL loans to businesses of a prurient sexual nature is prohibited by the CARES Act, violates the Administrative Procedure Act ("APA"), and infringes on their First and Fifth Amendment rights. Plaintiffs seek preliminary injunctive relief prohibiting the SBA from applying § 123.201(f) to deny them EIDL loans.

Plaintiffs' motion should be denied, because they have satisfied none of the requisites for such extraordinary relief. First, Plaintiffs lack Article III standing. Because of questions concerning Plaintiffs' affiliation with Déjà Vu, and one another, based on license agreements, common ownership, and common management, a cloud of uncertainty hangs over their eligibility for EIDL loans, regardless of § 123.201(f). They cannot show, therefore, that their claimed injury is redressable by the injunctive relief they have prayed for. Second, Plaintiffs' claim that the CARES Act eliminates all eligibility criteria for EIDL loans apart from size misconstrues the Act. The statute merely expands temporarily the class of entities to which the SBA is authorized to make EIDL loans, and gives no indication that Congress meant to eliminate longstanding SBA conditions on eligibility for such loans. Plaintiffs' APA claim lacks merit, and even were it otherwise, the claim provides no basis for the injunctive relief they seek.

Plaintiffs' constitutional claims are also without merit. Section § 123.201(f) is not, as Plaintiffs maintain, a content- or viewpoint-based prohibition of speech. As the Supreme Court has explained, government does not ban, penalize or otherwise infringe on speech simply by deciding not to fund it, and is entitled to make content-based judgments about the speech it will and will not fund so long it does not (which is the case here) engage in invidious viewpoint discrimination, or attempt to suppress the expression of particular ideas. Nor does § 123.201(f) violate the overbreadth doctrine, constitutional standards of obscenity, the doctrine of unconstitutional conditions, the rule against prior restraints, or the vagueness doctrine, because it merely prohibits the use of SBA loans to fund private speech that the Government does not wish to subsidize, while leaving businesses such as Plaintiffs entirely free to use their own financial resources to engage in any speech they wish. Section 123.201(f) is also consistent with principles of Equal Protection, and Plaintiffs' asserted right to "occupational liberty." The SBA rationally may decide that it is not the best use of limited public funds to subsidize the operation of adult-entertainment establishments, given the adverse "secondary effects," both economic and otherwise, with which these establishments are associated.

Although the legal deficiency of Plaintiffs' claims alone requires that their request for preliminary relief be denied, as discussed below their conclusory claims of "ruination," without

supporting evidence, are insufficient to make the requisite showing of irreparable harm. Moreover, they have not shown that awarding the relief they seek would be in the public interest. Congress did not deem it in the public interest to compel the SBA to make EIDL loans available to businesses of a prurient sexual nature. Plaintiffs offer no justification for disregarding that legislative judgment, or for diverting CARES Act funding intended for struggling small businesses to a "massive international chain" with hundreds of establishments worldwide.

## BACKGROUND

### The Small Business Administration and Its Disaster Loan Programs

The policy of the Small Business Act, 15 U.S.C. § 631 *et seq.*, is to "aid, counsel, assist, and protect . . . the interests of small-business concerns," in order to preserve the system of free competitive enterprise that is "essential" to the economic well-being and security of the Nation. 15 U.S.C. § 631(a). To promote that important national objective, Congress created the Small Business Administration ("SBA"), under the leadership of a single Administrator, *id.* § 633(a), (b)(1), who is given "extraordinarily broad powers" under § 7(a) and (b)(2) of the Act to provide a wide variety of technical, managerial, and financial assistance to small-business concerns. *SBA v. McClellan*, 364 U.S. 446, 447 (1960); se*e* 15 U.S.C. § 636(a) ("Section 7(a)") (describing numerous varieties of general small-business loans the Administrator is "authorized" and "empowered" to make); *id.* § 636(b)(2) ("Section 7(b)(2)") (authorizing economic injury disaster loans to small business concerns, private non-profit organizations, and small agricultural cooperatives); 13 C.F.R. §§ 120.1, 123.5. In the performance of these functions the Administrator is further empowered to "make such rules and regulations as [she] deems necessary to carry out the authority vested in [her]," and to "take any and all actions . . . [that] [she] determines . . . are necessary or desirable in making . . . loans." 15 U.S.C. § 634(b)(6), (7). The Act also empowers the Administrator to "establish general policies" in the public interest governing the "granting and denial" of SBA financial assistance. *Id.* § 633(d).[1]

---

[1] The Administrator's authority under 15 U.S.C. § 633(d) was originally vested in a Loan Policy Board consisting of the Administrator and the Secretaries of the Treasury and Commerce, *see* 15 U.S.C. § 633(d), but that authority was transferred to the Administrator alone by Reorganization Plan No. 4 of 1965, *see* 5 U.S.C. App., Reorg Plan No. 4 of 1965, §§ 11(b), 13(a), pursuant to the Reorganization Act of 1949, 5 U.S.C. § 901 *et seq*.

Section 7(b)(2) of the Small Business Act authorizes the SBA to make or guarantee such loans "as the Administration may determine to be necessary or appropriate to any small business concern, private nonprofit organization, or small agricultural cooperative" suffering "substantial economic injury" as a result of an officially declared disaster in an area where the concern, organization, or cooperative is located. 15 U.S.C. § 636(b)(2); *see* 13 C.F.R. § 123.300(a). These so-called economic injury disaster loans ("EIDLs") are intended to provide working capital that may be used to help small businesses meet their financial obligations and operating expenses following a disaster, until normal operations resume. *See* 13 C.F.R. §§ 123.200(a), 123.303(a); *see also id.* § 123.2.

EIDL loans are subsidized by the Government. The interest rate on EIDL loans is capped at four percent. 13 C.F.R. § 123.302. In addition, the SBA does not charge borrowers points, closing, or servicing fees on any disaster loans authorized under Section 7(b), *id.* § 123.8, or require EIDL borrowers to pledge collateral on loans of $25,000 or less. *Id.* § 123.11(a).

Ordinarily, to qualify for an EIDL loan an applicant must meet the size standards for a "small" business under the Small Business Act and SBA rules. 15 U.S.C. § 632(a)(2); 13 C.F.R. §§ 121.101, 121.102; SBA Standard Operating Procedure ("SOP") 50 30 9, *Disaster Assistance Program*, at 76 (excerpts attached as Ex. 1), https://www.sba.gov/sites/default/files/2018-06/SOP%2050%2030%209-FINAL.PDF. The applicant must also demonstrate (i) "that [it] is not able to obtain credit elsewhere," 15 U.S.C. § 636(b)(2) (flush matter following subparagraph (E));13 C.F.R. § 121.300(b); SOP 50 30 9 at 65, (ii) that it has "satisfactory character," and (iii) must provide reasonable assurance of its ability to repay the loan, 13 U.S.C. § 123.6. The SBA "analyze[s] Federal tax return/income information to substantiate repayment ability." SOP 50 30 9 at 11. The agency also requires that all principals of an applicant personally guarantee the loan; failure of a principal to do so "is a basis for declining the application. *Id.* at 117.

**Size Determinations of Affiliated Businesses and Franchises**

The Small Business Act defines a "small business concern" as "one which is independently owned and operated and which is not dominant in its field of operation," and further authorizes the SBA to establish size standards by which a business concern may be

determined to be "small" based on "number of employees, dollar volume of business, net worth, net income, a combination thereof, or other appropriate factors."  15 U.S.C. § 632(a)(1), (2)(B); *see* 13 C.F.R. §§ 121.101, 121.201.

One key factor SBA considers in determining whether an applicant for an SBA loan is independent and small is whether the applicant is affiliated with any other parties.  *See* Decl. of Stephen J. Olear (filed herewith) ("Olear Decl.") ¶ 11.  Under SBA regulations, affiliation exists when one individual or entity controls or has the power to control another or a third party or parties controls or has the power to control both.  13 C.F.R. § 121.103(a).  When a business is not independently owned and operated, but is instead affiliated with another business, SBA aggregates the employees, annual receipts or other measure of size of the business and all of its affiliates to determine whether the business is small.  *Id.* § 121.103(a)(6); *see also id.* § 121.301.

Affiliation can exist under a number of different circumstances, including affiliation based on common ownership, and common management.  13 C.F.R. § 121.301(f)(1), (3).[2] SBA's regulation at 13 C.F.R. § 121.301(f)(5) also describes affiliation based on franchise and license agreements.  The rule states that the "restraints imposed on a franchisee or licensee by its franchise or license agreement generally will not be considered in determining whether the franchisor or licensor is affiliated with an applicant franchisee or licensee *provided the applicant franchisee or licensee has the right to profit from its efforts and bears the risk of loss commensurate with ownership.*"  *Id.* § 121.301(f)(5) (emphasis added); *see also*  Olear Decl. ¶ 13. For purposes of determining whether an agreement between an applicant and another business concern constitutes a "franchise" agreement, the SBA has adopted the Federal Trade Commission's definition of "franchise" found at 16 C.F.R. § 436.1(h).  Olear Decl. ¶ 14.

By its nature, the relationship between a franchisor and franchisee necessarily provides for some level of control of the franchisee by the franchisor to maintain product quality and protect the brand name.  *Id.* ¶ 16.  The SBA does not consider such features by themselves to

---

[2] In February 2020 the SBA published an interim final rule amending various SBA regulations in which the provisions of 13 C.F.R. § 121.301(f)(5) were re-codified at 13 C.F.R. § 121.301(f)(7).  *See* 85 Fed. Reg. 7622 (Feb. 10, 2020).  Section 1102(e) of the CARES Act, however, rescinded the amendments made by the interim final rule.  Accordingly, reference is made herein to the 2019 version of 13 C.F.R. § 121.301.

represent a level of control by the franchisor that would result in affiliation with the franchisee. *Id.* However, other areas of control afforded the franchisor over the franchisee may create affiliation between them. *Id.*[3] Affiliation is determined by reviewing the franchise or license agreement and any related documents governing the relationship to identify any areas of control that could result in a determination that the applicant is not independent and is affiliated with the franchisor, licensor, or other party to the agreement. *Id.* ¶ 17.

If an applicant franchisee is be deemed to be affiliated with the franchisor and all of the franchisor's other franchisees, then the employees, receipts or other measure of size of the applicant, the franchisor, and the other franchisees, will be aggregated to determine whether the applicant is small. 13 C.F.R. §§ 121.103(a)(6), 121.301(a); Olear Decl. ¶ 19. If thereupon the applicant franchisee does not meet the criteria to be considered small, it may obtain SBA financial assistance only if the franchisor will agree to execute a standardized or negotiated addendum providing that during the life of the SBA loan it will not enforce any provision in the franchise agreement (or in any related document) that SBA has determined deprives the franchisee of its independence. *Id.* ¶ 20. Once the addendum is executed, the franchisee is no longer considered affiliated with the franchisor (or the other franchisees) and its number of employees or annual receipts need not be aggregated with those of the franchisor (or the other franchisees) when determining whether the applicant franchisee is small. *Id.*

**Ineligible Business Types Under 13 C.F.R. §§ 123.201 and 123.301**

Pursuant to the broad powers conferred on the SBA by the Small Business Act to make disaster loans to small business concerns as it "may determine to be necessary or appropriate," 15 U.S.C. § 636(b)(2), and to make rules and regulations, establish general policies, and take other actions deemed necessary or desirable in making SBA loans to small-business concerns, *id.* §§ 633(d), 634(b)(6), (7); *supra* at 3, the SBA over time has determined as a matter of policy that SBA disaster loans should not be made available to certain types of businesses. These include,

---

[3] Provisions in a franchise agreement that result in affiliation between a franchisor and a franchisee include, for example, restrictions on transfer or change of ownership of the franchise business; restrictions on the sale of business assets upon the franchisee's default or termination of the franchise agreement; and franchisor control over the hiring, firing, and other management of franchisee employees. Olear Decl. ¶ 18.

for example, non-profit businesses, other lenders, consumer-marketing cooperatives, and businesses primarily engaged in political activities or lobbying.  13 C.F.R. § 123.301(a)-(c), (h).  Section 123.301 also incorporates by reference additional categories of businesses considered ineligible for SBA financial assistance, set forth at 13 C.F.R. §§ 123.101 and 123.201, including businesses engaged in illegal activity, and government-owned entities.  *Id.* § 123.201(d), (e).  As relevant here, businesses that "[1] present[ ] live performances of a prurient sexual nature or [2] [d]erive[ ] . . . more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature" are ineligible for SBA disaster loans under 13 C.F.R. § 123.201(f), as incorporated by 13 C.F.R. § 123.301.

The SBA first decided that businesses of a prurient sexual nature should be deemed ineligible for SBA financial assistance almost a quarter century ago, in January 1996, when it adopted a virtually identical rule barring loans to such businesses under Section 7(a).  13 C.F.R. § 120.110(p); 61 Fed. Reg. 3226, 3229-40 (Jan. 31, 1996) (final rule).  It did so in accordance with the agency's mandate under the Small Business Act to establish general policies that direct its limited financial resources in ways that will best serve the public interest.  SBA, *Business Loan Programs*, Proposed Rule, 60 Fed. Reg. 64,356, 64,360 (Dec. 15, 1995) (citing 5 U.S.C. § 633(d)).  In 1998, SBA issued the rule at issue here, § 123.201(f), in furtherance of agency policy to use "the same ineligibility criteria for its economic injury disaster and business loan program[s]," so that "if a business is not eligible, because of these criteria, for an SBA guaranteed [business] loan . . . it would not be eligible for an economic injury disaster loan."  SBA, *Disaster Loan Program*, Final Rule, 63 Fed. Reg. 46,643, 46,643 (Sep. 2, 1998).  Until recently, the validity of SBA's policy prohibiting assistance to businesses of a prurient sexual nature, as codified in § 120.110(p) and § 123.201(f), has never been questioned in federal court.

**The Coronavirus Aid, Relief, and Economic Stimulus (CARES) Act**

On March 13, 2020, President Trump declared the COVID-19 pandemic to be a nationwide disaster affecting all U.S. states, territories, and the District of Columbia.  *See* Presidential Proclamation 9994, Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://www.govinfo.gov/

content/pkg/DCPD-202000156/pdf/DCPD-202000156.pdf.  The President's declaration thus authorized the SBA under Section 7(b)(2) to make or guarantee EIDL loans to small business concerns, private non-profit organizations, and small agricultural cooperatives suffering substantial economic injury due to the COVID-19 pandemic.

On March 27, 2020, President Trump signed into law the Coronavirus Aid, Relief, and Economic Stimulus ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281, passed by Congress to provide an unprecedented package of emergency economic assistance and other support to help individuals, families, businesses, and health-care providers cope with the enormous economic and public-health crises triggered by the COVID-19 pandemic.  First among the numerous measures taken by the CARES Act to address the COVID-19 crisis is the Paycheck Protection Program ("PPP"), CARES Act. § 1102, enacted as a temporary extension of the SBA's Section 7(a) authority to provide relief to small businesses experiencing economic hardship as a result of the COVID-19 crisis..  *See Am. Ass'n of Political Consultants v. SBA ("AAPC")*, 2020 WL 1935525, at *1 (April 21, 2020).  Of principal concern here, however, is CARES Act § 1110, codified at 15 U.S.C. § 9009, which temporarily expanded the class of eligible entities to which the SBA is authorized to make EIDL loans under Section 7(b)(2).

Specifically, CARES Act § 1110 provides that "[d]uring the covered period" (defined at 15 U.S.C. § 9009(a)(1) to be January 31 to December 31, 2020) "*in addition to* small business concerns, private nonprofit organizations, and small agricultural cooperatives" (to which Section 7(b)(2) already authorizes the SBA to make EIDL loans) "an eligible entity shall be eligible for a loan made under [Section 7(b)(2)]."  15 U.S.C. § 9009(b) (emphasis added).  The CARES Act defines "eligible entity" for this purpose to include sole proprietorships, independent contractors, and businesses, cooperatives, employee stock ownership plans, and tribal small business concerns, "with not more than 500 employees."  *Id*. ¶ 9009(a)(2).

For purposes of EIDL loans made in response to the COVID-19 disaster during the covered period ("covered EIDL loans"), the CARES Act also waives, for loans up to $200,000, the SBA's rule requiring principals to provide personal guarantees, and the requirement that applicants be unable to acquire credit elsewhere.  *Id.* § 9009(c).  The Act also provides that the

SBA shall not require applicants for COVID-19-related disaster loans to submit tax returns for purposes of evaluating their creditworthiness. *Id.* § 9009(d). Finally, the Act authorizes emergency advances of up to $10,000 to applicants "to address any allowable purpose for a loan made under [Section 7(b)(2)]." *Id.* § 9009(e).

Congress appropriated $10 billion for EIDL loans issued under these temporary amendments to the Section 7(b)(2) program. CARES Act. § 1107(a)(6).

**Plaintiffs and Their Claims**

Plaintiffs are 15 operators of adult-entertainment nightclubs doing business in California (7), Colorado (1), Oregon (1), and Washington (6) that present "live female performance dance entertainment which is fully-clothed, at times topless, and at times for certain Plaintiffs, fully nude." Am. Compl., ECF No. 31, ¶¶ 10-45, 70. According to Plaintiffs, '[n]one of the live performances at [their] establishments are unlawful or obscene." *Id.* ¶ 71. More information about the nature of the entertainment presented by the Plaintiffs is available at their respective establishments' websites, all but two of which may be accessed via the website of Déjà Vu Services, Inc., at https://dejavu.com/locations. (All sites were last verified on June 30, 2020.)

Plaintiff Déjà Vu – San Francisco d/b/a Centerfolds (https://centerfoldssf.com), promises "no end to the variety of x-rated entertainment you can enjoy," from "signature girl-on-girl stage performances and the steamy shower show to nude lap dances" in "private VIP booths and rooms." Plaintiff Bijou-Century d/b/a New Century Theater (https://newcenturysf.com) "features fully-nude private rooms, sexy themed rooms, and VIP rooms," costing "$500 for 15 mins.," "where you can have the ultimate adult entertainment experience." San Francisco Garden of Eden d/b/a Garden of Eden (https://goe-sf.com) and Déjà Vu Showgirls of San Francisco d/b/a Little Darlings (https://littledarlingssf.com) also offer "private lap dances" among other forms of "fully nude adult entertainment." Plaintiff Dreamgirls of Lake City d/b/a/ Dream Girls at Rick's (https://dejavu.com/dream-girls-at-ricks/) invites patrons to "[i]ndulge your fantasies while nude exotic dancers tease from the stage," and "a stunning young lady leads you by the hand into a private room." Dreamgirls of Tacoma d/b/a/ Dream Girl's at Fox's (https://dejavu.com/dream-girls-at-foxs/) describes itself as "an adult playground where your

dreams really do come true."  All six of the Washington Plaintiffs offer a $1,000 "VIP Baller Package," that includes a "FREE 1 Hour VIP Room."  *See, e.g.,* https://dejavu.com/showgirls-spokane/; https://dejavu.com/showgirls-lake-forest-park/.

Plaintiffs allege that they "have been and continue to be shuttered" due to government "'stay-at-home' orders" or similar measures to cope with the COVID-19 pandemic in their respective States, as a result of which they have "suffered substantial business losses."  Am. Compl. ¶ 73.  Plaintiffs applied for EIDL loans on or about April 16, 2020, *id*. ¶ 76, but received correspondence from the SBA stating that their applications had been denied for the reason "Business activity is not eligible."  *Id*. ¶¶ 78-91 & Exs. H-T.  Plaintiffs understand that their applications were rejected because of the regulation, § 123.201(f), that denies EIDL eligibility to businesses of a prurient sexual nature.  *Id*. ¶ 92.  Plaintiffs allege that if they are "unable to obtain EIDL loans, each may lack the staff and/or funds to reopen following the COVID-19 pandemic, or to sustain their operations through a period of reduced revenue" thereafter.  *Id*. ¶ 95.

Plaintiffs also allege that but for the challenged regulation, they are all qualified to obtain loans in accordance with the expanded EIDL program temporarily authorized under the CARES Act.  *Id*. ¶ 77.  Evidence in the public domain calls that assertion into serious question.  Fourteen of the 15 Plaintiffs in this case operate adult-oriented entertainment establishments that are identified by Déjà Vu Services, Inc. ("Déjà Vu") as locations in its "massive international chain of hundreds of adult theaters and bookstores."  *See* Olear Decl. ¶ 22-23 (citing https://dejavu.com/about and https://dejavu.com/locations/).  "What Déjà Vu states . . . about itself and the adult-entertainment establishments operated by 14 of the 15 Plaintiff[s] . . . gives reason to believe that these Plaintiffs are part of a Déjà Vu franchise system, raising affiliation issues that must be resolved before the SBA can offer them financial assistance of any kind, including EIDL loans."  *Id*. ¶ 21.

For example, the Déjà Vu website identifies a number of its "renowned brands," including "Déjà Vu ®, Déjà Vu Showgirls®, Little Darlings®, Dream Girls®, and Larry Flynt's Hustler Club®."  *See* https://dejavu.com/about/.  Apparently these are all registered trademarks, for the use of which a license fee is ordinarily charged, and all are trade names under which

Plaintiffs in this case do business. *See* Olear Decl. ¶ 24. Various references on Déjà Vu's websites suggest that operators of Déjà Vu–branded theaters are required by the terms of their agreements with Déjà Vu to operate according to specified standards meant to preserve the "upscale" image of the Déjà Vu brands. *Id*. ¶¶ 25-26. In addition, at https://dejavu.com/free-pass/, Déjà Vu offers patrons free discount passes to the locations of their choice, and at https://www.dejavuvip.com it sells "VIP" membership cards offering discounts "[g]ood at any PARTICIPATING Déjà Vu® affiliated location worldwide." *Id*. ¶ 27. Chain-wide promotions and discounts such as these are also typical of franchise systems. *Id*.

That Plaintiffs appear to be Déjà Vu franchises does not necessarily mean they are affiliated with Déjà Vu, but depending on the degree of control that Déjà Vu exerts over their businesses, they may be affiliates in a franchise system that, according to Déjà Vu's LinkedIn profile, has over 10,000 employees. https://www.linkedin.com/company/dejavuservices/about/ (last visited July 1, 2020). That number far exceeds the limit (500 employees) for EIDL loan eligibility set forth under the CARES Act at 15 U.S.C. § 9009(a)(2)(A). *See* Olear Decl. ¶ 29.

Under these circumstances, SBA cannot determine these 14 Plaintiffs' eligibility for SBA financial assistance of any kind without first examining their license agreements with Déjà Vu (and any related agreements), to determine, first, whether the relationships defined by those agreements meet the FTC definition of a franchise, and if so, whether the terms of the agreements establish affiliation between the Plaintiffs and Déjà Vu. *Id*. ¶ 30. If they are affiliated, then before the SBA could authorize EIDL loans to the Plaintiffs, Déjà Vu would have to execute addenda agreeing not to enforce the terms of Plaintiffs' license agreements giving rise to affiliation issues for the duration of their SBA loans. *Id*.

In addition to the issue of affiliation based on franchise agreements, public filings made by each of the Plaintiffs under the laws of the States where they do business, and information contained in their applications for covered EIDL loans, also raise issues of affiliation by common ownership and management under 13 C.F.R. § 121.301(f)(1) and (3). *See id*. ¶¶ 31-32. These issues would also have to be resolved before the SBA could determine whether Plaintiffs qualify as "small" businesses eligible for EIDL loans. *Id*. ¶ 32.

Notwithstanding the questions surrounding Plaintiffs' eligibility, Plaintiffs seek invalidation of § 123.201(f) on the grounds that prohibiting covered EIDL loans for prurient sexual businesses is a "content and viewpoint-based restriction[ ] on speech" that "fail[s] to conform to the constitutional standards regarding obscenity," "violate[s] the doctrine of unconstitutional conditions," and is "unconstitutionally vague" and "overbroad." Am. Compl. ¶ 105 (Count I). They also assert that the SBA's rule violates the Fifth Amendment, because businesses of a prurient sexual nature are treated differently from other entertainment establishments; violates a Fifth Amendment right to "occupational liberty," *id.* ¶ 108 (Count II); and is unauthorized under the CARES Act, *id.* ¶ 111 (Count III).

Based on these claims, Plaintiffs seek a preliminary injunction prohibiting SBA from continuing to apply § 123.201(f) to deny their applications for covered EIDL loans, and directing SBA to grant Plaintiffs' applications for covered EIDL loans if they otherwise qualify for them. Am. Compl., Prayer for Relief, ¶¶ A, E. That request should be denied.

## LEGAL STANDARDS

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right," *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008), and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 996 (9th Cir. 2011). A plaintiff seeking a preliminary injunction must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20; *see also Living Well Med. Clinic, Inc. v. Becerra*, 901 F.3d 1168, 1169 (9th Cir. 2018).

"A plaintiff must make a showing *on all four prongs* to obtain a preliminary injunction." *Living Well Med. Clinic*, 901 F.3d at 1169 (cleaned up) (citation omitted). The last two factors "merge," however, "when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Supreme Court has also admonished that a preliminary injunction cannot issue on the basis of speculative or possible injury. *See Flexible Lifeline Sys.*, 654 F.3d at 996-97 (noting that under *Winter* a "possibility standard" of harm is "too lenient" (citation omitted)); *see*

*also Herb Reed Enter., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

Rather, the movant must establish that irreparable harm is "*likely* in the absence of an injunction." *Winter*, 555 U.S at 22. Plaintiffs have not carried these heavy burdens.

**ARGUMENT**

## I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

Plaintiffs' request for preliminary injunctive relief must be denied because they have not shown that they are likely to succeed on the merits of their claims. *Winter*, 555 U.S. at 20; *Living Well. Med. Clinic*, 901 F.3d at 1169. This is so for numerous reasons.

### A. Plaintiffs Lack Article III Standing, Because They Cannot Show That Their Claimed Injuries Will Likely Be Redressed by the Relief Sought.

First, Plaintiffs are unlikely to succeed on the merits of their claims for the threshold reason that they have not established their standing. Specifically, they cannot show that their injuries are redressable by the injunctive relief they seek. Thus, because a demonstration of standing is "an indispensable part of [a] plaintiff's case," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), Plaintiffs have no likelihood of success on any of their claims.

#### 1. Principles of Article III standing

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "[N]o principle is more fundamental to the judiciary's proper role" under the Constitution's separation of powers. *Id.*. "[A]n essential and unchanging part of the case-or-controversy requirement" is that litigants must have "standing to invoke the authority of a federal court[,]" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006), assuring they have a sufficient "personal stake in the outcome of [a] controversy" as to . . . justify exercise of the court's remedial powers on [their] behalf." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). Standing is, therefore, a "threshold jurisdictional question[,]" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998), determining "the power of the court to entertain the suit," *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To establish Article III standing, a plaintiff must seek relief from an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and

redressable by a favorable ruling." *Amnesty Int'l USA*, 568 U.S. at 409 (citation omitted);

*Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013). A plaintiff must establish each of these elements "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the [same] manner and degree of evidence required at the successive stages of . . . litigation." *Bennett v. Spear*, 520 U.S.154, 167-68 (1997) (citations omitted). "At the preliminary injunction stage, a movant must make a clear showing of each element of standing." *Townley*, 722 F.3d at 1133; *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010).

At issue in this case is the third element, redressability. "To establish redressability, a plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (citation omitted). While a plaintiff "need not demonstrate . . . a guarantee that [its] injuries will be redressed by a favorable decision," the plaintiff still must "show a substantial likelihood that the relief sought would redress the injury[.]" *Id.* (citation omitted). "If, however, a favorable judicial decision would not require the defendant to redress the plaintiff's claimed injury, [then] the plaintiff cannot demonstrate redressability, unless [it] adduces facts to show that the defendant . . . [is] nonetheless likely to provide redress as a result of the decision[.]" *Id.* (citing *Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010)).

> **2.  Plaintiffs cannot establish redressability, because they cannot show that they are likely to be found eligible for EIDL loans as a result of the injunctive relief requested.**

Plaintiffs cannot establish that the relief they seek—an order barring application of § 123.201(f) to deny their EIDL loan requests, Pls.' Notice of Mot. at 1, ECF No. 33—would likely redress their claimed economic injuries. That is so because they cannot show that Defendants are likely to find them eligible for covered EIDL loans as a result of a judicial decision to grant such relief.

As discussed above, and in Mr. Olear's declaration, evidence in the public domain indicates that 14 of the 15 Plaintiffs operate their businesses under license agreements with Déjà Vu Services, Inc., the apparent owner of the Déjà Vu®, Déjà Vu Showgirls®, Little Darlings®, Dream Girls®, and Larry Flynt's Hustler Club® trademarks, and the self-proclaimed "#1 Erotic

Entertainment Chain in the World." *See* Olear Decl. ¶¶ 21-22; https://dejavu.com. Even if the Court were to enjoin reliance on § 123.201(f) to deny these Plaintiffs' loan requests, under SBA regulations the agency still would be required to examine Plaintiffs' license agreements with Déjà Vu to determine if they meet the FTC definition of a franchise. Olear Decl. ¶¶ 28-29.[4] If the SBA concludes they are franchises, then it will have to examine their license agreements (and their related agreements with Déjà Vu) to determine if the agreements grant Déjà Vu such a degree of control over Plaintiffs' operations that they must be considered affiliated with the Déjà Vu franchise organization. *Id.*

In that event, to calculate whether these Plaintiffs meet the CARES Act limit (500 employees) for eligible business entities, the number of each Plaintiff's employees would have to be aggregated with the number of persons employed by Déjà Vu and all of its affiliated establishments. *Id.* ¶ 32. According to Déjà Vu, that number exceeds 10,000 persons, *see* https://www.linkedin.com/company/dejavuservices/about/); Olear Decl. ¶ 29, far beyond the CARES Act limit for EIDL eligibility, 15 U.S.C. § 9009(a)(2)(A).[5] For SBA to calculate each Plaintiff's size without regard to other affiliated businesses in the Déjà Vu franchise system, so that Plaintiffs might qualify for covered EIDL loans, Déjà Vu would have to sign SBA addenda, *see* Olear Decl. ¶ 20, agreements barring enforcement of the terms in Plaintiffs' license agreements that compromise their independence as small businesses, *id.* ¶ 30.

Moreover, all of the Plaintiffs' public filings in the States where they do business, and information contained in their EIDL loan applications, also raise issues, under 13 C.F.R. § 121.301(f)(1) and (3), as to whether they are all affiliated based on common management, and ownership. *See* Olear Decl. ¶¶ 32-33. This issue, and any consequent issue concerning the

[4] It does not matter that Déjà Vu denies that it franchises. *See* https://dejavu.com/faq (answering "No" to the question "Do you franchise?" while acknowledging that it "sometimes license[s] [its] brand names to select operators"). Under the FTC's regulation, if the relationship between a licensor and licensee meets the definition of a franchise, then it is treated as a franchise "whatever it may be called[.]" 16 C.F.R. § 436.1(h); *see also* Olear Decl. ¶ 28. Over time the SBA, during the loan-application process, has found numerous business concerns to be franchises under the FTC's definition, notwithstanding disclaimers such as Déjà Vu's. *Id.*

[5] To determine whether these Plaintiffs, if affiliated, could nonetheless qualify as small businesses under the SBA's usual size standards, SBA would have to examine tax-return information to ascertain the annual receipts of these Plaintiffs and all their affiliates for the past five fiscal years. *See* Olear Decl. ¶ 29 & n.5.

calculation of Plaintiffs' size, also would have to be resolved by the SBA before it could conclude that Plaintiffs are eligible for covered EIDL loans. *Id.* ¶¶ 31, 34-35.

Given these potentially numerous hurdles to Plaintiffs' eligibility for EIDL loans, it cannot be said that a ruling in their favor "would . . . require [Defendants] to redress [their] claimed injur[ies][,]" or even that that Defendants are "nonetheless likely to provide" the redress that Plaintiffs desire. *M.S. v. Brown*, 902 F.3d at 1083. Rather, it remains a matter of speculation whether awarding Plaintiffs the injunctive relief they have asked for would relieve their alleged economic harm, meaning they cannot make the "clear showing" of standing required to contest the validity of § 123.201(f) on any ground. *See id; Townley*, 722 F.3d at 1133. Thus, they cannot show a likelihood of success on any of their claims.

### 3. Alternatively, the Court should hold these proceedings briefly in abeyance pending an SBA review of the affiliation issues among Plaintiffs and Déjà Vu.

Because it is Plaintiffs' burden to make a clear showing of standing before they can obtain preliminary injunctive relief, *Townley*, 722 F.3d at 1133, any doubt about their ability to meet the element of redressability must be resolved against them. *See Munaf*, 553 U.S. at 690 ("A difficult question as to jurisdiction is, of course, no reason to grant a preliminary injunction" because it makes success on the merits "more *unlikely* due to [the] potential impediments to even reaching the merits.") Nevertheless, "[a] federal court always has jurisdiction to determine its own jurisdiction." *In re Bunyan*, 354 F.3d 1149, 1152 (9th Cir. 2004). Therefore, if any question remains concerning Plaintiffs' likelihood of securing EIDL loans in the event of a favorable ruling by this Court, then the Court could hold these proceedings in brief abeyance, pending (1) submission by all Plaintiffs of their license agreements with Déjà Vu (and all related agreements) to the SBA; (2) SBA review of Plaintiffs' agreements, in accordance with the usual loan-application process; and (3) SBA resolution of any questions concerning Plaintiffs' status as franchises, as Déjà Vu affiliates, and their size eligibility for EIDL loans. Concurrently, upon submission by Plaintiffs of necessary documentation concerning the identities of their owners and managing officials, the SBA could also resolve any question of affiliation based on common management and ownership that could impact their EIDL size eligibility.

Proceeding in this fashion would dispel, one way or the other, any doubts about the redressability of Plaintiffs' injuries, and would be consistent with the Court's "inflexible" obligation to establish its jurisdiction "as a threshold matter." *Steel Co.*, 523 U.S. at 94-95.

## B. The CARES Act Does Not Bar Application of § 123.201(f).

Even if Plaintiffs had standing to challenge the application of § 123.201(f) to requests for covered EIDL loans, their claims fail on the merits. Plaintiffs first contend, incorrectly, that the CARES Act, 15 U.S.C. § 9009(b), did not permit the SBA to refuse their loan applications based on regulations such as § 123.201(f). Pls.' Am. Mot. for TRO & Prelim. Inj. ("Pls.' Am. Mot.") at 11-14, ECF No. 33. Taken in context, however, nothing in the plain language of § 9009 prohibits the SBA from relying on § 123.201(f) to deny applications for covered EIDL loans. Plaintiffs' contrary position is flawed, because it views § 9009(b) in isolation, without considering the statutory scheme as a whole. *See Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010).

As Plaintiffs recognize, when a court reviews an agency's interpretation of a statute it is charged with administering, it applies the two-step analytic framework of *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984); *see* Pls.' Am. Mot. at 11-12. At the first step, the court applies ordinary tools of statutory construction to determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842; *see City of Arlington v. FCC*, 569 U.S. 290, 296 (2013). If so, and "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43; *see City of Arlington*, 569 U.S. at 296. If, however, "the statute is silent or ambiguous with respect to the specific issue," then the court proceeds to step two, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843; *see City of Arlington*, 569 U.S. at 296. At this step in the *Chevron* analysis, the "reviewing court must respect the agency's construction of the statute so long as it is permissible." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999).

Section 9009(b) provides that "[d]uring the covered period, *in addition to* small business concerns, private nonprofit organizations, and small agricultural cooperatives, an eligible entity shall be eligible for a loan made under [Section 7(b)(2)[.]" (emphasis added). Plaintiffs argue that under these terms, the "sole eligibility criteri[on]" for a covered EIDL loan is that the applicant be an "eligible entity" defined under 15 U.S.C. § 9009(a)(2), as relevant here, a "business with not more than 500 employees[,]" *id.* § 9009(a)(2)(A); Pls.' Am. Mot. at 12-13. Plaintiffs conclude, therefore, that so long as they qualify as businesses with 500 employees or less, they must be deemed eligible for covered EIDL loans, and the SBA has no authority to impose additional conditions of eligibility on them. *Id.* at 12.

Plaintiffs reach the wrong conclusion, however, because they have made the mistake of attempting to construe § 9009(b) without regard to the other provisions of the statute, or the statutory scheme as a whole. "In making the threshold [determination] under *Chevron,* a reviewing court should not confine itself to examining a particular statutory provision in isolation." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (citation omitted). Rather, to glean the meaning of particular words or phrases in a statute, they "must be read in their context and with a view to their place in the overall statutory scheme. *Id.; see also Diocese of Rochester v. SBA*, 2020 WL 3071603, at *6 (W.D.N.Y. June 10, 2020) (holding that CARES Act does not bar application of SBA eligibility restrictions under the PPP); *Tradeways, Ltd. v. Dep't of the Treasury*, 2020 WL 3447767, at *13 (D. Md. June 24, 2020) (same); *Pharaohs GC, Inc. v. SBA*, 2020 WL 3489404, at *4 (W.D.N.Y. June 26, 2020) (same). When § 9009(b) is considered in proper context, it becomes clear that it is properly understood not as setting forth the exclusive eligibility criteria for covered EIDL loans, but only as temporarily expanding the class of entities to which the SBA is authorized to make EIDL loans under its existing Section 7(b)(2) program.

As discussed, Section 7(b)(2) authorizes SBA to make EIDL loans to three types of entities—"small business concern[s], private nonprofit organization[s], [and] small agricultural cooperative[s]"—as the agency "may determine to be necessary or appropriate[.]" 15 U.S.C. § 636(b)(2). In exercising this authority the SBA is further empowered to make rules and

regulations and establish general policies regarding the granting and denial of loan applications as it deems necessary or desirable in the public interest. *Id.* §§ 633(d), 634(b)(6), (7). Pursuant to this broad grant of policymaking authority, the SBA has determined that it is not appropriate in the public interest to make EIDL loans to certain types of business entities—those designated in 13 C.F.R. §§ 123.101, 123.201 and 123.301—even though they may fall within the three broad categories, small business concerns, private nonprofit organizations, and small agricultural cooperatives, to which the SBA is authorized to make such loans under Section 7(b)(2). Within this pre-existing statutory and regulatory setting, § 9009(b) provides that "in addition to" the three categories of authorized business entities under Section 7(b)(2), "eligible entities" defined under § 9009(a)(2) shall also be eligible for covered EIDL loans "under [Section 7(b)(2).]"

Thus, to provide for covered EIDL loans under the CARES Act, Congress engrafted temporary loan-making authority onto the SBA's existing authority under Section 7(b)(2). Congress is presumed to be aware of existing law and regulatory practice when it passes legislation of this kind. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990); *United States v. Vallee*, 677 F.3d 1263, 1265 (9th Cir. 2012); *United States v. Wilson*, 290 F.3d 347, 357 (D.C. Cir. 2002). Yet § 9009 gives no indication that Congress, in temporarily expanding the roster of entities to which the SBA is authorized to make EIDL loans, also meant to prohibit enforcement of longstanding conditions that the SBA has placed on eligibility for those loans. *See Diocese of Rochester*, 2020 WL 3061603, at * 6 (reaching similar conclusion regarding eligibility under the PPP); *Tradeways*, 2020 WL 3447677, at *13 (same); *Defy Ventures, Inc. v. SBA*, 2020 WL 3546873, at *8 (D. Md. June 29, 2020) (same). When viewed in context, the statute simply instructs that certain defined entities shall be eligible for EIDL loans "in addition to" those businesses named in Section 7(b)(2), and the most natural reading is that these additional entities named in the CARES Act should be eligible for such loans under the same terms and conditions as those named in Section 7(b)(2) historically have been.

That conclusion also follows from other provisions of § 9009, which Plaintiffs ignore, but which "clearly anticipate the existence of additional eligibility criteria." *Diocese of Rochester*, 2020 WL 3071603, at *7; *Tradeways*, 2020 WL 3447767, at *13; *Defy Ventures*, 2020 WL

3546873, at *6.  For purposes of covered EIDL loans, § 9009(c) expressly waives the requirement of Section 7(b)(2) that an applicant be unable to obtain credit elsewhere, and, for loans of $200,000 or less, waives the SBA's requirement that the borrower's principals personally guarantee the loan.  15 U.S.C. § 9009(c)(1), (3).  *See id.* § 636(b)(2) (flush matter following subparagraph (E)); SOP 50 30 9 at 117; *supra* at 4.  If Plaintiffs were correct, that § 9009(b) established the sole eligibility criteria for covered EIDL loans, then the provisions of § 9009(c) would have been unnecessary, for Congress would have already made clear that the SBA may not impose any conditions on the eligibility of businesses other than the size limits of § 9009(a)(2)(A).  But it is one "of the most basic" canons of statutory interpretation that "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up); *see also Diocese of Rochester*, 2020 WL 3071603, at *7; *Pharaohs GC*, 2020 WL at 3489404, at *4.  Plaintiffs' reading of the statute is inconsistent with that most basic canon, and should therefore be rejected.

Plaintiffs' reading of § 9009(b) also cannot be squared with § 9009(a)(2)(C), which includes on the statute's list of eligible entities "cooperative[s] with not more than 500 employees[.]"  15 U.S.C. § 9009(a)(2)(C).  Cooperatives are one category of business entities excluded from EIDL loan eligibility under the SBA's regulations.  *See* 13 C.F.R. § 123.301(c).  Thus, § 9009(a)(2)(C) would also be rendered superfluous if § 9009(a)(2)(A) were construed as mandating eligibility for all business concerns (with 500 or fewer employees) excluded under the SBA's regulations.  And the fact that Congress expressly singled out cooperatives for inclusion as eligible entities under § 9009(a)(2) stands as further evidence that Congress did not tacitly mean to include other categories of businesses denied EIDL loan eligibility by §§ 123.101, 123.201, and 123.301, including businesses that present live performances of a prurient sexual nature.  *See Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) ("The doctrine of *expressio unius est exclusio alterius* as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions.").

Moreover, construing § 9009(b) to mean that the SBA must make covered EIDL loans to *any* business meeting the size requirement of § 9009(a)(2)(A) would lead to strange and anomalous results. As the Supreme Court has admonished, the meaning of the word "any" can differ from its usual understanding if "strange and indeterminate results" would emerge from adopting the ordinary meaning of "any" in a given context. *Nixon v. Mo. Mun. League,* 541 U.S. 125, 132-33 (2004); *see also Small v. United States*, 544 U.S. 385, 388-94 (2005) (holding that the term "any court," as used in 18 U.S.C. § 922(g)(1), was limited to domestic courts because, *inter alia*, including foreign courts would create anomalies that Congress could not have intended).

Plaintiffs' reading of the CARES Act would lead to just such irregular and abnormal results. Under Plaintiffs' interpretation, no category of business denied eligibility under §§ 123.101, 123.201, and 123.301, could be denied eligibility for covered EIDL loans, meaning that in one fell swoop Congress also purportedly compelled the SBA to make loans available to businesses "engaged in . . . illegal activit[ies,]" businesses owned by persons who are "presently incarcerated," businesses owned by state and local governments, and businesses "[p]rimarily engaged in political or lobbying activities." *See* 13 C.F.R. §§ 123.101(i), 123.201(d), (e), 123.301(h); *Pharaohs GC*, 2020 WL 3489404, at *5 (refusing to construe CARES Act to compel PPP eligibility for "drug conspiracies"); *AAPC*, 2020 WL 1935525, at *2 (noting longstanding U.S. Government policy against use of Federal funds "for lobbying or political activities"). There is no basis in § 9009(b) for concluding that Congress found it necessary or appropriate in the public interest to compel the SBA to make dramatic departures from the Government's longstanding policies against financial assistance to businesses falling into these categories. *See Whitman v. American Trucking Assocs.*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."); *Jones v. United States*, 526 U.S. 227, 234 (1999) ("Congress is unlikely to intend any radical departures from past practice without making a point of saying so."); *Diocese of Rochester*, 2020 WL 3071603, at *7 (reaching same conclusion regarding the PPP); *Tradeways*, 2020 WL 3447767, at *13 (same).

In support of their position Plaintiffs cite *DV Diamond Club of Flint, LLC v. SBA*, 2020 WL 2315880 (E.D. Mich. May 11, 2020) and *Camelot Banquet Rooms, Inc. v. SBA*, 2020 WL 2088637

(E.D. Wis. May 1, 2020), holding that under the CARES Act the SBA cannot rely on 13 C.F.R. § 120.110(p) to deny prurient sexually oriented businesses participation in the PPP. Pls.' Am. Mot. at 7-8. But courts considering the issue since these rulings have expressly rejected the holdings and analyses of *Diamond Club* and *Camelot Banquet Rooms*, for largely the reasons discussed above. *See Diocese of Rochester*, 2020 WL 3071603, at *6-7; *Tradeways*, 2020 WL 3447767, at *12-14; *Pharaohs GC*, 2020 WL 3489404, at *3-5; *Defy Ventures*, 2020 WL 3546873, at *6-9.[6]

Simply put, when appropriately read in context, § 9009(b) merely names additional entities to which the SBA is authorized to make EIDL loans during the period covered by the CARES Act. The terms of the statute offer no support for the conclusion that Congress also meant to eliminate all other requirements for EIDL eligibility apart from size. At a minimum, it would be erroneous to conclude that the CARES Act *unambiguously* compels that interpretation. For all of the reasons already discussed, the meaning of § 9009(b) is at least ambiguous as to whether it prevents the SBA from applying longstanding eligibility requirements to covered EIDL loans. And for those same reasons, the SBA's continued application of its longstanding regulations to requests for covered EIDL loans is at a minimum a *permissible* construction of the statutory language, to which *Chevron* requires a court to defer. *Brown & Williamson*, 529 U.S. at 132; *see also Diocese of Rochester*, 2020 WL 3071603, at *7; *Tradeways*, 2020 WL 3447767, at *14-15; *Pharaohs GC*, 2020 WL 3489404, at *5-6; *Defy Ventures*, 2020 WL 3546873, at *8-9.

**C. Plaintiffs' Arbitrary and Capricious Claim Also Lacks Merit**

Plaintiffs next argue that the SBA failed to meet its obligation under the Administrative Procedure Act to provide a reasoned explanation for its action when it adopted § 123.201(f). Pls.' Am. Mot. at 14-16. This claim, too, is unlikely to succeed on the merits.

---

[6] Plaintiffs also contend that an intent to bar application of longtime SBA conditions on EIDL eligibility can be gleaned from 15 U.S.C. § 9009(e), which allows applicants for covered EIDL loans to request advances of up to $10,000 while their applications are still pending. In Plaintiffs' view, the CARES Act manifests that intent because, whereas EIDL loans under Section 7(b)(2) may be used as working capital for any purpose necessary to carry on the borrower's business or to alleviate specific economic injury, 13 C.F.R. § 123.303, the CARES Act supposedly "tailor[s] the purposes" for which EIDL advances "[can] be used for this particular national emergency[.]" Pls.' Am. Mot. at 13. Even setting aside the transluscent logic of this argument, the premise is wrong. The CARES Act plainly states that "[a]n advance provided under [§ 9009(e)] may be used to address any allowable purpose for a loan made under [Section 7(b)(2)]." 15 U.S.C. § 9009(e)(4). Hence, § 9009(e)(4) offers no support for Plaintiffs' construction of § 9009(b).

So far as prurient sexual businesses are concerned, § 123.201(f) adopts for purposes of Section 7(b)(2) disaster loans the same restriction on eligibility that the SBA had previously adopted under the Section 7(a) general business loan program, 13 C.F.R. § 120.110(p).  *See supra* at 7-8.  When the SBA issued § 123.201(f), it explained that its purpose was "to codify SBA's existing policy of using the same ineligibility criteria for SBA's disaster and business loan programs."  63 Fed. Reg. at 46,643.  "[That] explanation may have been curt, but it surely indicated the determinative reason for the final action taken."  *Camp v. Pitts*, 411 U.S. 138, 143 (1973).  The APA required nothing more under the circumstances.  "[A]n agency reaffirming its long-standing policy need not analyze all aspects of that policy as if adopting it for the first time, but rather must only consider specific objections made to its continuation of that policy." *Atrium Med. Ctr. v. HHS*, 766 F.3d 560, 5668 (6th Cir. 2014) (quoting *Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 176 (2d Cir. 2006)).  SBA was not required to "analyze all aspects" of its long-standing policy concerning loans to pruriently sexual businesses "as if adopting it for the first time" when applying it under Section 7(b)(2).  And Plaintiffs offer no explanation as to why it was unreasonable of the SBA to seek to promote consistency among the terms of eligibility for its various loan programs.[7]

Plaintiffs' arbitrary and capricious claim would still be unlikely to succeed, even if the Court were to conclude that the SBA did not furnish a sufficient explanation for excluding prurient sexual businesses from the Section 7(b)(2) program.  While ordinarily an agency must explain the basis for its decisions when rulemaking, *see Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986); *Motor Vehicle Mfrs. Ass'n of U.S. v. St. Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), the purpose of this requirement is to facilitate judicial review of the agency's decision under the APA.  *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 167–68 (1962)

---

[7] When the SBA earlier adopted its regulation prohibiting Section 7(a) loans to prurient sexual businesses, the agency explained that the rule was "consistent with [the agency's] obligation to direct its limited resources and financial assistance to small businesses in ways which will best accomplish SBA's mission, serve its constituency, and serve the public interest." SBA, *Business Loan Programs*, Proposed Rule, 60 Fed. Reg. 64,356, 64,360 (Dec. 15, 1995). Plaintiffs suggest in passing that this justification, too, was insufficient, Pls.' Am. Mot. at 15-16, but the agency's desire to prioritize the allocation of its limited financial resources so as best to serve the public interest was a "reasonable explanation" that cannot be dismissed as arbitrary and capricious.  *See Pharaohs GC*, 2020 WL 3489404, at *6.

("[F]or the courts to determine whether [an] agency has [exercised its authority within the bounds of its statutory discretion], it must disclose the basis of its order[.]" (internal quotation marks and citation omitted)); *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947) ("If [an] administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable."). Insufficiency of the agency's explanation is not itself a basis on which to find agency action unlawful. Rather, where an agency has not offered a plausible explanation for its decision, the proper course for the court is to remand to the agency for clarification of its reasons, not to "jump[ ] ahead to resolve the merits of the dispute." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 657-58 (2007); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, --- S. Ct. ----, 2020 WL 3271746, at \*9 (U.S. June 18, 2020); *N.W. Coal. for Alts. to Pesticides v. EPA*, 544 F.3d 1043, 1052-53 (9th Cir. 2008).

Accordingly, even if the SBA's explanation for adopting § 123.201(f) in 1998 were found to have fallen short of APA requirements, that conclusion alone would not be a basis for invalidating the rule without first remanding to the SBA for a further explanation of the rule's basis and purpose.

### D.     Plaintiffs' Constitutional Claims Are Also Unlikely to Succeed.

Plaintiffs' litany of First and Fifth Amendment challenges to § 123.201(f), Pls.' Am Mot. at 16-32, also exhibit no likelihood of success, principally for a single reason.

It is fundamental to constitutional jurisprudence that "although government may not place obstacles in the path of a person's exercise" of constitutional freedoms, including "freedom of speech, it need not remove those not of its own creation." *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549-50 (1983) (cleaned up). The Government, therefore, "is not required by the First Amendment to subsidize lobbying" (as held in *Regan*) or any other form of speech, and does not restrict or penalize speech simply because it has "chosen not to pay for [it]." *Id.* at 546 (citing *Cammarano v. United States*, 358 U.S. 498, 513 (1959)). *See also Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that government "is not required to assist others in funding the expression of particular ideas."); *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality) (a "decision not to subsidize the exercise

of a fundamental right does not infringe the right.") (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (government "is not required to subsidize First Amendment rights[.]").

This bedrock principle forecloses Plaintiffs' constitutional claims. As Plaintiffs acknowledge, the economic obstacles to the exercise of their First Amendment freedoms were placed in their path by the COVID-19 pandemic and their State governments' efforts to contain it, *see supra* at 10; those obstacles are not of the Federal Government's creation. *See AAPC*, 2020 WL 1935525, at *3. Thus, the Government has no constitutional obligation to remove them. *Regan*, 461 U.S. at 549-50. For their part, Plaintiffs fail to cite a single precedent (other than the erroneous decision in *Camelot Banquet Room*) holding that the Government must fund or subsidize speech on particular topics, or of particular genres, that it did not wish to promote. Yet that is exactly what they ask this Court to conclude, that the SBA is constitutionally required to make subsidized EIDL loans to support live performances of a prurient sexual nature that the Government has refused to subsidize for at least a quarter century. No argument advanced by Plaintiffs supports that result.

### 1. Section 123.201(f) is not a content- or viewpoint-based restriction on speech.

Plaintiffs first contend that § 123.201(f) must be invalidated as a "content-based restriction[ ] on speech." Pls.' Am. Mot. at 17-19. This claim suffers from numerous fatal defects and has no likelihood of success.

In the first place, § 123.201(f) is not a prohibition or restriction on speech. Like 13 C.F.R. § 120.110(p), it simply embodies SBA policy that the agency will not use federal funds to subsidize businesses of a prurient sexual nature. *See Pharaohs GC*, 2020 WL 3489404, at *6-7; *AAPC*, 2020 WL 1935525 at *5 (holding that an analogous SBA prohibiting loans for businesses engaged in political activities or lobbying "is not a prohibition or restriction on speech"). As explained above, the Supreme Court has held time and again that the Government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See supra* at 24-25 (citing, *inter alia*, *Regan*, 461 U.S. at 546; *Am. Library Ass'n*, 539 U.S. at 212; *Rust*, 500 U.S. at 193). Hence, Plaintiffs' reliance on such cases as *Reed*

*v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (invalidating content-based restriction on posting signs without a permit) and *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816-17 (2000) (striking down statute mandating that adult-oriented cable television channels be fully scrambled or blocked during certain hours) as the touchstones of their analysis, *see* Pls.' Am. Mot. at 17-18, is categorically misplaced.

The controlling principle here, articulated many times by the Supreme Court, is that "government can make content-based distinctions when it subsidizes speech" as opposed to regulating speech. *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188-89 (2007). It has "broad discretion," in fact, "to make content-based judgments in deciding what private speech to make available to the public." *Am. Library Ass'n*, 539 U.S. at 204-05. *See also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998) ("[I]n the subsidy context," the Government may allocate funding "according to criteria that would be impermissible were direct regulation of speech . . . at stake[.]"). Though content-based, the Government's funding choices will be upheld unless they are shown to be "the product of invidious viewpoint discrimination," or "aim[ed] at the suppression of dangerous ideas." *Id.* at 586-87; *Regan*, 461 U.S. at 543-49 ("The case would be different if Congress were to discriminate invidiously in its subsidies" with an "inten[t] to suppress any ideas."). *See also Leathers*, 499 U.S. at 447, 450-51 (1991) ("[D]ifferential taxation of . . . is constitutionally suspect [only] when it threatens to suppress the expression of particular ideas or viewpoints"); *Pharaohs GC*, 2020 WL 3489404, at *7.

Section 123.201(f) is not subject to invalidation under these standards. The policy against loans to businesses of a prurient sexual nature is entirely viewpoint-neutral, and singles out no particular ideas for disfavorable treatment. The rule prohibits federally subsidized loans to these businesses without regard to any ideas they wish to convey, promote, or oppose through the live performances they present (or the lap dances they provide). *See Pharaohs GC*, 2020 WL 3489404, at *7-8; *AAPC*, 2020 WL 1935525 at *5 (SBA policy against loans to political consultants and lobbyists is viewpoint-neutral and does not suppress certain ideas or beliefs).

Plaintiffs nonetheless maintain that § 123.201(f) is impermissibly viewpoint-based, arguing that by denying loans only to those entertainment establishments that present live

performances of a prurient sexual nature, the rule exhibits disagreement with Plaintiffs' "message of eroticism." Pls.' Am. Mot. at 20. This argument fails both factually and legally. As a factual matter, § 123.201(f) would prohibit a loan to a business whose depictions, displays, or performances were pruriently sexual, regardless of whether their intended message was to promote eroticism (say, as a form of female empowerment), or to oppose eroticism (say, as the objectification or sexual subjugation of women). Regardless of the message conveyed, § 123.201(f) even-handedly provides that the SBA will not fund it.

As a legal matter, the argument is foreclosed by Circuit precedent, *PMG Int'l Div. L.L.C. v. Rumsfeld*, 303 F.3d 1163 (9th Cir. 2002). *PMG International* concerned the Military Honor and Decency Act, in which Congress had prohibited the sale or rental on military property of "sexually explicit material." *Id.* at 1165-66. The Act defined "sexually explicit material" to mean audio or video recordings or visual depictions "the dominant theme of which depicts or describes nudity, including sexual or excretory activity or organs, in a lascivious way." *Id.* at 1166. A Department of Defense memorandum defined "lascivious" for purposes of implementing the Act to mean "[l]ewd and intended or designed to elicit a sexual response." *Id.*. In the same fashion as Plaintiffs here, the plaintiffs in *PMG International* argued that the Act was unconstitutionally viewpoint-based, because it "target[ed] the viewpoint that 'the human sexual response is positive, healthy and appropriate for consideration and consumption by the adult public.'" *Id.* at 1171. Agreeing with the Second Circuit in a virtually identical challenge to the Act, *General Media Commc'ns v. Cohen*, 131 F.3d 273 (2d Cir. 1997), the Court of Appeals rejected the plaintiffs' argument, holding that it would "risk eviscerating altogether the line between content and viewpoint." *PMG Int'l*, 303 F.3d at 1171.

So too, here, holding that it targets a "message of eroticism" to deny a loan based on the prurient sexual nature of the entertainment a business presents would eviscerate the same line between content and viewpoint that the Ninth Circuit refused to erase in *PMG International*. *Accord General Media*, 131 F.3d at 282 (rejecting argument that "lasciviousness" should be

conceived of as a viewpoint as "linguistic overreaching"); *Pharaohs GC*, 2020 WL 3489404, at

*7-8 (refusing to construe the identical prurience standard in § 120.110(p) as viewpoint-based).[8]

### 2. Section 123.201(f) is not unconstitutionally overbroad.

Plaintiffs' effort to mount a facial First Amendment overbreadth challenge, Pls.' Am.

Mot. at 21-22, also falls short of the mark.

Generally, to succeed in a facial attack on a law a plaintiff must establish "that no set of

circumstances exists under which [the law] would be valid." *United States v. Salerno,* 481 U.S.

739, 745 (1987). The First Amendment doctrine of overbreadth represents an exception to this

rule, permitting a claimant to which a law might constitutionally be applied nevertheless to

mount a facial challenge to the law where "there is a realistic danger that the statute itself will

significantly compromise recognized First Amendment protections of parties not before the

Court." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 811 (9th Cir. 2013) (citing *Members of City*

*Coun. of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984)).

Even in free-speech cases, however, facial invalidation of a law remains "strong medicine

that is not . . . casually employed," and is "disfavored[.]" *United States v. Williams,* 553 U.S.

285, 293 (2008) (citation omitted); *Wash. State Grange v. Wash. St. Republican Party*, 552 U.S.

442, 450 (2008)). The burden is therefore placed on an overbreadth claimant to demonstrate that

the challenged law "prohibits a substantial amount of protected speech" both "in an absolute

sense" and "relative to the [law's] plainly legitimate sweep." *Williams,* 553 U.S. at 292; *see also*

*Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (explaining that a successful overbreadth

challenge requires "[a] showing that [the] law punishes a 'substantial' amount of protected

speech, 'judged in relation to [its] plainly legitimate sweep'") (quoting *Broadrick v. Oklahoma*,

---

[8] As the court in *Pharaohs GC* observed, the conclusion in *Camelot Banquet Rooms* that
13 C.F.R. § 120.110(p) violates the First Amendment was largely based on its views that
the Government "'had chosen to remove the COVID-19 obstacle from the path of nearly every other
small business in the United States,'" and that nude dancing "'inherently conveys a specific
message.'" 2020 WL 3489404, at *7-8 (quoting *Camelot Banquet Rooms*, 2020 WL 2088637,
at *8, 10). But as further observed in *Pharaohs GC*, § 120.110(p) does not single out adult-
entertainment establishments for unfavorable treatment, but excludes "more than a dozen types
of businesses. *Id.* at *7. The same is true of 13 C.F.R. §§ 123.101, 123.201, and 123.301.
Moreover, as in *Pharaohs GC*, the reasoning in *Camelot Banquet Rooms* that "nude dancing
inherently conveys a specific message" is foreclosed by precedent, *see* 2020 WL 3489404, at *8,
in this case by the Ninth Circuit's decision in *PMG International*.

413 U.S. 601, 615 (1973)).  "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Taxpayers for Vincent*, 466 U.S. at 800.  To prevail on a facial overbreadth challenge a plaintiff "must demonstrate from the text of [the law] *and from actual fact* that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally."  *N.Y. State Club Ass'n v. City of N.Y*, 487 U.S. 1, 14 (1988); *see also Hicks*, 539 U.S. at 122.

Plaintiffs manifestly fail to substantiate an overbreadth claim under these requirements. That is so for at least two reasons.  First, as Defendants have previously explained, section § 123.201(f) does not restrict or prohibit speech; it merely provides that the SBA will not use federal funds to subsidize businesses of a prurient sexual nature.   As also remarked above, the Supreme Court has repeatedly held that the Government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it.  *See supra* at 24-25. Thus, far from "punish[ing]" or "prohibit[ing]" a "substantial amount of protected speech," *Hicks*, 539 U.S. at 118-19, § 123.201(f) does not punish or prohibit protected speech at all.  It is therefore categorically insusceptible to invalidation on overbreadth grounds.

Second, even if an overbreadth challenge to a mere funding restriction such as § 123.201(f) were conceivable, Plaintiffs still would have to demonstrate as a matter of "actual fact" that a substantial number of instances exist in which § 123.201(f) cannot be applied constitutionally, and that the number is substantial both in an absolute sense and in relation to the regulation's legitimate sweep.  *Hicks*, 539 U.S. at 118-19; *N.Y. State Club Ass'n*, 487 U.S. at 14.

Seeking to carry that burden, Plaintiffs assert that casinos regularly present "erotic" entertainment that they assert would fall within § 123.201(f)'s reach.  Pls.' Am. Mot. at 22.  But they offer no information as to how many casinos, compared to adult theaters, present such entertainment, or explain why the Government would be any more constitutionally obligated to subsidize "erotic" entertainment presented at casinos than it is obliged to subsidize the performances offered by Plaintiffs, or show that its failure to do so has chilled casino owners' speech.  *See Taxpayers for Vincent*, 466 U.S. at 801 (rejecting overbreadth claim where there was "nothing in the record to indicate that the [challenged law] will have any different impact on

any third parties' interests in free speech than it has on [the plaintiffs]").  Plaintiffs also

rhetorically ask whether the SBA would deny a loan to the author of *Fifty Shades of Grey*, Pls.'

Am. Mot at 22, but they also do not explain why the SBA would be constitutionally obligated to

subsidize sales of erotic writings, or how its failure to do so chills such expression.[9]

### 3. Section 123.201(f) need not conform to constitutional standards governing prohibitions of obscenity

Plaintiffs next appear to argue that § 123.201(f) violates the First Amendment because

the standard by which it identifies the type of performances, products, services, and presentations

that the SBA will not finance—that is, material of a "prurient sexual nature"—does not "satisfy"

the three-prong test for obscenity articulated in *Miller v. California,* 413 U.S. 15, 24 (1973).

Pls.' Am. Mot. at 23-27.  This argument is baseless.

As held in *Miller*, government has a "legitimate interest in prohibiting the dissemination

or exhibition of obscene material," 413 U.S. at 18, and the *Miller* test sets "the standards which

must be used to identify obscene material that [government] may regulate without infringing on

the First Amendment," *id.* at 20.  As explained *supra*, § 123.201(f) does not "prohibit[ ]" or even

"regulate" speech in any fashion.  It simply embodies a determination by the SBA that it will not

offer federal financial support for certain "sexually oriented" products, services, and activities, a

decision that does not "infring[e] on the First Amendment," *Miller*, 413 U.S. at 20.  *See Am.*

*Library Ass'n*, 539 U.S. at 212; *Rust*, 500 U.S. at 193.  Accordingly, the Constitution did not

require SBA to adopt the *Miller* test when deciding, and describing, which products, services,

and activities it will not finance.  It was free for that purpose to rely instead on the standard it

chose, material of a "prurient sexual nature."

### 4. Section 123.201(f) does not violate the doctrine of unconstitutional conditions

Plaintiffs next argue in passing that § 123.201(f) forces them to "[a]bandon their

chosen form of expression or forgo a government benefit," in violation of the doctrine of

unconstitutional conditions.  Pls.' Am. Mot.  at 27-28.  This argument, too, is meritless.

---

[9] Plaintiffs' self-serving assertion that they have censored their own expression to avoid running afoul of § 123.201(f)'s prurience standard, Pls.' Am. Mot. at 22, is unexplained, unsubstantiated by evidence, and entitled to no weight.

SBA loan programs generally, and covered EIDL loans in particular, represent the exercise of Congress's power under the Spending Clause, U.S. Const. Art. I, § 8, cl. 1. These programs, and the considerable sums of taxpayer money that Congress appropriates to fund them, are a form of government subsidy that makes funds available to small-business concerns affected by officially declared disasters that otherwise could not find credit on reasonable terms.[10]  The Spending Clause gives Congress "broad discretion to tax and spend for the 'general Welfare,'" including the authority "to impose limits on the use of [the] funds" it appropriates for particular programs or activities, "to ensure they are used in the manner Congress intends." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013).  "As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds," even where the condition "may affect the recipient's exercise of its First Amendment rights." *Id.* at 214 (citing *Am. Library Ass'n*, 539 U.S. at 212).  "At the same time, however, … the Government may not deny a benefit to a [party] on a basis that infringes [its] constitutionally protected freedom of speech[.]" *Id.*

The relevant distinction, the Court explained, is between conditions that merely "define the limits of [a] Government spending program" by "specify[ing] the activities the [Government] wants [or does not want] to subsidize"—which are permissible—and conditions that "leverage[ ] federal funding to regulate [recipients'] speech outside the scope of the program"—which are not. *All. for Open Soc'y*, 570 U.S. at 214-17.  *See also Rust*, 500 U.S. at 194, 197.

To illustrate the difference, both *Alliance for Open Society*, 570 U.S. at 215, and *Rust*, 500 U.S. at 197-98, pointed to *Regan*.  There the IRS had denied tax-exempt status to the plaintiff, a non-profit organization, because its intended use of tax-deductible contributions to support its lobbying activities was prohibited by section 501(c)(3) of the Internal Revenue Code. *Regan*, 461 U.S. at 542.  The plaintiff challenged this prohibition as an unconstitutional

---

[10] Covered EIDL loans are undeniably subsidized.  Congress appropriated $10 billion for covered EIDL loans to make disaster recovery funding available to small businesses nationwide to which they would not otherwise have ready access, if at all.  The interest rate on covered EIDL loans is capped at four percent, collateral requirements are waived for loans of $25,000 or less, and the CARES Act waives the SBA's personal guarantee requirement for loans up to $200,000.  *See supra* at 4, 9.  Thus the Act makes these loans far less expensive to small-business borrowers than market-rate loans would be.

condition imposed on its receipt of tax-deductible contributions from donors. *Id.* at 545. The Court had no difficulty rejecting this claim. *See id.* at 545-46. Treating the tax-deductibility of contributions as "similar to cash grants," the Court concluded that the plaintiff could continue to receive tax-deductible contributions for its non-lobbying activities by forming an affiliated tax-exempt entity, under section 501(c)(4) of the Code, that would be permitted to conduct lobbying activities using sources of funds other than tax-deductible (that is, federally subsidized) contributions. *Id.* at 544-46. Thus, the plaintiff was not prohibited from using non-subsidized contributions to engage in lobbying, nor denied other government benefits because of its intent to lobby; "Congress ha[d] merely refused to pay for the lobbying out of public monies." *Id.* at 545.

In reaching this conclusion, *Regan* distinguished the precedent on which Plaintiffs rely, *Perry v. Sinderman*, 408 U.S. 593 (1972). *See* 461 U.S. at 545; Pls.' Am. Mot. at 27-28. In *Perry*, the Court concluded that an untenured professor at a state college could not be terminated based on his constitutionally protected expression, holding that government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests[.]" 408 U.S. at 597-98. *Regan* explained, however, that a "mere[ ] refus[al]" to pay for the expression of a private party "out of public monies" does not "fit[ ] the [*Perry*] model." 461 U.S. at 545. Government does "not infringe[ ] any First Amendment rights" within the meaning of *Perry* when it "simply [chooses] not to pay for" a private party's speech. *Id.* at 546.

That is the situation here. Section 123.201(f) does not prohibit businesses of a prurient sexual nature from expressing themselves using their own funds, or deny them benefits "independent of [SBA loans] "on account of [their] intention" to engage in expressive activities. SBA "merely refuse[s] to pay for [these activities] out of [SBA] monies." *Regan*, 461 U.S. at 545. That decision is perfectly constitutional.

That conclusion is reinforced by *American Library Association*, *supra*. The plaintiffs there challenged a federal law that required public libraries receiving federal financial assistance for the purpose of providing Internet access to install filtering software designed to block access to online pornography. *See* 539 U.S. at 198-99. The plurality rejected the contention that Congress had imposed an unconstitutional condition on the libraries' receipt of this federal

assistance.  *Id.* at 210-12.  Congress had not "penalize[d]" libraries that chose not to install filters by denying them other, unrelated federal benefits, and the libraries remained free to offer unfiltered Internet access to their patrons using their own funds, without the benefit of federal aid.  *Id.* at 212.  Congress had simply decided not to subsidize unfiltered Internet access.

Likewise, under § 123.201(f), no small business is denied benefits outside the parameters of SBA lending simply because it engages in prurient sexual activities.  Businesses that wish to conduct these activities are free to do so using their own funds rather than Government-subsidized loans.  What they cannot do is have it both ways, as Plaintiffs insist.  They are not entitled to federal subsidies *and* to use those subsidies to finance activities, even expressive activities, that the Government does not wish to fund, any more than public libraries were entitled both to receive federal subsidies *and* to use those subsidies for unfiltered Internet access that the Government did not wish to pay for.

### 5.    Section 123.201(f) does not impose a prior restraint.

Plaintiffs' reliance on the "prior restraint" doctrine, *see* Pls.' Am. Mot. at 28, is also mistaken.  The "term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation omitted).  But in administering the EIDL loan program, the SBA "does not *forbid*" Plaintiffs from "engag[ing] in any expressive activities in the future, nor does [SBA] require [Plaintiffs] to obtain prior approval for any expressive activities." *Id.* at 550-51.  The Plaintiffs' performers may dance as provocatively as Plaintiffs would like tomorrow "without any risk" that SBA would "impose[]" a "legal impediment to . . . Plaintiffs' ability to engage in any expressive activity [they] choose[]." *Alexander*, 509 U.S. at 551.

Rather, all that § 123.201(f) provides is that Plaintiffs "cannot finance [their] enterprises" with SBA loans, which may present practical challenges because of the COVID-19 crisis, but which certainly is not a "legal impediment" of the sort at issue in the licensing cases on which Plaintiffs rely.  *Compare Alexander*, 509 U.S. at 549-51, *with, e.g.*, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223-24 (1990) (describing municipality's licensing scheme for "sexually

oriented businesses").  Simply put, the SBA's decision that it will not make loans to establishments such as Plaintiffs' is "not a restraint on private speech."  *Cf. Am. Library Ass'n*, 539 U.S. at 209 n.4 (rejecting dissent's "prior restraint" theory because a "library's decision to use filtering software is a collection decision, not a restraint on private speech . . . a public library does not have an obligation to add material to its collection simply because the material is constitutionally protected.").

### 6.    Section 123.201(f) is not impermissibly vague.

Plaintiffs next contend that § 123.201(f) is impermissibly vague.  Pls.' Am. Mot. at 29-31.  This argument, too, is unavailing.

The void-for-vagueness doctrine is a due-process doctrine requiring that a law "give the person of ordinary intelligence a reasonable opportunity to know what is *prohibited*, so that he may act accordingly."  *Id.* at 23 (emphasis added) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).  "[T]he vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."  *United States v. Lanier,* 520 U.S. 259, 266 (1997).  And as Plaintiffs also correctly recite, the doctrine requires greater "precision of *regulation*" in areas touching on First Amendment rights.  *Keyishian v. Bd. of Regents Univ.*, 385 U.S. 603-04 (1967) (emphasis added); *see* Pls.' Am. Mot. at 29-30.

However, § 123.201(f) is not a prohibition or regulation of speech that forbids or requires Plaintiffs to do anything.  Rather, it merely sets terms on which the Government will exercise its broad discretion to subsidize speech, or not.  *All. for Open Soc'y*, 570 U.S. at 215; *Rust*, 500 U.S. at 192-94.  Accordingly, the controlling precedent so far as Plaintiffs' vagueness claim is concerned is a case they overlook, *National Endowment for the Arts v. Finley, supra.*  In *Finley,* four performance artists and an artists' association brought suit contesting the validity of a federal law that required the NEA to "tak[e] into consideration general standards of decency and respect for the diverse beliefs and values of the American public" when making grant determinations.  524 U.S. at 572, 576-78.  Congress enacted this "decency and respect" provision following the public controversy that erupted after an NEA grant was used to fund an exhibition

of homoerotic photographs by Robert Mapplethorpe, and another was awarded to photographer Andres Serrano, whose work, entitled "Piss Christ," depicted a crucifix immersed in urine. *Id.* at 574-76. The district court agreed with the plaintiffs' contention that the "decency and respect" criteria were unconstitutionally vague, stating that they "fail[ed] adequately to notify applicants of what is required of them or to circumscribe NEA discretion." *Id.* at 578. The court of appeals agreed with the district court, "[c]oncluding that the decency and respect criteria [were] not susceptible to objective definition." *Id.* at 579. The Supreme Court reversed.

The Court acknowledged that "[u]nder the First and Fifth Amendments, speakers are protected from arbitrary and discriminatory enforcement of vague standards," and that the terms of the "decency and respect" provision were "undeniably opaque." *Id.* at 588. "[I]f they appeared in a criminal statute or regulatory scheme," the Court allowed, "they could raise substantial vagueness concerns." *Id.* Nevertheless, the Court sustained the validity of the "decency and respect" provision because, in the context of a grant program, "[i]t [was] unlikely . . . that speakers [would] be compelled to steer too far clear of any 'forbidden area.'" *Id.* (distinguishing, *inter alia*, *Grayned v. City of Rockford*). And even if some artists "conform[ed] their speech to what they believe[d] to be the decisionmaking criteria in order to acquire funding," "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* *Finley* thus establishes that "the standard set in evaluating statutes related to subsidies for speech is less demanding than the standard for statutes that impose penalties for speech." *Ostrom v. O'Hare*, 160 F. Supp. 2d 486, 496 (E.D.N.Y. 2001); *see also Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 94 (1st Cir. 2004); *United States v. Nat'l Training & Info. Ctr., Inc.*, 532 F. Supp. 2d 946, 953-54 (N.D. Ill. 2007) ("[B]ecause there is no right to government subsidization of free speech, regulations relating to entitlement programs are entitled to greater leniency in their construction.").

Under *Finley's* far less demanding standard, § 123.201(f) is plainly constitutional. Plaintiffs condemn the rule's "prurien[ce]" standard as "fail[ing] to supply intelligible guidelines for businesses" or the "objective guidance needed to avoid arbitrary application." Pls.' Am. Mot. at 30. But the SBA's EIDL loan program is a spending program, not a regulatory program, and

as a standard by which the Government makes funding decisions, "prurient sexual nature" is no more opaque, indeed it is far less so, than the criteria "general standards of decency," and "respect for the diverse beliefs and values of the American public," that the Court readily upheld in *Finley*. And although § 123.201(f) has governed SBA lending decisions under the section 7(a) program for nearly a quarter-century, *see supra* at 14, Plaintiffs offer no proof that they or other speakers like them have steered clear of "forbidden area[s]," or "conform[ed] their speech to what they believe to be the decisionmaking criteria" in order to obtain SBA loans. *See Finley*, 524 U.S. at 588-89.[11]

The Second Circuit's decision in *General Media* reinforces the conclusion that § 123.201(f) is not impermissibly vague. There the plaintiffs also maintained that the Act barring sales or rental of "lascivious" sexually explicit material on military bases was unconstitutionally vague. *General Media*, 131 F.3d at 286. Rejecting that argument, the Second Circuit observed that the "degree of linguistic precision" required of a statute "varies with the nature—and in particular, with the consequences of enforcement—of the statutory provision." *Id*. "[A]bsolute linguistic precision" was not required of the Act, therefore, because the sole "penalty" it applied to the plaintiffs was "losing the government's assistance in (re)selling their wares." *Id*. Noting as well the flexibility accorded to Congress in prescribing rules for the governance and regulation of the armed forces, the court held that many of the terms used in the Act, including "lascivious," had been found to be sufficiently clear for constitutional purposes in the past, and that any remaining ambiguity or subjectivity was constitutionally tolerable under applicable vagueness standards. *Id*. at 286-87. That reasoning is just as apt, if not more so, when applied to a subsidy provision such as § 123.201(f).

---

[11] Plaintiffs argue that § 123.201(f) puts them at risk of perjury charges should they "guess wrong" in answering whether they are businesses of a prurient sexual nature on their EIDL loan applications. Pls.' Am. Mot. at 30. (Apparently none of them had any difficulty answer "yes" to that question.) Perjury is a specific-intent crime requiring that a person "willfully subscribe[ ] as true [a] material matter which he does not believe to be true." 18 U.S.C. § 1621(2); *see United States v. Cook*, 497 F.2d 753, 759 (9th Cir. 1972). It is well established that scienter requirements of that kind can mitigate whatever vagueness concerns a law might present. *See, e.g., United States v. Lee*, 183 F.3d 1029, 1032-33 (9th Cir. 1999).

**E. Section 123.201(f) Easily Meets Fifth Amendment Requirements.**

Finally, Plaintiffs argue that § 123.201(f) violates Fifth Amendment guarantees of Equal Protection and "occupational liberty." Pls.' Am. Mot. at 31-32. Neither contention has merit.

Plaintiffs' Equal Protection argument is foreclosed by *Regan*, and *Ysursa*. In *Regan* the plaintiff, in addition to raising a First Amendment challenge, also "contend[ed] that the equal protection component of the Fifth Amendment render[ed] the [section 501(c)(3)] prohibition against substantial lobbying invalid." 461 U.S. at 546. The Supreme Court disagreed.

First, because prohibiting the use of federally subsidized contributions for lobbying purposes did not violate the First Amendment rights of non-profit organizations, and because the law was not evidently aimed at suppressing particular ideas, the Court concluded that it was subject only to rational-basis review, not strict scrutiny, under the Fifth Amendment. *Id.* at 548-49. The lobbying restriction easily withstood review under this standard, for it was "not irrational" of Congress to decide that the public interest in promoting additional lobbying by charities would not be worth the taxpayer expense. *Id.* at 550; *see also Ysursa*, 555 U.S. at 359-60 ("Given that the State has not infringed the unions' First Amendment rights" by refusing to make public employee payroll deductions for union political activities, "the State need only demonstrate a rational basis to justify [its decision].").

Section 123.201(f) must be upheld on the same grounds. Because the rule restricts only the use of federally subsidized funds, not a firm's own monies, to engage in business of a prurient sexual nature, and because the rule is neither viewpoint-based nor aimed at suppressing particular ideas, the rule is subject only to rational-basis review under the Fifth Amendment. *Regan*, 461 U.S. at 550; *see Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018) ("[R]ational-basis review is the appropriate standard" of review when a law "implicates neither a suspect classification nor a fundamental right."); *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1279–80 (9th Cir. 2004) ("If the classification at issue does not involve fundamental rights or suspect classes, it must be upheld 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'") (quoting *Heller v. Doe*, 509 U.S. 312, 319–20 (1993)).

Rational-basis review "is a paradigm of judicial restraint." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). "[E]qual [P]rotection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices" in areas of social and economic policy. *Id.* at 313. Under the rational-basis test, a court is required to uphold the classification "'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Gallinger*, 898 F.3d at 1017 (quoting *Heller*, 509 U.S. at 320); *see also Beach Communc'ns*, 508 U.S. at 313. "[I]t is entirely irrelevant for constitutional purposes," moreover, "whether the conceived reason for the challenged distinction actually motivated" the adoption of the rule. *Id.* at 315; *see also Jackson Water Works, Inc. v. Pub. Utilities Comm'n of State of Cal.*, 793 F.2d 1090, 1094 (9th Cir. 1986).

Section 123.201(f) easily satisfies these standards. The adverse "secondary effects" associated with sexually oriented adult-entertainment establishments such as Plaintiffs' are well known. They include negative impacts on "crime rates, property values, and the quality of [a] city's neighborhoods," as well as "unlawful public sexual activity, prostitution, and drug trafficking." *Ctr. for Fair Pub. Policy v. Maricopa Cty.*, 336 F.3d 1153, 1164–65, 1166 (9th Cir. 2003); *see also Gammoh v. City of La Habra*, 395 F.3d 1114, 1124 (9th Cir. 2005) (discussing object of city ordinance to protect the public welfare against the negative secondary effects of "adult businesses," including "the protection of the city's retail trade, the prevention of blight in neighborhoods and . . . protecting and preserving the quality of the city's neighborhoods and the city's commercial districts").

Given the SBA's statutory charter to "aid, counsel, assist, and protect . . . the interests of small-business concerns" in order to "strengthen the overall economy of the Nation," 15 U.S.C. § 631(a), it would "not [be] irrational," *Regan*, 461 U.S. at 550, for the agency to decide that its limited financial resources should not be devoted to subsidizing businesses associated with such adverse impacts on the Nation's economic health.[12] Certainly, if it was "not irrational" of the

---

[12] Of course, when a state or local government seeks to *regulate* the operation of adult- or sexually oriented establishments, intermediate "time, place, and manner" scrutiny applies and the government bears the burden of providing evidence that supports a link between the regulated businesses and harmful secondary effects. *See, e.g., City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 433-37 (2002). As explained above, however, in a case involving only a viewpoint-neutral funding restriction such as § 123.201(f), rational-basis scrutiny applies. *Regan*, 461 U.S. at 550. Under that standard of review, the government "has no obligation to produce evidence to sustain the rationality of a [regulatory] classification." *Heller*, 509 U.S. at 320; *Kahawaiolaa*, 386 F.3d at 179-80).

Government in *Regan* to decide it would not be worth the expense to taxpayers of subsidizing lobbying, speech that lies at "the core of the protection afforded by the First Amendment," *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995), then it was permissible for the SBA to decide that it would not be a worthwhile commitment of its finite resources to promote additional speech of a prurient sexual nature, which lies at "the outer ambit of the First Amendment's protection," *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000).

Plaintiffs' "occupational liberty" argument also lacks merit. Whatever the law may have been in 1897, *see* Pls.' Am. Mot. at 32 (citing *Allgeyer v. St. of La.*, 165 U.S. 578 (1897)), the Seventh, Eleventh, and Eighth Circuits agree that "claims alleging the deprivation of occupational liberty are [no longer] cognizable under substantive due process." *Machoka v. City of Collegedale*, 2019 WL 1768861, at *5 (E.D. Tenn. Apr. 22, 2019) (citations omitted). The Ninth Circuit, too, has recognized that a claim sounding in occupational liberty engenders no more than rational-basis review, *see Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 997 (9th Cir. 2007), which § 123.201(f) easily withstands. And even if contemporary due process jurisprudence still recognized a constitutionally protected right of occupational liberty, it would still be the case that a "decision not to subsidize the exercise" of such a right would "not infringe the right." *Rust*, 500 U.S. at 193.

**F. The Small Business Act Provides That "No Injunction" Shall Issue Against the SBA.**

Plaintiffs are also unlikely to succeed on the merits because Congress has restricted the availability of injunctive relief against the SBA. Specifically, the Small Business Act provides that the SBA may

> sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; *but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the [agency] or [its] property[.]*

15 U.S.C. § 634(b)(1) (emphasis added). Many courts have interpreted this statute to preclude injunctive or any similar relief against the SBA. *See, e.g., Enplanar, Inc. v. Marsh,* 11 F.3d 1284, 1290 (5th Cir.1994); *Driskill, Inc. v. Abdnor,* 901 F.2d 383, 386 (4th Cir.1990) (explaining that "courts have no jurisdiction to award injunctive relief against the SBA"). Most recently, in a

case challenging an SBA restriction on eligibility for the PPP, the Fifth Circuit held that "all injunctive relief directed at the SBA is *absolutely prohibited.*"  *In re Hidalgo Cty. Emer. Serv. Found.*, 2020 WL 3411190, at *1-2 & n.2 (5th Cir. June 22, 2020).  Other courts have held, though, that § 634(b)(1) does not necessarily bar injunctions against the SBA in all circumstances.  *See, e.g., Ulstein Mar., Ltd. v. United States,* 833 F.2d 1052, 1056–57 (1st Cir.1987); *Diamond Club*, 2020 WL 2315880, at *7-8; *Camelot Banquet*, 2020 WL 2088637, at *3-4.  It is unnecessary to resolve questions surrounding the statute's reach at this time, however, because Plaintiffs have failed to show that a preliminary injunction is warranted, regardless of whether it is precluded by section 634(b)(1).  Nevertheless, this provision casts still further doubt, if any were needed, on the likelihood of Plaintiffs' success in this case.  *See AAPC*, 2020 WL 1935525 at *5-6; *Tradeways*, 2020 WL 3447767, at *11.

## II.  PLAINTIFFS HAVE NOT ADDUCED EVIDENCE OF IRREPARABLE HARM.

In addition to the reason that Plaintiffs' claims have no prospect of success, Plaintiffs' request for a preliminary injunction must also be denied because they have not presented any evidence, by affidavit or otherwise, of irreparable harm.

Plaintiffs contend that absent relief they "will surely suffer" the "ruination" of their businesses. Pls.' Am. Mot. at 33.  But they do not submit even a scintilla of evidence to substantiate that assertion.  *See id.*  In principle, of course, "'[t]he threat of being driven out of business is sufficient to establish irreparable harm,'" *see id.* (quoting *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 650 F.2d 1470, 1474 (9th Cir. 1985)).  But Plaintiffs cannot ground a claim of irreparable harm "in platitudes[,] rather than evidence" that "'irreparable injury is likely in the absence of an injunction.'"  *Herb Reed Enter.*, 736 F.3d at 1250 (quoting *Winter*, 555 U.S. at 22).  "[M]issing from this record is any such evidence."  *See id.*

Relying on *Elrod v. Burns*, 427 U.S. 347, 373 (1976), Plaintiffs argue alternatively that "[t]he loss of [their] First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Pls.' Am. Mot. at 33.  But that theory of injury pre-supposes that Plaintiffs have established a likelihood of success on the merits of their First Amendment claims.  "[T]he mere assertion of First Amendment rights does not automatically

require a finding of irreparable injury." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir.), *cert. denied*, 140 S. Ct. 658 (2019). For the reasons already discussed, Plaintiffs' constitutional claims have no merit. Thus, Plaintiffs fail under *Elrod,* as well, to demonstrate an injury entitling them to preliminary relief.

## III.    A PRELIMINARY INJUNCTION WOULD BE CONTRARY TO THE PUBLIC INTEREST.

Finally, to obtain preliminary injunctive relief in a case against the Government, Plaintiffs must show that an injunction prohibiting application of § 123.201(f) under the PPP would be in the public interest. *Nken*, 556 U.S. at 435. Plaintiffs cannot make that showing, because Congress has already determined that the SBA should continue to apply the restrictions on eligibility codified under §§ 123.101, 123.201, and 123.301when administering the PPP.

As discussed above, when Congress passed the CARES Act, it authorized the SBA to make covered EIDL loans to certain entities not otherwise eligible for Section 7(b)(2) assistance, but nevertheless decided that those loans should be made available subject to the same pre-existing SBA conditions on eligibility as other Section 7(b)(2) loans. While the CARES Act expressly waived certain eligibility restrictions applied to Section 7(b)(2) loans, *see* 15 U.S.C. § 9009(c), § 123.201(f) was not among them. Thus, Congress already decided that the substantial but not unlimited amount of funding available for covered EIDL loans would be best reserved for small businesses other than the categories of businesses identified by § 123.301, and 123.201, all of which have become accustomed to doing business without access to SBA disaster loans for a quarter century or more.

Plaintiffs offer no justification for disturbing that legislative judgment. They invoke the public interest in free expression and the protection of constitutional rights, Pls.' Am. Mot. at 34, but § 123.201(f) does not interfere with their freedom of speech. *See AAPC*, 2020 WL 1935525 at *6-7; *Pharaohs GC*, 2020 WL 3489404, at *6-8. If the public interest in free expression did not warrant preliminary relief on behalf of political consultants and lobbyists, *see AAPC*, 2020 WL 1935525 at *6-7,* whose speech lies at "the core of the protection afforded by the First Amendment," *see McIntyre*, 514 U.S. at 346, then surely it does not compel relief on behalf of nude "female performance dance entertainment," Am. Compl. ¶ 70, which lies at "the outer

ambit of the First Amendment's protection," *Pap's A.M.*, 529 U.S. at 289. The fact that Plaintiffs happen to engage in expressive activities does not entitle them to overturn Congress's funding choices, or justify Government funding for a "massive international chain of hundreds of adult theaters and bookstores," *see* https://dejavu.com/about, at the expense of small businesses that are just as much in need of the Government's assistance in this time of crisis as are Plaintiffs, if not more so.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for a temporary restraining order and preliminary injunction should be denied.

Dated: July 3, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director

ERIC WOMACK
Assistant Director

       */s/ James J. Gilligan*
       JAMES J. GILLIGAN

Special Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883, Ben Franklin Station
Washington, DC 20044

Telephone:   (202) 514-3358
E-mail:       james.gilligan@usdoj.gov

*Attorneys for the Defendants*