Douglas J. Melton, Bar No. 161353
Shane M. Cahill, Bar No. 227972
LONG & LEVIT LLP
dmelton@longlevit.com
scahill@longlevit.com
465 California Street, 5th Floor
San Francisco, California  94104
Telephone:     (415) 397-2222
Facsimile:     (415) 397-6392

ATTORNEYS FOR ALL PLAINTIFFS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

DEJA VU-SAN FRANCISCO, LLC; BIJOU-CENTURY, LLC; SAN FRANCISCO GARDEN OF EDEN, LLC; DEJA VU SHOWGIRLS OF SAN FRANCISCO, LLC; GOLD CLUB-SF, LLC; DEJA VU COLORADO SPRINGS, INC.; ROUGE PORTLAND, LLC; DEJA VU SPOKANE, INC.; DREAMGIRLS OF LAKE CITY, LLC; DEJA VU SEATTLE, LLC; DEJA VU LAKE CITY, INC.; DREAMGIRLS OF TACOMA, LLC; DREAMGIRLS OF SEATTLE, LLC; SAW ENTERTAINMENT, LTD; AND BT CALIFORNIA, LLC,

Plaintiffs,

v.

UNITED STATES SMALL BUSINESS ADMINISTRATION; JOVITA CARRANZA, ADMINISTRATOR OF THE SMALL BUSINESS ADMINISTRATION, IN HER OFFICIAL CAPACITY; AND THE UNITED STATES OF AMERICA,
Defendants.

Defendants.

Case No. 3:20-cv-03982

**PLAINTIFFS' STATEMENT OF RECENT DECISIONS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Date:           July 30, 2020
Time:          9:30 a.m.
Courtroom:   B – 15th Floor
Judge:         Hon. Magistrate Laurel Beeler

LONG & LEVIT LLP
465 CALIFORNIA STREET,
5TH FLOOR
SAN FRANCISCO,
CALIFORNIA  94104
(415) 397-2222

1       Pending before this Court is Plaintiffs' motion to preliminarily enjoin the Small Business

2   Administrations' ("SBA") regulation precluding Emergency Injury Disaster Loans ("EIDL's")

3   under the Coronavirus Aid Relief, and Economic Security Act (the "CARES Act") to businesses

4   that present entertainment that is of a  "prurient sexual nature" (the "Regulation").  Among other

5   things, Plaintiffs argue that—under Chevron U.S.A., Inc. v. National Resources Defense Council,

6   Inc., 467 U.S. 837 (1984)—the Regulation is invalid because it both exceeds Congressional

7   authority under the CARES Act and it is not the result of reasoned decision-making.  As part of

8   its response, the government argues that this Court should, if it believes Plaintiffs have a

9   colorable argument in regard to their reasoned decision-making claim, provide for a remand to the

10  SBA to potentially permit it to provide a legally and constitutionally justifiable basis for the

11  enactment of the Regulation.  [See SBA Response, ECF 45 at pp 36-37].

12      Subsequent to the filing of the motion for preliminary injunction at issue here, the United

13  States Supreme Court issued its decision in Department of Homeland Security v. Regents of the

14  University of California, 591 U.S. __, 140 S. Ct. 1891 (2020) ("DHS"), that invalidated the

15  administration's rescission of Deferred Action for Childhood Arrivals ("DACA").  Plaintiffs

16  attach that ruling as **Exhibit A** because it directly addresses these issues, and further attach as

17  **Exhibit B** the underlying decision of NAACP v. Trump, 298 F. Supp. 3d 209 (D.D.C. 2018),

18  because it directly addresses the remand issue raised by the SBA here.

19      The Court discusses the Chevron issues in detail at pages 1907-1910 (Exhibit pp. 9-11) of

20  its opinion,  and observes, among other things, that "judicial review of agency action is limited to

21  'the grounds that the agency invoked when it took the action'"; that if those grounds are

22  inadequate a court may remand for the agency to either offer "a fuller explanation of the agency's

23  reasoning *at the time of the agency action*" or to provide new agency action; that consideration of

24  only "contemporaneous explanations for agency action . . . instills confidence that the reasons

25  given are not simply 'convenient litigating position[s]'"; that permitting agencies "to invoke

26  belated justifications, on the other hand, can upset 'the orderly functioning of the process of

27  review' . . . forcing both litigants and courts to chase a moving target";  and that an agency "must

28  defend its actions based on the reasons it gave when it acted.  This is not the case for cutting

LONG & LEVIT LLP
465 CALIFORNIA STREET,
5TH FLOOR
SAN FRANCISCO,
CALIFORNIA  94104
(415) 397-2222

- 2 -                                   CASE NO. 3:20-CV-03982

PLAINTIFFS' STATEMENT OF RECENT DECISIONS

1  corners to allow DHS to rely upon reasons absent from its original decision." (Numerous citations

2  omitted).  Because DHS had not provided such justification, the rescission of DACA was invalid.

3  Id. at 1915.

4         In NAACP, the District Court discusses, after having found that the administration had not

5  justified the rescission of DACA, the appropriate remedy to apply:  choosing between vacatur

6  without remand and remand without vacatur.  298 F. Supp. 3d at 243-45. Noting that "remand

7  without vacatur 'sometimes invites agency indifference'" and that time was of the essence, the

8  court granted partial summary judgment on the Chevron issues while staying its order of vacatur

9  for 90 days "to afford DHS an opportunity to better explain its view that DACA is unlawful." Id.

10  at 245-46, 249.  This remand is also discussed on page 1908 of DHS.

11

12  Date:   July 28, 2020                          LONG & LEVIT LLP

13

14                                                 By: /s/ Douglas J. Melton
15                                                     DOUGLAS J. MELTON
                                                       SHANE M. CAHILL
16                                                     Attorneys for All Plaintiffs

17                                                 SHAFER & ASSOCIATES, P.C.

18
19                                                 By: /s/ Bradley J. Shafer
                                                       BRADLEY J. SHAFER (MI P36604)*
20                                                     brad@bradshaferlaw.com
                                                       MATTHEW J. HOFFER (MI P70495)*
21                                                     matt@bradshaferlaw.com
                                                       ZACHARY M. YOUNGSMA (MI P48148)*
22                                                     zack@bradshaferlaw.com
                                                       SHAFER & ASSOCIATES, P.C.
23                                                     3800 Capital City Boulevard, Suite 2
                                                       Lansing, MI 48906
24                                                     (517) 886-6560
                                                       ADMITTED PRO HAC VICE
25                                                     Attorneys for All Plaintiffs

26

27  Statement of Supplemental Authority 4829-3304-9285 v.1.docx

28

LONG & LEVIT LLP
465 CALIFORNIA STREET,
5TH FLOOR
SAN FRANCISCO,
CALIFORNIA  94104
(415) 397-2222

- 3 -                                           CASE NO. 3:20-CV-03982

PLAINTIFFS' STATEMENT OF RECENT DECISIONS

# EXHIBIT A

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 5 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)
20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

140 S.Ct. 1891
Supreme Court of the United States.

DEPARTMENT OF HOMELAND
SECURITY , et al., Petitioners
v.
REGENTS OF THE UNIVERSITY
OF CALIFORNIA , et al.;
Donald J. Trump, President of the
United States, et al., Petitioners
National Association for the Advancement
of Colored People, et al.; and
Chad Wolf, Acting Secretary of
Homeland Security, et al., Petitioners
v.
Martin Jonathan Batalla Vidal, et al.

No. 18-587, No. 18-588, No. 18-589
|
Argued November 12, 2019
|
Decided June 18, 2020

**Synopsis**
**Background:** In first case, states, state university, county, city, union, and individuals brought action for declaratory and injunctive relief against Department of Homeland Security (DHS) and federal officials, challenging on constitutional grounds, and under the Administrative Procedure Act (APA), the rescission of Deferred Action for Childhood Arrivals (DACA) program, which provided work authorization and eligibility for various federal benefits, as well as protections from removal, for certain unauthorized aliens who had entered the United States as children. The United States District Court for the Northern District of California, William H. Alsup, J., 279 F.Supp.3d 1011, entered preliminary injunction requiring DHS to adjudicate renewal applications for existing DACA recipients and, 298 F.Supp.3d 1304, partially granted government's motion to dismiss for failure to state a claim. Parties appealed. The United States Court of Appeals for the Ninth Circuit, Wardlaw, Circuit Judge, 908 F.3d 476, affirmed. In second case, similar claims were brought by a civil rights organization and individuals. The United States District Court for the District of Columbia, John D. Bates, J., 298 F.Supp.3d 209, granted in part and denied in part plaintiffs' motion for partial summary judgment and defendants' motion to dismiss, and vacated the rescission, and later denied reconsideration, 315 F.Supp.3d 457, but granted

in part a stay of the vacatur pending appeal, 321 F.Supp.3d 143. In third case, similar claims were brought by states, individuals, and nonprofit organization. The United States District Court for the Eastern District of New York, Nicholas G. Garaufis, J., 279 F.Supp.3d 401, granted preliminary injunction, and granted in part and denied in part defendants' motions to dismiss, 291 F.Supp.3d 260 and 295 F.Supp.3d 127. Certiorari was granted in first case, and certiorari before judgment was granted in second and third cases.

**Holdings:** The Supreme Court, Chief Justice Roberts, held that:

rescission of DACA program was arbitrary and capricious, and

plaintiffs failed to state a claim for an equal protection violation.

Judgment in first case vacated in part and reversed in part; judgment in second case affirmed; orders in third case affirmed in part, reversed in part, and vacated in part; all cases remanded.

Justice Sotomayor filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part.

Justice Thomas filed an opinion concurring in the judgment in part and dissenting in part, in which Justices Alito and Gorsuch joined.

Justice Alito filed an opinion concurring in the judgment in part and dissenting in part.

Justice Kavanaugh filed an opinion concurring in the judgment in part and dissenting in part.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Motion to Dismiss; Motion to Dismiss for Failure to State a Claim; Motion for Summary Judgment; Motion for Preliminary Injunction.

*Syllabus*[*]

In 2012, the Department of Homeland Security (DHS) issued a memorandum announcing an immigration relief program known as Deferred Action for Childhood Arrivals (DACA),

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 6 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

which allows certain unauthorized aliens who arrived in the United States as children to apply for a two-year forbearance of removal. Those granted such relief become eligible for work authorization and various federal benefits. Some 700,000 aliens have availed themselves of this opportunity.

Two years later, DHS expanded DACA eligibility and created a related program known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). If implemented, that program would have made 4.3 million parents of U.S. citizens or lawful permanent residents eligible for the same forbearance from removal, work eligibility, and other benefits as DACA recipients. Texas, joined by 25 other States, secured a nationwide preliminary injunction barring implementation of both the DACA expansion and DAPA. The Fifth Circuit upheld the injunction, concluding that the program violated the Immigration and Nationality Act (INA), which carefully defines eligibility for benefits. This Court affirmed by an equally divided vote, and the litigation then continued in the District Court.

In June 2017, following a change in Presidential administrations, DHS rescinded the DAPA Memorandum, citing, among other reasons, the ongoing suit by Texas and new policy priorities. That September, the Attorney General advised Acting Secretary of Homeland Security Elaine C. Duke that DACA shared DAPA's legal flaws and should also be rescinded. The next day, Duke acted on that advice. Taking into consideration the Fifth Circuit and Supreme Court rulings and the Attorney General's letter, Duke decided to terminate the program. She explained that DHS would no longer accept new applications, but that existing DACA recipients whose benefits were set to expire within six months could apply for a two-year renewal. For all other DACA recipients, previously issued grants of relief would expire on their own terms, with no prospect for renewal.

Several groups of plaintiffs challenged Duke's decision to rescind DACA, claiming that it was arbitrary and capricious in violation of the Administrative Procedure Act (APA) and infringed the equal protection guarantee of the Fifth Amendment's Due Process Clause. District Courts in California (*Regents*, No. 18–587), New York ( *Batalla Vidal*, No. 18–589), and the District of Columbia ( *NAACP*, No. 18–588) all ruled for the plaintiffs. Each court rejected the Government's arguments that the claims were unreviewable under the APA and that the INA deprived the courts of jurisdiction. In *Regents* and *Batalla Vidal* , the District Courts further held that the equal protection claims were

adequately alleged, and they entered coextensive nationwide preliminary injunctions based on the conclusion that the plaintiffs were likely to succeed on their APA claims. The District Court in *NAACP* took a different approach. It deferred ruling on the equal protection challenge but granted partial summary judgment to the plaintiffs on their APA claim, finding that the rescission was inadequately explained. The court then stayed its order for 90 days to permit DHS to reissue a memorandum rescinding DACA, this time with a fuller explanation of the conclusion that DACA was unlawful. Two months later, Duke's successor, Secretary Kirstjen M. Nielsen, responded to the court's order. She declined to disturb or replace Duke's rescission decision and instead explained why she thought her predecessor's decision was sound. In addition to reiterating the illegality conclusion, she offered several new justifications for the rescission. The Government moved for the District Court to reconsider in light of this additional explanation, but the court concluded that the new reasoning failed to elaborate meaningfully on the illegality rationale.

The Government appealed the various District Court decisions to the Second, Ninth, and D. C. Circuits, respectively. While those appeals were pending, the Government filed three petitions for certiorari before judgment. Following the Ninth Circuit affirmance in *Regents* , this Court granted certiorari.

*Held*: The judgment in No. 18–587 is vacated in part and reversed in part; the judgment in No. 18–588 is affirmed; the February 13, 2018 order in No. 18–589 is vacated, the November 9, 2017 order is affirmed in part, and the March 29, 2018 order is reversed in part; and all of the cases are remanded.

908 F. 3d 476, vacated in part and reversed in part; No. 18–588, affirmed; and No. 18–589, February 13, 2018 order vacated, November 9, 2017 order affirmed in part, and March 29, 2018 order reversed in part; all cases remanded.

THE CHIEF JUSTICE delivered the opinion of the Court, except as to Part IV, concluding:

1. DHS's rescission decision is reviewable under the APA and is within this Court's jurisdiction. Pp. 1905 – 1908.

(a) The APA's "basic presumption of judicial review" of agency action, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 , can be

EXHIBIT A
Page 2

Case 3:20-cv-03982-LB   Document 57   Filed 07/28/20   Page 7 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

rebutted by showing that the "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2). In *Heckler* v. *Chaney* , the Court held that this narrow exception includes an agency's decision not to institute an enforcement action. 470 U.S. 821, 831–832, 105 S.Ct. 1649, 84 L.Ed.2d 714 . The Government contends that DACA is a general non-enforcement policy equivalent to the individual non-enforcement decision in *Chaney* . But the DACA Memorandum did not merely decline to institute enforcement proceedings; it created a program for conferring affirmative immigration relief. Therefore, unlike the non-enforcement decision in *Chaney* , DACA's creation—and its rescission —is an "action [that] provides a focus for judicial review." *Id.,* at 832, 105 S.Ct. 1649 . In addition, by virtue of receiving deferred action, 700,000 DACA recipients may request work authorization and are eligible for Social Security and Medicare. Access to such benefits is an interest "courts often are called upon to protect." *Ibid.* DACA's rescission is thus subject to review under the APA. Pp. 1905 – 1907.

(b) The two jurisdictional provisions of the INA invoked by the Government do not apply. Title 8 U.S.C. § 1252(b) (9), which bars review of claims arising from "action[s]" or "proceeding[s] brought to remove an alien," is inapplicable where, as here, the parties do not challenge any removal proceedings. And the rescission is not a decision "to commence proceedings, adjudicate cases, or execute removal orders" within the meaning of § 1252(g). Pp. 1906 – 1908.

2. DHS's decision to rescind DACA was arbitrary and capricious under the APA. Pp. 1907 – 1915.

(a) In assessing the rescission, the Government urges the Court to consider not just the contemporaneous explanation offered by Acting Secretary Duke but also the additional reasons supplied by Secretary Nielsen nine months later. Judicial review of agency action, however, is limited to "the grounds that the agency invoked when it took the action." *Michigan* v. *EPA*, 576 U.S. 743, 758, 135 S.Ct. 2699, 192 L.Ed.2d 674 . If those grounds are inadequate, a court may remand for the agency to offer "a fuller explanation of the agency's reasoning *at the time of the agency action*," *Pension Benefit Guaranty Corporation v. LTV Corp.*, 496 U.S. 633, 654, 110 S.Ct. 2668, 110 L.Ed.2d 579 (emphasis added), or to "deal with the problem afresh" by taking *new* agency action, *SEC v. Chenery Corp.*, 332 U.S. 194, 201, 67 S.Ct. 1760, 91 L.Ed. 1995 . Because Secretary Nielsen chose not to take new action, she was limited to elaborating on the agency's original reasons. But her reasoning bears little relationship to that

of her predecessor and consists primarily of impermissible "*post hoc* rationalization." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 . The rule requiring a new decision before considering new reasons is not merely a formality. It serves important administrative law values by promoting agency accountability to the public, instilling confidence that the reasons given are not simply convenient litigating positions, and facilitating orderly review. Each of these values would be markedly undermined if this Court allowed DHS to rely on reasons offered nine months after the rescission and after three different courts had identified flaws in the original explanation. Pp. 1907 – 1910.

(b) Acting Secretary Duke's rescission memorandum failed to consider important aspects of the problem before the agency. Although Duke was bound by the Attorney General's determination that DACA is illegal, see 8 U.S.C. § 1103(a) (1), deciding how best to address that determination involved important policy choices reserved for DHS. Acting Secretary Duke plainly exercised such discretionary authority in winding down the program, but she did not appreciate the full scope of her discretion. The Attorney General concluded that the legal defects in DACA mirrored those that the courts had recognized in DAPA. The Fifth Circuit, the highest court to offer a reasoned opinion on DAPA's legality, found that DAPA violated the INA because it extended eligibility for benefits to a class of unauthorized aliens. But the defining feature of DAPA (and DACA) is DHS's decision to defer removal, and the Fifth Circuit carefully distinguished that forbearance component from the associated benefits eligibility. Eliminating benefits eligibility while continuing forbearance thus remained squarely within Duke's discretion. Yet, rather than addressing forbearance in her decision, Duke treated the Attorney General's conclusion regarding the illegality of benefits as sufficient to rescind both benefits and forbearance, without explanation. That reasoning repeated the error in *Motor Vehicle Manufacturers Association of the United States, Inc.* v. *State Farm* — treating a rationale that applied to only part of a policy as sufficient to rescind the entire policy. 463 U.S. 29, 51, 103 S.Ct. 2856, 77 L.Ed.2d 443 . While DHS was not required to "consider all policy alternatives," *ibid.*, deferred action was "within the ambit of the existing" policy, *ibid.* ; indeed, it was the centerpiece of the policy. In failing to consider the option to retain deferred action, Duke "failed to supply the requisite 'reasoned analysis.' " *Id.,* at 57, 103 S.Ct. 2856 .

Case 3:20-cv-03982-LB   Document 57   Filed 07/28/20   Page 8 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

That omission alone renders Duke's decision arbitrary and capricious, but it was not the only defect. Duke also failed to address whether there was "legitimate reliance" on the DACA Memorandum. *Smiley v. Citibank (South Dakota), N. A.*, 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 . Certain features of the DACA policy may affect the strength of any reliance interests, but those features are for the agency to consider in the first instance. DHS has flexibility in addressing any reliance interests and could have considered various accommodations. While the agency was not required to pursue these accommodations, it was required to assess the existence and strength of any reliance interests, and weigh them against competing policy concerns. Its failure to do so was arbitrary and capricious. Pp. 1909 – 1915.

THE CHIEF JUSTICE, joined by Justice GINSBURG, Justice Breyer, and Justice KAGAN, concluded in Part IV that respondents' claims fail to establish a plausible inference that the rescission was motivated by animus in violation of the equal protection guarantee of the Fifth Amendment. Pp. 1915 – 1916.

ROBERTS, C.J., delivered the opinion of the Court, except as to Part IV. GINSBURG, BREYER, and KAGAN, JJ., joined that opinion in full, and SOTOMAYOR, J., joined as to all but Part IV. SOTOMAYOR, J., filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part. THOMAS, J., filed an opinion concurring in the judgment in part and dissenting in part, in which ALITO and GORSUCH, JJ., joined. ALITO, J., and KAVANAUGH, J., filed opinions concurring in the judgment in part and dissenting in part.

**\*1896** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**Attorneys and Law Firms**

Noel J. Francisco, Solicitor General, Department of Justice, Washington, DC, for Petitioners.

Noel J. Francisco, Solicitor General, Joseph H. Hunt, Assistant Attorney, General, Jeffrey B. Wall, Deputy Solicitor General, Hashim M. Mooppan, Deputy Assistant Attorney, General, Jonathan Y. Ellis, Assistant to the Solicitor, General, Mark B. Stern, Abby C. Wright, Thomas Pulham, Attorneys, Department of Justice, Washington, DC, for Petitioners.

Benjamin M. Eidelson, Cambridge, MA, Lindsay C. Harrison, Ian Heath Gershengorn, Thomas J. Perrelli, Matthew E. Price, Ishan K. Bhabha, Jenner & Block LLP, Washington, DC, for Respondents The Trustees of Princeton University, Microsoft Corporation, and Maria De La Cruz Perales Sanchez.

Joseph M. Sellers, Julie S. Selesnick, Cohen Milstein Sellers, & Toll PLLC, Washington, DC, for Respondents NAACP; American Federation of Teachers, AFL-CIO; and United Food and Commercial Workers International Union, AFL-CIO, CLC.

Bradford M. Berry, NAACP, Baltimore, MD, for Respondent NAACP.

Ramona E. Romero, Wesley Markham, Princeton, NJ, for Respondent The Trustees of Princeton University.

Cynthia L. Randall, Microsoft Corporation, Redmond, WA, for Respondent Microsoft Corporation.

David J. Strom, American Federation, of Teachers, Washington, DC, for Respondent American Federation of Teachers, AFL-CIO.

Peter J. Ford, United Food &, Commercial Workers, International Union, AFL-CIO, CLC, Washington, DC, for Respondent United Food & Commercial Workers International Union, AFL-CIO, CLC.

Xavier Becerra, Attorney General of California, Michael J. Mongan, Solicitor General, Michael L. Newman, Senior Assistant Attorney General, Samuel P. Siegel, Joshua Patashnik, Deputy Solicitors General, Shubhra Shivpuri, James F. Zahradka II, Deputy Attorneys General, San Francisco, CA, Aaron M. Frey, Attorney General of Maine, Susan P. Herman, Deputy Attorney General, Augusta, ME, Brian E. Frosh, Attorney General of Maryland, Steven M. Sullivan, Solicitor General, Leah J. Tulin, Assistant Attorney General, Baltimore, MD, Keith Ellison, Attorney General of Minnesota, Liz Kramer, Solicitor General, Jacob Campion, Assistant Attorney General, St. Paul, MN, for Respondents.

EXHIBIT A
Page 4

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

Theodore J. Boutrous, Jr., Ethan D. Dettmer, Jonathan N. Soleimani, Gibson, Dunn & Crutcher LLP, Mark D. Rosenbaum, Judy London, Public Counsel, Los Angeles, CA, Theodore B. Olson, Stuart F. Delery, Matthew S. Rozen, Andrew J. Wilhelm, Suria M. Bahadue, Gibson, Dunn & Crutcher LLP, Washington, DC, for DACA Recipient Respondents in No. 18-587.

Erwin Chemerinsky, University of California, Berkeley School of Law, Berkeley, CA, Laurence H. Tribe, Harvard Law School, Cambridge, MA, Luis Cortes Romero, Immigrant Advocacy & Litigation, Center, PLLC, Kent, WA, Leah M. Litman, University of Michigan, Law School, Ann Arbor, MI, Michael J. Wishnie, Muneer I. Ahmad, Marisol Orihuela, Karen C. Tumlin, Cooperating Attorney, Jerome N. Frank Legal, Services Organization, New Haven, CT, Amy S. Taylor, Paige Austin, Brooklyn, NY, Trudy S. Rebert, National Immigration Law Center, Jackson Heights, NY, Araceli Martínez-Olguín, Mayra B. Joachin, National Immigration Law Center, Los Angeles, CA, Scott Foletta, Jackson Heights, NY, for DACA Recipient Respondents and, Make the Road New York in No. 18-589.

Stacey M. Leyton, Altshuler Berzon LLP, San Francisco, CA, for Respondents County of, Santa Clara and Service Employees, International Union Local 521 in, No. 18-587.

James R. Williams, Greta S. Hansen, Laura S. Trice, Marcelo Quiñones, Office Of The County Counsel, County of Santa Clara, San Jose, CA, for Respondent County of, Santa Clara in No. 18-587.

Jeffrey M. Davidson, David Watnick, Covington & Burling LLP, San Francisco, CA, Charles F. Robinson, Margaret Wu, Sonya Sanchez, University of California, Office of the General Counsel, Oakland, CA, Robert A. Long, Lanny A. Breuer, Mark H. Lynch, Alexander A. Berengaut, Megan A. Crowley, Ivano M. Ventresca, Covington & Burling LLP, Washington, DC, for The Regents of the University of California, and Janet Napolitano.

Justin T. Berger, Brian Danitz, Tamarah Prevost, Cotchett, Pitre & McCarthy, LLP, Burlingame, CA, for City of San José.

Letitia James, Attorney General of New York, Barbara D. Underwood, Solicitor General, Anisha S. Dasgupta, Deputy Solicitor General, Andrew W. Amend, Assistant Deputy Solicitor General, David S. Frankel, Assistant Solicitor General, New York, NY, for Respondents.

**Opinion**

Chief Justice ROBERTS delivered the opinion of the Court, except as to Part IV.

**\*1901** In the summer of 2012, the Department of Homeland Security (DHS) announced an immigration program known as Deferred Action for Childhood Arrivals, or DACA. That program allows certain unauthorized aliens who entered the United States as children to apply for a two-year forbearance of removal. Those granted such relief are also eligible for work authorization and various federal benefits. Some 700,000 aliens have availed themselves of this opportunity.

Five years later, the Attorney General advised DHS to rescind DACA, based on his conclusion that it was unlawful. The Department's Acting Secretary issued a memorandum terminating the program on that basis. The termination was challenged by affected individuals and third parties who alleged, among other things, that the Acting Secretary had violated the Administrative Procedure Act (APA) by failing to adequately address important factors bearing on her decision. For the reasons that follow, we conclude that the Acting Secretary did violate the APA, and that the rescission must be vacated.

I

A

In June 2012, the Secretary of Homeland Security issued a memorandum announcing an immigration relief program for "certain young people who were brought to this country as children." App. to Pet. for Cert. in No. 18–587, p. 97a (App. to Pet. for Cert.). Known as DACA, the program applies to childhood arrivals who were under age 31 in 2012; have continuously resided here since 2007; are current students, have completed high school, or are honorably discharged veterans; have not been convicted of any serious crimes; and do not threaten national security or public safety. *Id.*, at 98a. DHS concluded that individuals who meet these criteria warrant favorable treatment under the immigration laws because they "lacked the intent to violate the law," are "productive" contributors to our society, and "know only this country as home." *Id.*, at 98a–99a.

EXHIBIT A
Page 5

Case 3:20-cv-03982-LB   Document 57   Filed 07/28/20   Page 10 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)
20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

"[T]o prevent [these] low priority individuals from being removed from the **\*1902** United States," the DACA Memorandum instructs Immigration and Customs Enforcement to "exercise prosecutorial discretion[ ] on an individual basis ... by deferring action for a period of two years, subject to renewal." *Id.*, at 100a. In addition, it directs U.S. Citizenship and Immigration Services (USCIS) to "accept applications to determine whether these individuals qualify for work authorization during this period of deferred action," *id.*, at 101a, as permitted under regulations long predating DACA's creation, see 8 CFR § 274a.12(c)(14) (2012) (permitting work authorization for deferred action recipients who establish "economic necessity"); 46 Fed. Reg. 25080–25081 (1981) (similar). Pursuant to other regulations, deferred action recipients are considered "lawfully present" for purposes of, and therefore eligible to receive, Social Security and Medicare benefits. See 8 CFR § 1.3(a)(4)(vi); 42 CFR § 417.422(h) (2012).

In November 2014, two years after DACA was promulgated, DHS issued a memorandum announcing that it would expand DACA eligibility by removing the age cap, shifting the date-of-entry requirement from 2007 to 2010, and extending the deferred action and work authorization period to three years. App. to Pet. for Cert. 106a–107a. In the same memorandum, DHS created a new, related program known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. That program would have authorized deferred action for up to 4.3 million parents whose children were U.S. citizens or lawful permanent residents. These parents were to enjoy the same forbearance, work eligibility, and other benefits as DACA recipients.

Before the DAPA Memorandum was implemented, 26 States, led by Texas, filed suit in the Southern District of Texas. The States contended that DAPA and the DACA expansion violated the APA's notice and comment requirement, the Immigration and Nationality Act (INA), and the Executive's duty under the Take Care Clause of the Constitution. The District Court found that the States were likely to succeed on the merits of at least one of their claims and entered a nationwide preliminary injunction barring implementation of both DAPA and the DACA expansion. See *Texas v. United States*, 86 F.Supp.3d 591, 677–678 (2015).

A divided panel of the Court of Appeals for the Fifth Circuit affirmed the preliminary injunction. *Texas v. United States*, 809 F.3d 134, 188 (2015). In opposing the injunction, the Government argued that the DAPA Memorandum reflected an unreviewable exercise of the Government's enforcement discretion. The Fifth Circuit majority disagreed. It reasoned that the deferred action described in the DAPA memorandum was "much more than nonenforcement: It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens." *Id.*, at 166. From this, the majority concluded that the creation of the DAPA program was not an unreviewable action "committed to agency discretion by law." *Id.*, at 169 (quoting 5 U.S.C. § 701(a)(2)).

The majority then upheld the injunction on two grounds. It first concluded the States were likely to succeed on their procedural claim that the DAPA Memorandum was a substantive rule that was required to undergo notice and comment. It then held that the APA required DAPA to be set aside because the program was "manifestly contrary" to the INA, which "expressly and carefully provides legal designations allowing defined classes" to "receive the benefits" associated with "lawful presence" and to qualify for work authorization, 809 F.3d at 179–181, 186 (internal **\*1903** quotation marks omitted). Judge King dissented.

This Court affirmed the Fifth Circuit's judgment by an equally divided vote, which meant that no opinion was issued. *United States* v. *Texas*, 579 U.S. ——, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) ( *per curiam* ). For the next year, litigation over DAPA and the DACA expansion continued in the Southern District of Texas, while implementation of those policies remained enjoined.

Then, in June 2017, following a change in Presidential administrations, DHS rescinded the DAPA Memorandum. In explaining that decision, DHS cited the preliminary injunction and ongoing litigation in Texas, the fact that DAPA had never taken effect, and the new administration's immigration enforcement priorities.

Three months later, in September 2017, Attorney General Jefferson B. Sessions III sent a letter to Acting Secretary of Homeland Security Elaine C. Duke, "advis[ing]" that DHS "should rescind" DACA as well. App. 877. Citing the Fifth Circuit's opinion and this Court's equally divided affirmance, the Attorney General concluded that DACA shared the "same legal ... defects that the courts recognized as to DAPA" and was "likely" to meet a similar fate. *Id.*, at 878. "In light of the costs and burdens" that a rescission would "impose[ ] on DHS," the Attorney General urged DHS to "consider an orderly and efficient wind-down process." *Ibid.*

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 11 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

The next day, Duke acted on the Attorney General's advice. In her decision memorandum, Duke summarized the history of the DACA and DAPA programs, the Fifth Circuit opinion and ensuing affirmance, and the contents of the Attorney General's letter. App. to Pet. for Cert. 111a–117a. "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings" and the "letter from the Attorney General," she concluded that the "DACA program should be terminated." *Id.*, at 117a.

Duke then detailed how the program would be wound down: No new applications would be accepted, but DHS would entertain applications for two-year renewals from DACA recipients whose benefits were set to expire within six months. For all other DACA recipients, previously issued grants of deferred action and work authorization would not be revoked but would expire on their own terms, with no prospect for renewal. *Id.*, at 117a–118a.

### B

Within days of Acting Secretary Duke's rescission announcement, multiple groups of plaintiffs ranging from individual DACA recipients and States to the Regents of the University of California and the National Association for the Advancement of Colored People challenged her decision in the U.S. District Courts for the Northern District of California (*Regents*, No. 18–587), the Eastern District of New York ( *Batalla Vidal*, No. 18–589), and the District of Columbia ( *NAACP*, No. 18–588). The relevant claims are that the rescission was arbitrary and capricious in violation of the APA and that it infringed the equal protection guarantee of the Fifth Amendment's Due Process Clause.[1]

All three District Courts ruled for the plaintiffs, albeit at different stages of the proceedings.[2] In doing so, each court rejected **\*1904** the Government's threshold arguments that the claims were unreviewable under the APA and that the INA deprived the court of jurisdiction. 298 F.Supp.3d 209, 223–224, 234–235 (DDC 2018); 279 F.Supp.3d 1011, 1029–1033 (ND Cal. 2018); 295 F.Supp.3d 127, 150, 153–154 (EDNY 2017).

In *Regents* and *Batalla Vidal* , the District Courts held that the equal protection claims were adequately alleged. 298 F.Supp.3d 1304, 1315 (ND Cal. 2018); 291 F.Supp.3d 260, 279 (EDNY 2018). Those courts also entered coextensive nationwide preliminary injunctions, based on the conclusion

that the plaintiffs were likely to succeed on the merits of their claims that the rescission was arbitrary and capricious. These injunctions did not require DHS to accept new applications, but did order the agency to allow DACA recipients to "renew their enrollments." 279 F.Supp.3d at 1048; see 279 F.Supp.3d 401, 437 (EDNY 2018).

In *NAACP* , the D. C. District Court took a different course. In April 2018, it deferred ruling on the equal protection challenge but granted partial summary judgment to the plaintiffs on their APA claim, holding that Acting Secretary Duke's "conclusory statements were insufficient to explain the change in [the agency's] view of DACA's lawfulness." 298 F.Supp.3d at 243. The District Court stayed its order for 90 days to permit DHS to "reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority." *Id.*, at 245.

Two months later, Duke's successor, Secretary Kirstjen M. Nielsen, responded via memorandum. App. to Pet. for Cert. 120a–126a. She explained that, "[h]aving considered the Duke memorandum," she "decline[d] to disturb" the rescission. *Id.*, at 121a. Secretary Nielsen went on to articulate her "understanding" of Duke's memorandum, identifying three reasons why, in Nielsen's estimation, "the decision to rescind the DACA policy was, and remains, sound." *Ibid.* First, she reiterated that, "as the Attorney General concluded, the DACA policy was contrary to law." *Id.*, at 122a. Second, she added that, regardless, the agency had "serious doubts about [DACA's] legality" and, for law enforcement reasons, wanted to avoid "legally questionable" policies. *Id.*, at 123a. Third, she identified multiple policy reasons for rescinding DACA, including (1) the belief that any class-based immigration relief should come from Congress, not through executive non-enforcement; (2) DHS's preference for exercising prosecutorial discretion on "a truly individualized, case-by-case basis"; and (3) the importance of "project[ing] a message" that immigration laws would be enforced against all classes and categories of aliens. *Id.*, at 123a–124a. In her final paragraph, Secretary Nielsen acknowledged the "asserted reliance interests" in DACA's continuation but concluded that they did not "outweigh the questionable legality of the DACA policy and the other reasons" for the rescission discussed in her memorandum. *Id.*, at 125a.

The Government asked the D. C. District Court to revise its prior order in light of the reasons provided by Secretary Nielsen, but the court declined. In the court's view, the

Case 3:20-cv-03982-LB   Document 57   Filed 07/28/20   Page 12 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

new memorandum, which **\*1905** "fail[ed] to elaborate meaningfully" on the agency's illegality rationale, still did not provide an adequate explanation for the September 2017 rescission. 315 F.Supp.3d 457, 460, 473–474 (2018).

The Government appealed the various District Court decisions to the Second, Ninth, and D. C. Circuits, respectively. In November 2018, while those appeals were pending, the Government simultaneously filed three petitions for certiorari before judgment. After the Ninth Circuit affirmed the nationwide injunction in *Regents* , see 908 F.3d 476 (2018), but before rulings from the other two Circuits, we granted the petitions and consolidated the cases for argument. 588 U.S. ——, 139 S.Ct. 2779, 204 L.Ed.2d 1156 (2019). The issues raised here are (1) whether the APA claims are reviewable, (2) if so, whether the rescission was arbitrary and capricious in violation of the APA, and (3) whether the plaintiffs have stated an equal protection claim.

## II

The dispute before the Court is not whether DHS may rescind DACA. All parties agree that it may. The dispute is instead primarily about the procedure the agency followed in doing so.

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). It requires agencies to engage in "reasoned decisionmaking," *Michigan* v. *EPA*, 576 U.S. 743, 750, 135 S.Ct. 2699, 192 L.Ed.2d 674 (2015) (internal quotation marks omitted), and directs that agency actions be "set aside" if they are "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A). Under this "narrow standard of review, ... a court is not to substitute its judgment for that of the agency," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (internal quotation marks omitted), but instead to assess only whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

But before determining whether the rescission was arbitrary and capricious, we must first address the Government's contentions that DHS's decision is unreviewable under the APA and outside this Court's jurisdiction.

### A

The APA establishes a "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.' " *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (quoting § 702). That presumption can be rebutted by a showing that the relevant statute "preclude[s]" review, § 701(a)(1), or that the "agency action is committed to agency discretion by law," § 701(a)(2). The latter exception is at issue here.

To "honor the presumption of review, we have read the exception in § 701(a)(2) quite narrowly," *Weyerhaeuser Co.* v. *United States Fish and Wildlife Serv.*, 586 U.S. ——, ——, 139 S.Ct. 361, 370, 202 L.Ed.2d 269 (2018), confining it to those rare "administrative decision[s] traditionally left to agency discretion," *Lincoln v. Vigil*, 508 U.S. 182, 191, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993). This limited category of unreviewable actions includes an agency's decision not to institute enforcement proceedings, *Heckler v. Chaney*, 470 U.S. 821, 831–832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), and it is on that exception that the Government primarily relies.

**\*1906** In *Chaney* , several death-row inmates petitioned the Food and Drug Administration (FDA) to take enforcement action against two States to prevent their use of certain drugs for lethal injection. The Court held that the FDA's denial of that petition was presumptively unreviewable in light of the well-established "tradition" that "an agency's decision not to prosecute or enforce" is "generally committed to an agency's absolute discretion." *Id.*, at 831, 105 S.Ct. 1649 . We identified a constellation of reasons that underpin this tradition. To start, a non-enforcement decision "often involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," such as "whether the particular enforcement action requested best fits the agency's overall policies." *Ibid.* The decision also mirrors, "to some extent," a prosecutor's decision not to indict, which has "long been regarded as the special province of the Executive Branch." *Id.*, at 832, 105 S.Ct. 1649 . And, as a practical matter, "when an agency refuses to act" there is no action to "provide[ ] a focus for judicial review." *Ibid.*

The Government contends that a general non-enforcement policy is equivalent to the individual non-enforcement decision at issue in *Chaney* . In each case, the Government

EXHIBIT A
Page 8

Case 3:20-cv-03982-LB   Document 57   Filed 07/28/20   Page 13 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

argues, the agency must balance factors peculiarly within its expertise, and does so in a manner akin to a criminal prosecutor. Building on that premise, the Government argues that the rescission of a non-enforcement policy is no different—for purposes of reviewability—from the adoption of that policy. While the rescission may lead to increased enforcement, it does not, by itself, constitute a particular enforcement action. Applying this logic to the facts here, the Government submits that DACA is a non-enforcement policy and that its rescission is therefore unreviewable.

But we need not test this chain of reasoning because DACA is not simply a non-enforcement policy. For starters, the DACA Memorandum did not merely "refus[e] to institute proceedings" against a particular entity or even a particular class. *Ibid.* Instead, it directed USCIS to "establish a clear and efficient process" for identifying individuals who met the enumerated criteria. App. to Pet. for Cert. 100a. Based on this directive, USCIS solicited applications from eligible aliens, instituted a standardized review process, and sent formal notices indicating whether the alien would receive the two-year forbearance. These proceedings are effectively "adjudicat[ions]." *Id.*, at 117a. And the result of these adjudications—DHS's decision to "grant deferred action," Brief for Petitioners 45—is an "affirmative act of approval," the very opposite of a "refus[al] to act," *Chaney*, 470 U.S. at 831–832, 105 S.Ct. 1649 . In short, the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief. The creation of that program—and its rescission—is an "action [that] provides a focus for judicial review." *Id.*, at 832, 105 S.Ct. 1649 .

The benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy. As described above, by virtue of receiving deferred action, the 700,000 DACA recipients may request work authorization and are eligible for Social Security and Medicare. See *supra*, at 1901 . Unlike an agency's refusal to take requested enforcement action, access to these types of benefits is an interest "courts often are called upon to protect." *Chaney*, 470 U.S. at 832, 105 S.Ct. 1649 . See also *Barnhart* v. *Thomas* , 540 U.S. 20, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003) ( reviewing **\*1907** eligibility determination for Social Security benefits).

Because the DACA program is more than a non-enforcement policy, its rescission is subject to review under the APA.

B

The Government also invokes two jurisdictional provisions of the INA as independent bars to review. Neither applies.

Section 1252(b)(9) bars review of claims arising from "action[s]" or "proceeding[s] brought to remove an alien." 66 Stat. 209, as amended, 8 U.S.C. § 1252(b)(9). That targeted language is not aimed at this sort of case. As we have said before, § 1252(b)(9) "does not present a jurisdictional bar" where those bringing suit "are not asking for review of an order of removal," "the decision ... to seek removal," or "the process by which ... removability will be determined." *Jennings* v. *Rodriguez*, 583 U.S. ——, ——–——, 138 S.Ct. 830, 841, 200 L.Ed.2d 122 (2018) (plurality opinion); *id.*, at ——, 138 S.Ct., at 875–876  (BREYER, J., dissenting). And it is certainly not a bar where, as here, the parties are not challenging any removal proceedings.

Section 1252(g) is similarly narrow. That provision limits review of cases "arising from" decisions "to commence proceedings, adjudicate cases, or execute removal orders." § 1252(g). We have previously rejected as "implausible" the Government's suggestion that § 1252(g) covers "all claims arising from deportation proceedings" or imposes "a general jurisdictional limitation." *Reno* v. *American–Arab Anti – Discrimination Comm.*, 525 U.S. 471, 482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999). The rescission, which revokes a deferred action program with associated benefits, is not a decision to "commence proceedings," much less to "adjudicate" a case or "execute" a removal order.

With these preliminary arguments out of the way, we proceed to the merits.

III

A

Deciding whether agency action was adequately explained requires, first, knowing where to look for the agency's explanation. The natural starting point here is the explanation provided by Acting Secretary Duke when she announced the rescission in September 2017. But the Government urges us to go on and consider the June 2018 memorandum submitted by Secretary Nielsen as well. That memo was prepared

after the D. C. District Court vacated the Duke rescission and gave DHS an opportunity to "reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority." 298 F.Supp.3d at 245. According to the Government, the Nielsen Memorandum is properly before us because it was invited by the District Court and reflects the views of the Secretary of Homeland Security— the official responsible for immigration policy. Respondents disagree, arguing that the Nielsen Memorandum, issued nine months after the rescission, impermissibly asserts prudential and policy reasons not relied upon by Duke.

It is a "foundational principle of administrative law" that judicial review of agency action is limited to "the grounds that the agency invoked when it took the action." *Michigan*, 576 U.S. at 758, 135 S.Ct. 2699 . If those grounds are inadequate, a court may remand for the agency to do one of two things: First, the agency can offer "a fuller explanation of the agency's reasoning *at the time of the agency action*." **\*1908** *Pension Benefit Guaranty Corpo ration v. LTV Corp.*, 496 U.S. 633, 654, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (emphasis added). See also *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 5–6 (CADC 2006) (Garland, J.) (permitting an agency to provide an "amplified articulation" of a prior "conclusory" observation (internal quotation marks omitted)). This route has important limitations. When an agency's initial explanation "indicate[s] the determinative reason for the final action taken," the agency may elaborate later on that reason (or reasons) but may not provide new ones. *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (*per curiam*). Alternatively, the agency can "deal with the problem afresh" by taking *new* agency action. *SEC v. Chenery Corp.*, 332 U.S. 194, 201, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947) ( *Chenery II* ). An agency taking this route is not limited to its prior reasons but must comply with the procedural requirements for new agency action.

The District Court's remand thus presented DHS with a choice: rest on the Duke Memorandum while elaborating on its prior reasoning, or issue a new rescission bolstered by new reasons absent from the Duke Memorandum. Secretary Nielsen took the first path. Rather than making a new decision, she "decline[d] to disturb the Duke memorandum's rescission" and instead "provide[d] further explanation" for that action. App. to Pet. for Cert. 121a. Indeed, the Government's subsequent request for reconsideration described the Nielsen Memorandum as "additional explanation for [Duke's] decision" and asked the

District Court to "leave in place [Duke's] September 5, 2017 decision to rescind the DACA policy." Motion to Revise Order in No. 17–cv–1907 etc. (D DC), pp. 2, 19. Contrary to the position of the Government before this Court, and of Justice KAVANAUGH in dissent, *post*, at 1933 (opinion concurring in judgment in part and dissenting in part), the Nielsen Memorandum was by its own terms not a new rule implementing a new policy.

Because Secretary Nielsen chose to elaborate on the reasons for the initial rescission rather than take new administrative action, she was limited to the agency's original reasons, and her explanation "must be viewed critically" to ensure that the rescission is not upheld on the basis of impermissible "*post hoc* rationalization." *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814 . But despite purporting to explain the Duke Memorandum, Secretary Nielsen's reasoning bears little relationship to that of her predecessor. Acting Secretary Duke rested the rescission on the conclusion that DACA is unlawful. Period. See App. to Pet. for Cert. 117a. By contrast, Secretary Nielsen's new memorandum offered three "separate and independently sufficient reasons" for the rescission, *id.*, at 122a, only the first of which is the conclusion that DACA is illegal.

Her second reason is that DACA is, at minimum, legally *questionable* and should be terminated to maintain public confidence in the rule of law and avoid burdensome litigation. No such justification can be found in the Duke Memorandum. Legal uncertainty is, of course, related to illegality. But the two justifications are meaningfully distinct, especially in this context. While an agency might, for one reason or another, choose to do nothing in the face of uncertainty, illegality presumably requires remedial action of some sort.

The policy reasons that Secretary Nielsen cites as a third basis for the rescission are also nowhere to be found in the Duke Memorandum. That document makes no mention of a preference for legislative fixes, the superiority of case-by-case decisionmaking, the importance of sending a message of robust enforcement, or any other policy consideration. Nor are these points **\*1909** included in the legal analysis from the Fifth Circuit and the Attorney General. They can be viewed only as impermissible *post hoc* rationalizations and thus are not properly before us.

The Government, echoed by Justice KAVANAUGH, protests that requiring a new decision before considering Nielsen's new justifications would be "an idle and useless formality."

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 15 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)
20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

*NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (plurality opinion). See also *post*, at 1934 . Procedural requirements can often seem such. But here the rule serves important values of administrative law. Requiring a new decision before considering new reasons promotes "agency accountability," *Bowen v. American Hospital Assn.*, 476 U.S. 610, 643, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986), by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority. Considering only contemporaneous explanations for agency action also instills confidence that the reasons given are not simply "convenient litigating position[s]." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155, 132 S.Ct. 2156, 183 L.Ed.2d 153 (2012) (internal quotation marks omitted). Permitting agencies to invoke belated justifications, on the other hand, can upset "the orderly functioning of the process of review," *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943), forcing both litigants and courts to chase a moving target. Each of these values would be markedly undermined were we to allow DHS to rely on reasons offered nine months after Duke announced the rescission and after three different courts had identified flaws in the original explanation.

Justice KAVANAUGH asserts that this "foundational principle of administrative law," *Michigan*, 576 U.S. at 758, 135 S.Ct. 2699 , actually limits only what lawyers may argue, not what agencies may do. *Post*, at 1934 . While it is true that the Court has often rejected justifications belatedly advanced by advocates, we refer to this as a prohibition on *post hoc* rationalizations, not advocate rationalizations, because the problem is the timing, not the speaker. The functional reasons for requiring contemporaneous explanations apply with equal force regardless whether *post hoc* justifications are raised in court by those appearing on behalf of the agency or by agency officials themselves. See *American Textile Mfrs. Institute, Inc. v. Donovan*, 452 U.S. 490, 539, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981) ("[T]he *post hoc* rationalizations of the agency ... cannot serve as a sufficient predicate for agency action."); *Overton Park*, 401 U.S. at 419, 91 S.Ct. 814 (rejecting "litigation affidavits" from agency officials as "merely '*post hoc*' rationalizations").[3]

Justice Holmes famously wrote that "[m]en must turn square corners when they deal with the Government." *Rock Island, A. & L. R. Co. v. United States*, 254 U.S. 141, 143, 41 S.Ct. 55, 65 L.Ed. 188 (1920). But it is also true, particularly when so much is at stake, that "the Government should turn square corners in dealing with the people." *St. Regis Paper Co. v.*

*United States*, 368 U.S. 208, 229, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961) (Black, J., dissenting). The basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted. This **\*1910** is not the case for cutting corners to allow DHS to rely upon reasons absent from its original decision.

B

We turn, finally, to whether DHS's decision to rescind DACA was arbitrary and capricious. As noted earlier, Acting Secretary Duke's justification for the rescission was succinct: "Taking into consideration" the Fifth Circuit's conclusion that DAPA was unlawful because it conferred benefits in violation of the INA, and the Attorney General's conclusion that DACA was unlawful for the same reason, she concluded —without elaboration—that the "DACA program should be terminated." App. to Pet. for Cert. 117a.[4]

Respondents maintain that this explanation is deficient for three reasons. Their first and second arguments work in tandem, claiming that the Duke Memorandum does not adequately explain the conclusion that DACA is unlawful, and that this conclusion is, in any event, wrong. While those arguments carried the day in the lower courts, in our view they overlook an important constraint on Acting Secretary Duke's decisionmaking authority—she was *bound* by the Attorney General's legal determination.

The same statutory provision that establishes the Secretary of Homeland Security's authority to administer and enforce immigration laws limits that authority, specifying that, with respect to "all questions of law," the determinations of the Attorney General "shall be controlling." 8 U.S.C. § 1103(a) (1). Respondents are aware of this constraint. Indeed they emphasized the point in the reviewability sections of their briefs. But in their merits arguments, respondents never addressed whether or how this unique statutory provision might affect our review. They did not discuss whether Duke was required to explain a legal conclusion that was not hers to make. Nor did they discuss whether the current suits challenging Duke's rescission decision, which everyone agrees was within her legal authority under the INA, are proper vehicles for attacking the Attorney General's legal conclusion.

Because of these gaps in respondents' briefing, we do not evaluate the claims challenging the explanation and

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-03982-LB   Document 57   Filed 07/28/20   Page 16 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)
20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

correctness of the illegality conclusion. Instead we focus our attention on respondents' third argument—that Acting Secretary Duke "failed to consider ... important aspect[s] of the problem" before her. *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

Whether DACA is illegal is, of course, a legal determination, and therefore a question for the Attorney General. But deciding how best to address a finding of illegality moving forward can involve important policy choices, especially when the finding concerns a program with the breadth of DACA. Those policy choices are for DHS.

Acting Secretary Duke plainly exercised such discretionary authority in winding down the program. See App. to Pet. for Cert. 117a–118a (listing the Acting Secretary's decisions on eight transition issues). **\*1911** Among other things, she specified that those DACA recipients whose benefits were set to expire within six months were eligible for two-year renewals. *Ibid.*

But Duke did not appear to appreciate the full scope of her discretion, which picked up where the Attorney General's legal reasoning left off. The Attorney General concluded that "the DACA policy has the same legal ... defects that the courts recognized as to DAPA." App. 878. So, to understand those defects, we look to the Fifth Circuit, the highest court to offer a reasoned opinion on the legality of DAPA. That court described the "core" issue before it as the "Secretary's decision" to grant "eligibility for benefits"— including work authorization, Social Security, and Medicare —to unauthorized aliens on "a class-wide basis." *Texas*, 809 F.3d at 170; see *id.,* at 148, 184. The Fifth Circuit's focus on these benefits was central to every stage of its analysis. See *id.,* at 155 (standing); *id.,* at 163 (zone of interest); *id.,* at 164 (applicability of § 1252(g)); *id.,* at 166 (reviewability); *id.,* at 176–177 (notice and comment); *id.,* at 184 (substantive APA). And the Court ultimately held that DAPA was "manifestly contrary to the INA" precisely because it "would make 4.3 million otherwise removable aliens" eligible for work authorization and public benefits. *Id.,* at 181–182 (internal quotation marks omitted). [5]

But there is more to DAPA (and DACA) than such benefits. The defining feature of deferred action is the decision to defer removal (and to notify the affected alien of that decision). See App. to Pet. for Cert. 99a. And the Fifth Circuit was careful to distinguish that forbearance component from eligibility for

benefits. As it explained, the "challenged portion of DAPA's deferred-action program" was the decision to make DAPA recipients eligible for benefits. See *Texas*, 809 F.3d at 168, and n. 108. The other "[p]art of DAPA," the court noted, "involve[d] the Secretary's decision—at least temporarily— not to enforce the immigration laws as to a class of what he deem[ed] to be low-priority illegal aliens." *Id.,* at 166. Borrowing from this Court's prior description of deferred action, the Fifth Circuit observed that "the states do not challenge the Secretary's decision to 'decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation.' " *Id.,* at 168 (quoting *Reno*, 525 U.S. at 484, 119 S.Ct. 936 ). And the Fifth Circuit underscored that nothing in its decision or the preliminary injunction "requires the Secretary to remove any alien or to alter" the Secretary's class-based "enforcement priorities." *Texas*, 809 F.3d at 166, 169. In other words, the Secretary's forbearance authority was unimpaired.

Acting Secretary Duke recognized that the Fifth Circuit's holding addressed the benefits associated with DAPA. In her memorandum she explained that the Fifth Circuit concluded that DAPA "conflicted with the discretion authorized by Congress" because the INA " 'flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby **\*1912** make them newly eligible for a host of federal and state benefits, including work authorization.' " App. to Pet. for Cert. 114a (quoting *Texas*, 809 F.3d at 184). Duke did not characterize the opinion as one about forbearance.

In short, the Attorney General neither addressed the forbearance policy at the heart of DACA nor compelled DHS to abandon that policy. Thus, removing benefits eligibility while continuing forbearance remained squarely within the discretion of Acting Secretary Duke, who was responsible for "[e]stablishing national immigration enforcement policies and priorities." 116 Stat. 2178, 6 U.S.C. § 202(5). But Duke's memo offers no reason for terminating forbearance. She instead treated the Attorney General's conclusion regarding the illegality of benefits as sufficient to rescind both benefits and forbearance, without explanation.

That reasoning repeated the error we identified in one of our leading modern administrative law cases, *Motor Vehicle Manufacturers Association of the United States, Inc.* v. *State Farm Mutual Automobile Insurance Co.* There, the National Highway Traffic Safety Administration (NHTSA) promulgated a requirement that motor vehicles produced after

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 17 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

1982 be equipped with one of two passive restraints: airbags or automatic seatbelts. 463 U.S. at 37–38, 46, 103 S.Ct. 2856. Four years later, before the requirement went into effect, NHTSA concluded that automatic seatbelts, the restraint of choice for most manufacturers, would not provide effective protection. Based on that premise, NHTSA rescinded the passive restraint requirement in full. *Id.*, at 38, 103 S.Ct. 2856.

We concluded that the total rescission was arbitrary and capricious. As we explained, NHTSA's justification supported only "disallow[ing] compliance by means of" automatic seatbelts. *Id.*, at 47, 103 S.Ct. 2856. It did "not cast doubt" on the "efficacy of airbag technology" or upon "the need for a passive restraint standard." *Ibid.* Given NHTSA's prior judgment that "airbags are an effective and cost-beneficial lifesaving technology," we held that "the mandatory passive restraint rule [could] not be abandoned without any consideration whatsoever of an airbags-only requirement." *Id.*, at 51, 103 S.Ct. 2856.

While the factual setting is different here, the error is the same. Even if it is illegal for DHS to extend work authorization and other benefits to DACA recipients, that conclusion supported only "disallow[ing]" benefits. *Id.*, at 47, 103 S.Ct. 2856. It did "not cast doubt" on the legality of forbearance or upon DHS's original reasons for extending forbearance to childhood arrivals. *Ibid.* Thus, given DHS's earlier judgment that forbearance is "especially justified" for "productive young people" who were brought here as children and "know only this country as home," App. to Pet. for Cert. 98a–99a, the DACA Memorandum could not be rescinded in full "without any consideration whatsoever" of a forbearance-only policy, *State Farm*, 463 U.S. at 51, 103 S.Ct. 2856. [6]

**\*1913** The Government acknowledges that "[d]eferred action coupled with the associated benefits are the two legs upon which the DACA policy stands." Reply Brief 21. It insists, however, that "DHS was not required to consider whether DACA's illegality could be addressed by separating" the two. *Ibid.* According to the Government, "It was not arbitrary and capricious for DHS to view deferred action and its collateral benefits as importantly linked." *Ibid.* Perhaps. But that response misses the point. The fact that there may be a valid reason not to separate deferred action from benefits does not establish that DHS considered that option or that such consideration was unnecessary.

The lead dissent acknowledges that forbearance and benefits are legally distinct and can be decoupled. *Post,* at 1929 – 1930, n. 14 (opinion of THOMAS, J). It contends, however, that we should not "dissect" agency action "piece by piece." *Post,* at 1929. The dissent instead rests on the Attorney General's legal determination—which considered only benefits—"to supply the 'reasoned analysis' " to support rescission of both benefits and forbearance. *Post,* at 1930 (quoting *State Farm,* 463 U.S. at 42, 103 S.Ct. 2856 ). But *State Farm* teaches that when an agency rescinds a prior policy its reasoned analysis must consider the "alternative[s]" that are "within the ambit of the existing [policy]." *Id.,* at 51, 103 S.Ct. 2856. Here forbearance was not simply "within the ambit of the existing [policy]," it was the centerpiece of the policy: DACA, after all, stands for "*Deferred Action* for Childhood Arrivals." App. to Pet. for Cert. 111a (emphasis added). But the rescission memorandum contains no discussion of forbearance or the option of retaining forbearance without benefits. Duke "entirely failed to consider [that] important aspect of the problem." *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856.

That omission alone renders Acting Secretary Duke's decision arbitrary and capricious. But it is not the only defect. Duke also failed to address whether there was "legitimate reliance" on the DACA Memorandum. *Smiley v. Citibank (South Dakota), N. A.,* 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). When an agency changes course, as DHS did here, it must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.' " *Encino Motorcars, LLC v. Navarro,* 579 U.S. ——, ——, 136 S.Ct. 2117, 2126, 195 L.Ed.2d 382 (2016) (quoting *Fox Television,* 556 U.S. at 515, 129 S.Ct. 1800 ). "It would be arbitrary and capricious to ignore such matters." *Id.,* at 515, 129 S.Ct. 1800. Yet that is what the Duke Memorandum did.

For its part, the Government does not contend that Duke considered potential reliance interests; it counters that she did not need to. In the Government's view, shared by the lead dissent, DACA recipients have no "legally cognizable reliance interests" because the DACA Memorandum stated that the program "conferred no substantive rights" and provided benefits only in two-year increments. Reply Brief 16–17; App. to Pet. for Cert. 125a. See also *post,* at 1930 – 1931 (opinion of THOMAS, J). But neither the Government nor the lead dissent cites any legal authority establishing that such features automatically preclude reliance interests, and we are not aware of any. These disclaimers are surely

EXHIBIT A
Page 13

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 18 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

pertinent in considering the strength of any reliance interests, but that consideration must be undertaken by the agency in the first instance, subject to **\*1914** normal APA review. There was no such consideration in the Duke Memorandum.

Respondents and their *amici* assert that there was much for DHS to consider. They stress that, since 2012, DACA recipients have "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance" on the DACA program. Brief for Respondent Regents of Univ. of California et al. in No. 18–587, p. 41 (Brief for Regents). The consequences of the rescission, respondents emphasize, would "radiate outward" to DACA recipients' families, including their 200,000 U.S.-citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them. See *id.*, at 41–42; Brief for Respondent State of New York et al. in No. 18–589, p. 42 (Brief for New York). See also Brief for 143 Businesses as *Amici Curiae* 17 (estimating that hiring and training replacements would cost employers $6.3 billion). In addition, excluding DACA recipients from the lawful labor force may, they tell us, result in the loss of $215 billion in economic activity and an associated $60 billion in federal tax revenue over the next ten years. Brief for Regents 6. Meanwhile, States and local governments could lose $1.25 billion in tax revenue each year. *Ibid.*

These are certainly noteworthy concerns, but they are not necessarily dispositive. To the Government and lead dissent's point, DHS could respond that reliance on forbearance and benefits was unjustified in light of the express limitations in the DACA Memorandum. Or it might conclude that reliance interests in benefits that it views as unlawful are entitled to no or diminished weight. And, even if DHS ultimately concludes that the reliance interests rank as serious, they are but one factor to consider. DHS may determine, in the particular context before it, that other interests and policy concerns outweigh any reliance interests. Making that difficult decision was the agency's job, but the agency failed to do it.

DHS has considerable flexibility in carrying out its responsibility. The wind-down here is a good example of the kind of options available. Acting Secretary Duke authorized DHS to process two-year renewals for those DACA recipients whose benefits were set to expire within six months. But Duke's consideration was solely for the purpose of assisting the agency in dealing with "administrative complexities." App. to Pet. for Cert. 116a–118a. She should have considered whether she had similar flexibility in addressing any reliance interests of DACA recipients. The lead dissent contends that accommodating such interests would be "another exercise of unlawful power," *post*, at 1930 (opinion of THOMAS, J.), but the Government does not make that argument and DHS has already extended benefits for purposes other than reliance, following consultation with the Office of the Attorney General. App. to Pet. for Cert. 116a.

Had Duke considered reliance interests, she might, for example, have considered a broader renewal period based on the need for DACA recipients to reorder their affairs. Alternatively, Duke might have considered more accommodating termination dates for recipients caught in the middle of a time-bounded commitment, to allow them to, say, graduate from their course of study, complete their military service, or finish a medical treatment regimen. Or she might have instructed immigration officials to give salient weight to any reliance interests engendered by DACA when exercising individualized enforcement discretion.

To be clear, DHS was not required to do any of this or to "consider all policy alternatives in reaching [its] decision." **\*1915** *State Farm*, 463 U.S. at 51, 103 S.Ct. 2856 . Agencies are not compelled to explore "every alternative device and thought conceivable by the mind of man." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). But, because DHS was "not writing on a blank slate," *post*, at 1929, n. 14 (opinion of THOMAS, J.), it *was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns.

The lead dissent sees all the foregoing differently. In its view, DACA is illegal, so any actions under DACA are themselves illegal. Such actions, it argues, must cease immediately and the APA should not be construed to impede that result. See *post*, at 1928 – 1930 (opinion of THOMAS, J.).

The dissent is correct that DACA was rescinded because of the Attorney General's illegality determination. See *post*, at 1928 . But nothing about that determination foreclosed or even addressed the options of retaining forbearance or accommodating particular reliance interests. Acting Secretary Duke should have considered those matters but did not. That failure was arbitrary and capricious in violation of the APA.

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 19 of 63
Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)
20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

IV

Lastly, we turn to respondents' claim that the rescission violates the equal protection guarantee of the Fifth Amendment.

The parties dispute the proper framing of this claim. The Government contends that the allegation that the Executive, motivated by animus, ended a program that disproportionately benefits certain ethnic groups is a selective enforcement claim. Such a claim, the Government asserts, is barred by our decision in *Reno* v. *American-Arab Anti-Discrimination Committee* . See 525 U.S. at 488, 119 S.Ct. 936 (holding that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation"). Respondents counter that their claim falls outside the scope of that precedent because they are not challenging individual enforcement proceedings. We need not resolve this debate because, even if the claim is cognizable, the allegations here are insufficient.

To plead animus, a plaintiff must raise a plausible inference that an "invidious discriminatory purpose was a motivating factor" in the relevant decision. *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Possible evidence includes disparate impact on a particular group, "[d]epartures from the normal procedural sequence," and "contemporary statements by members of the decisionmaking body." *Id.*, at 266–268, 97 S.Ct. 555 . Tracking these factors, respondents allege that animus is evidenced by (1) the disparate impact of the rescission on Latinos from Mexico, who represent 78% of DACA recipients; (2) the unusual history behind the rescission; and (3) pre- and post-election statements by President Trump. Brief for New York 54–55.

None of these points, either singly or in concert, establishes a plausible equal protection claim. First, because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. See B. Baker, DHS, Office of Immigration Statistics, Population Estimates, Illegal Alien Population Residing in the United States: January 2015, Table 2 (Dec. 2018), https://www.dhs.gov/sites/default/files/publications/18_1214_PLCY_pops-est-report.pdf. **\*1916** Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds.

Second, there is nothing irregular about the history leading up to the September 2017 rescission. The lower courts concluded that "DACA received reaffirmation by [DHS] as recently as three months before the rescission," 908 F.3d at 519 (quoting 298 F.Supp.3d at 1315), referring to the June 2017 DAPA rescission memo, which stated that DACA would "remain in effect," App. 870. But this reasoning confuses abstention with reaffirmation. The DAPA memo did not address the merits of the DACA policy or its legality. Thus, when the Attorney General later determined that DACA shared DAPA's legal defects, DHS's decision to reevaluate DACA was not a "strange about-face." 908 F.3d at 519. It was a natural response to a newly identified problem.

Finally, the cited statements are unilluminating. The relevant actors were most directly Acting Secretary Duke and the Attorney General. As the *Batalla Vidal* court acknowledged, respondents did not "identif[y] statements by [either] that would give rise to an inference of discriminatory motive." 291 F.Supp.3d at 278. Instead, respondents contend that President Trump made critical statements about Latinos that evince discriminatory intent. But, even as interpreted by respondents, these statements—remote in time and made in unrelated contexts—do not qualify as "contemporary statements" probative of the decision at issue. *Arlington Heights*, 429 U.S. at 268, 97 S.Ct. 555 . Thus, like respondents' other points, the statements fail to raise a plausible inference that the rescission was motivated by animus.

\* \* \*

We do not decide whether DACA or its rescission are sound policies. "The wisdom" of those decisions "is none of our concern." *Chenery II*, 332 U.S. at 207, 67 S.Ct. 1760 . We address only whether the agency complied with the procedural requirement that it provide a reasoned explanation for its action. Here the agency failed to consider the conspicuous issues of whether to retain forbearance and what if anything to do about the hardship to DACA recipients. That dual failure raises doubts about whether the agency appreciated the scope of its discretion or exercised that discretion in a reasonable manner. The appropriate recourse is therefore to remand to DHS so that it may consider the problem anew.

The judgment in *NAACP*, No. 18–588, is affirmed.[7] The judgment in *Regents*, No. 18–587, is vacated in part and reversed in part. And in *Batalla Vidal*, No. 18–589, the February 13, 2018 order granting respondents' motion for a preliminary injunction is vacated, the November 9, 2017 order partially denying the Government's motion to dismiss is affirmed in part, and the March 29, 2018 order partially denying the balance of the Government's motion to dismiss is reversed in part. All three cases are remanded for further proceedings consistent with this opinion.

It is so ordered.


Justice SOTOMAYOR, concurring in part, concurring in the judgment in part, and dissenting in part.

The majority rightly holds that the Department of Homeland Security (DHS) violated the Administrative Procedure Act in rescinding the Deferred Action for Childhood **\*1917** Arrivals (DACA) program. But the Court forecloses any challenge to the rescission under the Equal Protection Clause. I believe that determination is unwarranted on the existing record and premature at this stage of the litigation. I would instead permit respondents to develop their equal protection claims on remand.

Respondents' equal protection challenges come to us in a preliminary posture. All that respondents needed to do at this stage of the litigation was state sufficient facts that would "allo[w a] court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The three courts to evaluate respondents' pleadings below held that they cleared this modest threshold. 908 F.3d 476, 518–520 (CA9 2018) (affirming the District Court's denial of the Government's motion to dismiss); see also *Batalla Vidal v. Nielsen*, 291 F.Supp.3d 260, 274 (EDNY 2018).

I too would permit respondents' claims to proceed on remand. The complaints each set forth particularized facts that plausibly allege discriminatory animus. The plurality disagrees, reasoning that "[n]one of these points, either singly or in concert, establishes a plausible equal protection claim." *Ante*, at 1915 . But it reaches that conclusion by discounting some allegations altogether and by narrowly viewing the rest.

First, the plurality dismisses the statements that President Trump made both before and after he assumed office.

The *Batalla Vidal* complaints catalog then-candidate Trump's declarations that Mexican immigrants are "people that have lots of problems," "the bad ones," and "criminals, drug dealers, [and] rapists." 291 F.Supp.3d at 276 (internal quotation marks omitted). The *Regents* complaints additionally quote President Trump's 2017 statement comparing undocumented immigrants to "animals" responsible for "the drugs, the gangs, the cartels, the crisis of smuggling and trafficking, [and] MS13." 298 F.Supp.3d 1304, 1314 (ND Cal. 2018) (internal quotation marks omitted). The plurality brushes these aside as "unilluminating," "remote in time," and having been "made in unrelated contexts." *Ante*, at 1916 .

But "nothing in our precedent supports [the] blinkered approach" of disregarding any of the campaign statements as remote in time from later-enacted policies. *Trump* v. *Hawaii*, 585 U.S. ——, ——, n. 3, 138 S.Ct. 2392, 2438, n.3, 201 L.Ed.2d 775 (2018) (SOTOMAYOR, J., dissenting). Nor did any of the statements arise in unrelated contexts. They bear on unlawful migration from Mexico—a keystone of President Trump's campaign and a policy priority of his administration—and, according to respondents, were an animating force behind the rescission of DACA. Cf. *ibid.* (noting that Presidential Proclamation No. 9645, 82 Fed. Reg. 45161 (2017), which barred entry of individuals from several Muslim-majority countries, was an outgrowth of the President's campaign statements about Muslims). Taken together, "the words of the President" help to "create the strong perception" that the rescission decision was "contaminated by impermissible discriminatory animus." 585 U.S., at ——, 138 S.Ct., at 2440 (opinion of SOTOMAYOR, J.). This perception provides respondents with grounds to litigate their equal protection claims further.

Next, the plurality minimizes the disproportionate impact of the rescission decision on Latinos after considering this point in isolation. *Ante*, at 1916 ("Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection **\*1918** grounds"). But the impact of the policy decision must be viewed in the context of the President's public statements on and off the campaign trail. At the motion-to-dismiss stage, I would not so readily dismiss the allegation that an executive decision disproportionately harms the same racial group that the President branded as less desirable mere months earlier.

Finally, the plurality finds nothing untoward in the "specific sequence of events leading up to the challenged decision."

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

*Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252, 267, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). I disagree. As late as June 2017, DHS insisted it remained committed to DACA, even while rescinding a related program, the Deferred Action for Parents of Americans and Lawful Permanent Residents. App. 718–720. But a mere three months later, DHS terminated DACA without, as the plurality acknowledges, considering important aspects of the termination. The abrupt change in position plausibly suggests that something other than questions about the legality of DACA motivated the rescission decision. Accordingly, it raises the possibility of a "significant mismatch between the decision ... made and the rationale ... provided." *Department of Commerce* v. *New York*, 588 U.S. ——, ——, 139 S.Ct. 2551, 2575, 204 L.Ed.2d 978 (2019). Only by bypassing context does the plurality conclude otherwise.

* * *

The facts in respondents' complaints create more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 . Whether they ultimately amount to actionable discrimination should be determined only after factual development on remand. Because the Court prematurely disposes of respondents' equal protection claims by overlooking the strength of their complaints, I join all but Part IV of the opinion and do not concur in the corresponding part of the judgment.

Justice THOMAS, with whom Justice ALITO and Justice GORSUCH join, concurring in the judgment in part and dissenting in part.

Between 2001 and 2011, Congress considered over two dozen bills that would have granted lawful status to millions of aliens who were illegally brought to this country as children. Each of those legislative efforts failed. In the wake of this impasse, the Department of Homeland Security (DHS) under President Barack Obama took matters into its own hands. Without any purported delegation of authority from Congress and without undertaking a rulemaking, DHS unilaterally created a program known as Deferred Action for Childhood Arrivals (DACA). The three-page DACA memorandum made it possible for approximately 1.7 million illegal aliens to qualify for temporary lawful presence and certain federal and state benefits. When President Donald Trump took office in 2017, his Acting Secretary of Homeland Security, acting through yet another memorandum, rescinded the DACA memorandum. To state it plainly, the Trump administration rescinded DACA the same way that the Obama administration created it: unilaterally, and through a mere memorandum.

Today the majority makes the mystifying determination that this rescission of DACA was unlawful. In reaching that conclusion, the majority acts as though it is engaging in the routine application of standard principles of administrative law. On the contrary, this is anything but a standard administrative law case.

DHS created DACA during the Obama administration without any statutory authorization and without going through the **\*1919** requisite rulemaking process. As a result, the program was unlawful from its inception. The majority does not even attempt to explain why a court has the authority to scrutinize an agency's policy reasons for rescinding an unlawful program under the arbitrary and capricious microscope. The decision to countermand an unlawful agency action is clearly reasonable. So long as the agency's determination of illegality is sound, our review should be at an end.

Today's decision must be recognized for what it is: an effort to avoid a politically controversial but legally correct decision. The Court could have made clear that the solution respondents seek must come from the Legislative Branch. Instead, the majority has decided to prolong DHS' initial overreach by providing a stopgap measure of its own. In doing so, it has given the green light for future political battles to be fought in this Court rather than where they rightfully belong—the political branches. Such timidity forsakes the Court's duty to apply the law according to neutral principles, and the ripple effects of the majority's error will be felt throughout our system of self-government.

Perhaps even more unfortunately, the majority's holding creates perverse incentives, particularly for outgoing administrations. Under the auspices of today's decision, administrations can bind their successors by unlawfully adopting significant legal changes through Executive Branch agency memoranda. Even if the agency lacked authority to effectuate the changes, the changes cannot be undone by the same agency in a successor administration unless the successor provides sufficient policy justifications to the satisfaction of this Court. In other words, the majority erroneously holds that the agency is not only permitted, but required, to continue administering unlawful programs that

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 22 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

it inherited from a previous administration. I respectfully dissent in part. [1]

## I

## A

In 2012, after more than two dozen attempts by Congress to grant lawful status to aliens who were brought to this country as children, [2] the then-Secretary of Homeland Security Janet Napolitano announced, by memorandum, a new "prosecutorial discretion" policy known as DACA. App. to Pet. for Cert. in No. 18–587, p. 97a. The memorandum directed immigration enforcement officers not to remove "certain **\*1920** young people who were brought to this country as children" that met delineated criteria. *Id.*, at 97a–98a. In the Secretary's view, the program was consistent with "the framework of the existing law." *Id.*, at 101a.

DACA granted a renewable 2-year period of "deferred action" that made approximately 1.7 million otherwise removable aliens eligible to remain in this country temporarily. [3] By granting deferred action, the memorandum also made recipients eligible for certain state and federal benefits, including Medicare and Social Security. See 8 U.S.C. §§ 1611(b)(2)–(4); 8 CFR § 1.3(a)(4)(vi) (2020); 45 CFR § 152.2(4)(vi) (2019). In addition, deferred action enabled the recipients to seek work authorization. 8 U.S.C. § 1324a(h)(3)(B); 8 CFR § 274a.12(c)(14). Despite these changes, the memorandum contradictorily claimed that it "confer[red] no substantive right [or] immigration status," because "[o]nly the Congress, acting through its legislative authority, can confer these rights." App. to Pet. for Cert. in No. 18–587, at 101a.

In 2014, then-Secretary of Homeland Security Jeh Johnson broadened the deferred-action program in yet another brief memorandum. This 2014 memorandum expanded DACA eligibility by extending the deferred-action period to three years and by relaxing other criteria. It also implemented a related program, known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). DAPA allowed unlawfully present parents to obtain deferred action derivatively through their children who were either citizens or lawful permanent residents. Approximately 4.3 million aliens qualified for DAPA and, as with DACA, these individuals would have become eligible for certain federal and state benefits upon the approval of their DAPA applications. See *Texas v. United States*, 809 F.3d 134, 181 (CA5 2015). Nevertheless, the 2014 memorandum repeated the incongruous assertion that these programs "d[id] not confer any form of legal status in this country" and added that deferred action "may be terminated at any time at the agency's discretion." App. to Pet. for Cert. in No. 18–587, at 104a.

## B

Twenty-six States filed suit to enjoin the implementation of these new programs, DAPA and "expanded DACA," maintaining that they violated the Constitution, the Administrative Procedure Act (APA), and the Immigration and Naturalization Act (INA). The States contended that, because the 2014 memorandum allowed aliens to receive deferred action and other benefits, it amounted to a legislative rule that had to comply with the APA's notice and comment procedures. The States also argued that DHS' decision to recategorize an entire class of aliens from "unlawfully present" to "lawfully present" exceeded its statutory authority under the federal immigration laws. According to the States, these defects rendered the 2014 memorandum arbitrary, capricious, or otherwise not in accordance with law.

The District Court preliminarily enjoined DAPA and expanded DACA. The Fifth Circuit affirmed, rejecting DHS' claim that the programs were an exercise of prosecutorial discretion. *Texas*, 809 F.3d at 167, 188. The court concluded that the States were likely to succeed on their claim that the 2014 memorandum was a legislative rule that had to be adopted through notice and comment rulemaking. **\*1921** *Id.*, at 171–178. The court further concluded that the 2014 memorandum was "substantively contrary to law" because the INA did not grant DHS the statutory authority to implement either program. *Id.*, at 170, 178–186.

This Court affirmed the Fifth Circuit's judgment by an equally divided vote. *United States* v. *Texas*, 579 U.S. ——, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) ( *per curiam* ).

## C

The 2014 memorandum was rescinded on June 15, 2017, before taking effect. Shortly after that rescission, several of the plaintiff States sent a letter to then-Attorney General Jefferson Sessions III. They contended that the 2012 DACA

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 23 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

memorandum was also legally defective because, "just like DAPA, DACA unilaterally confers eligibility for ... lawful presence without any statutory authorization from Congress." App. 873. The States wrote that they would amend their complaint to challenge DACA if the administration did not rescind the 2012 memorandum creating DACA by September 5, 2017.

On September 4, then-Attorney General Sessions wrote to then-Acting Secretary of Homeland Security Elaine Duke, advising her to rescind DACA. Sessions stated that, in his legal opinion, DACA took effect "through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." *Id.*, at 877. The letter also stated that DACA was infected with the "same legal ... defects that the courts recognized as to DAPA," *id.*, at 878, and thus DACA would likely be enjoined as well.

Then-Acting Secretary Duke rescinded DACA the next day, also through a memorandum. Her memorandum began by noting that DACA "purported to use deferred action ... to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law." App. to Pet. for Cert. in No. 18–587, at 112a. It described the history of the Fifth Circuit litigation, noting that the court had concluded that DAPA "conflicted with the discretion authorized by Congress" because "the [INA] flatly does not permit the reclassification of millions of illegal aliens as lawfully present." *Id.*, at 114a (internal quotation marks omitted). Finally, the memorandum accepted then-Attorney General Sessions' legal determination that DACA was unlawful for the same reasons as DAPA. See § 1103(a)(1). In light of the legal conclusions reached by the Fifth Circuit and the Attorney General, then-Acting Secretary Duke set forth the procedures for winding down DACA.

These three cases soon followed. In each, respondents claimed, among other things, that DACA's rescission was arbitrary and capricious under the APA. Two District Courts granted a preliminary nationwide injunction, while the third vacated the rescission.

II

" '[A]n agency literally has no power to act ... unless and until Congress confers power upon it.' " *Arlington v. FCC*, 569 U.S. 290, 317, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013) (ROBERTS, C.J., dissenting) (quoting *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986)). When an agency exercises power beyond the bounds of its authority, it acts unlawfully. See, *e.g.*, *SAS Institute Inc.* v. *Iancu*, 584 U.S. ——, ——, n., 138 S.Ct. 1348, 1358, n., 200 L.Ed.2d 695 (2018). The 2012 memorandum **\*1922** creating DACA provides a poignant illustration of ultra vires agency action.

DACA alters how the immigration laws apply to a certain class of aliens. "DACA [recipients] primarily entered the country either by overstaying a visa or by entering without inspection, and the INA instructs that aliens in both classes are removable." *Texas v. United States*, 328 F.Supp.3d 662, 713 (SD Tex. 2018) (footnote omitted). But DACA granted its recipients deferred action, *i.e.*, a decision to "decline to institute [removal] proceedings, terminate [removal] proceedings, or decline to institute a final order of [removal]." *Reno v. American–Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (internal quotation marks omitted). Under other regulations, recipients of deferred action are deemed lawfully present for purposes of certain federal benefits. See *supra*, at 1919 . Thus, DACA in effect created a new exception to the statutory provisions governing removability and, in the process, conferred lawful presence on an entire class of aliens.

To lawfully implement such changes, DHS needed a grant of authority from Congress to either reclassify removable DACA recipients as lawfully present, or to exempt the entire class of aliens covered by DACA from statutory removal procedures. No party disputes that the immigration statutes lack an express delegation to accomplish either result. And, an examination of the highly reticulated immigration regime makes clear that DHS has no implicit discretion to create new classes of lawful presence or to grant relief from removal out of whole cloth. Accordingly, DACA is substantively unlawful.

This conclusion should begin and end our review. The decision to rescind an unlawful agency action is *per se* lawful. No additional policy justifications or considerations are necessary. And, the majority's contrary holding—that an agency is not only permitted, but required, to continue an ultra vires action—has no basis in law.

EXHIBIT A
Page 19

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

A

Congress has not authorized DHS to reclassify an entire class of removable aliens as lawfully present or to categorically exempt aliens from statutory removal provisions.

1

I begin with lawful presence. As just stated, nothing in the federal immigration laws expressly delegates to DHS the unfettered discretion to create new categories of lawfully present aliens. And, there is no basis for concluding that Congress implicitly delegated to DHS the power to reclassify categories of aliens as lawfully present. The immigration statutes provide numerous ways to obtain lawful presence, both temporary and permanent. The highly detailed nature of these provisions indicates that Congress has exhaustively provided for all of the ways that it thought lawful presence should be obtainable, leaving no discretion to DHS to add new pathways.

For example, federal immigration laws provide over 60 temporary nonimmigrant visa options, including visas for ambassadors, full-time students and their spouses and children, those engaged to marry a United States citizen within 90 days of arrival, athletes and performers, and aliens with specialized knowledge related to their employers. See §§ 1101(a)(15)(A)–(V), 1184; 8 CFR § 214.1; see also Congressional Research Service, J. Wilson, Nonimmigrant and Immigrant Visa Categories: Data Brief 1–6 (2019) (Table 1). In addition, the statutes permit the Attorney General to grant temporary "parole" into the United States "for urgent humanitarian reasons or [a] significant public benefit," **\*1923** 8 U.S.C. § 1182(d)(5)(A); provide for temporary protected status when the Attorney General finds that removal to a country with an ongoing armed conflict "would pose a serious threat to [an alien's] personal safety," § 1254a(b)(1)(A); and allow the Secretary of Homeland Security (in consultation with the Secretary of State) to waive visa requirements for certain aliens for up to 90 days, §§ 1187(a)–(d).

The immigration laws are equally complex and detailed when it comes to obtaining lawful permanent residence. Congress has expressly specified numerous avenues for obtaining an immigrant visa, which aliens may then use to become lawful permanent residents. §§ 1201, 1255(a).

Among other categories, immigrant visas are available to specified family-sponsored aliens, aliens with advanced degrees or exceptional abilities, certain types of skilled and unskilled workers, "special immigrants," and those entering the country to "engag[e] in a new commercial enterprise." §§ 1153(a)–(b), 1154; see also Congressional Research Service, Nonimmigrant and Immigrant Visa Categories, at 6–7 (Table 2). Refugees and asylees also may receive lawful permanent residence under certain conditions, § 1159; 8 CFR §§ 209.1, 209.2. [4] As with temporary lawful presence, each avenue to lawful permanent residence status has its own set of rules and exceptions. [5]

As the Fifth Circuit held in the DAPA litigation, a conclusion with which then-Attorney General Sessions agreed, "specific and detailed provisions[ of] the INA expressly and carefully provid[e] legal designations allowing defined classes of aliens to be lawfully present." *Texas*, 809 F.3d at 179. In light of this elaborate statutory scheme, the lack of any similar provision for DACA recipients convincingly establishes that Congress left DHS with no discretion to create an additional class of aliens eligible for lawful presence. Congress knows well how to provide broad discretion, and it has provided open-ended delegations of authority in statutes too numerous to name. But when it comes to lawful presence, Congress did something strikingly different. Instead of enacting a statute with "broad general directives" and leaving it to the agency to fill in the lion's share of the details, *Mistretta v. United States*, 488 U.S. 361, 372, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), Congress put in place intricate specifications governing eligibility for lawful presence. This comprehensive scheme indicates that DHS has no discretion to supplement or amend the statutory provisions in any manner, least of all by memorandum. See *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (An agency "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted" (internal quotation marks omitted)); see also *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 509–510, 108 S.Ct. 805, 98 L.Ed.2d 898 (1988).

2

The relief that Congress has extended to removable aliens likewise confirms that DACA exceeds DHS' delegated authority. **\*1924** Through deferred action, DACA grants temporary relief to removable aliens on a programmatic scale. See *Texas*, 328 F.Supp.3d at 714. But as with lawful presence,

EXHIBIT A
Page 20

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 25 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

Congress did not expressly grant DHS the authority to create categorical exceptions to the statute's removal requirements. And again, as with lawful presence, the intricate level of detail in the federal immigration laws regarding relief from removal indicates that DHS has no discretionary authority to supplement that relief with an entirely new programmatic exemption.

At the outset, Congress clearly knows how to provide for classwide deferred action when it wishes to do so. On multiple occasions, Congress has used express language to make certain classes of individuals eligible for deferred action. See 8 U.S.C. §§ 1154(a)(1)(D)(i)(II), (IV) (certain individuals covered under the Violence Against Women Act are "eligible for deferred action"); Victims of Trafficking and Violence Protection Act of 2000, 114 Stat. 1522 (" 'Any individual described in subclause (I) is eligible for deferred action' "); Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, § 423(b), 115 Stat. 361 ("Such spouse, child, son, or daughter may be eligible for deferred action"); National Defense Authorization Act for Fiscal Year 2004, §§ 1703(c)(1)(A), (2), 117 Stat. 1694–1695 ("Such spouse or child shall be eligible for deferred action"). [6] Congress has failed to provide similar explicit provisions for DACA recipients, and the immigration laws contain no indication that DHS can, at will, create its own categorical policies for deferred action.

Other provisions pertaining to relief from removal further demonstrate that DHS lacked the delegated authority to create DACA. As with lawful presence, Congress has provided a plethora of methods by which aliens may seek relief from removal. For instance, both permanent and temporary residents can seek cancellation of removal if they meet certain residency requirements and have not committed certain crimes. §§ 1229b(a)–(b). And certain nonpermanent residents may have their status adjusted to permanent residence during these proceedings. § 1229b(b)(2). Aliens can apply for asylum or withholding of removal during removal proceedings unless they have committed certain crimes. §§ 1158, 1231(b)(3). Applicants for certain nonimmigrant visas may be granted a stay of removal until the visa application is adjudicated. § 1227(d). And, aliens may voluntarily depart rather than be subject to an order of removal. § 1229c.

In sum, like lawful presence, Congress has provided for relief from removal in specific and complex ways. This nuanced detail indicates that Congress has provided the full panoply of methods it thinks should be available for an alien to seek relief from removal, leaving no discretion **\*1925** to DHS to provide additional programmatic forms of relief. [7]

3

Finally, DHS could not appeal to general grants of authority, such as the Secretary's ability to "perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter," § 1103(a)(3), or to "[e]stablis[h] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5). See also 8 U.S.C. § 1103(g)(2). Because we must interpret the statutes "as a symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), these grants of authority must be read alongside the express limits contained within the statute. Basing the Secretary's ability to completely overhaul immigration law on these general grants of authority would eviscerate that deliberate statutory scheme by "allow[ing the Secretary of DHS] to grant lawful presence ... to any illegal alien in the United States." *Texas*, 809 F.3d at 184. Not only is this "an untenable position in light of the INA's intricate system," *ibid.*, but it would also render many of those provisions wholly superfluous due to DHS' authority to disregard them at will, *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). And in addition to these fatal problems, adopting a broad interpretation of these general grants of authority would run afoul of the presumption that "Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). And it would also conflict with the major questions doctrine, which is based on the expectation that Congress speaks clearly when it delegates the power to make "decisions of vast economic and political significance." *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014) ( *UARG* ) (internal quotation marks omitted); see also *Texas*, 787 F.3d at 760–761.

Read together, the detailed statutory provisions governing temporary and lawful permanent resident status, relief from removal, and classwide deferred-action programs lead ineluctably to the conclusion that DACA is "inconsisten[t] with the design and structure of the statute as a whole." *University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338, 353, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013). As the District Court stated in the DAPA litigation and as

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 26 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

then-Attorney General Sessions agreed, "[i]nstead of merely refusing to enforce the INA's removal laws against an individual, the DHS has enacted a wide-reaching program that awards legal presence ... to individuals Congress has deemed deportable or removable." *Texas v. United States*, 86 F.Supp.3d 591, 654 (SD Tex. 2015). The immigration statutes contain a level of granular specificity that is exceedingly rare in the modern administrative state. It defies all logic and common sense to conclude that a statutory scheme detailed enough to provide conditional lawful presence to groups as narrowly defined as "alien entrepreneurs," § 1186b, is simultaneously capacious enough for DHS to **\*1926** grant lawful presence to almost two million illegal aliens with the stroke of a Cabinet secretary's pen.

B

Then-Attorney General Sessions concluded that the initial DACA program suffered from the "same legal ... defects" as DAPA and expanded DACA, finding that, like those programs, DACA was implemented without statutory authority. App. 877–878. Not only was this determination correct, but it is also dispositive for purposes of our review. "It is axiomatic that an administrative agency's power ... is limited to the authority granted by Congress." *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). DHS had no authority here to create DACA, and the unlawfulness of that program is a sufficient justification for its rescission.

The majority opts for a different path, all but ignoring DACA's substantive legal defect. See *ante*, at 1910 – 1911. On the majority's understanding of APA review, DHS was required to provide additional policy justifications in order to rescind an action that it had no authority to take. This rule "has no basis in our jurisprudence, and support for [it] is conspicuously absent from the Court's opinion." *Massachusetts v. EPA*, 549 U.S. 497, 536, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (ROBERTS, C.J., dissenting).

The lack of support for the majority's position is hardly surprising in light of our Constitution's separation of powers. No court can compel Executive Branch officials to exceed their congressionally delegated powers by continuing a program that was void *ab initio*. Cf. *Clinton v. City of New York*, 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998); *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); see also *EPA v. EME Homer City*

*Generation, L. P.*, 572 U.S. 489, 542, n. 5, 134 S.Ct. 1584, 188 L.Ed.2d 775 (2014) (Scalia, J., dissenting); *Public Citizen v. Department of Justice*, 491 U.S. 440, 487, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring in judgment). In reviewing agency action, our role is to ensure that Executive Branch officials do not transgress the proper bounds of their authority, *Arlington*, 569 U.S. at 327, 133 S.Ct. 1863 (ROBERTS, C.J., dissenting), not to perpetuate a decision to unlawfully wield power in direct contravention of the enabling statute's clear limits, see *UARG*, 573 U.S. at 327–328, 134 S.Ct. 2427 ; *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002).

Under our precedents, DHS can only exercise the authority that Congress has chosen to delegate to it. See *UARG*, 573 U.S. at 327, 134 S.Ct. 2427 . In implementing DACA, DHS under the Obama administration arrogated to itself power it was not given by Congress. Thus, every action taken by DHS under DACA is the unlawful exercise of power. Now, under the Trump administration, DHS has provided the most compelling reason to rescind DACA: The program was unlawful and would force DHS to continue acting unlawfully if it carried the program forward.

III

The majority's demanding review of DHS' decisionmaking process is especially perverse given that the 2012 memorandum flouted the APA's procedural requirements —the very requirements designed to prevent arbitrary decisionmaking. Even if DHS were authorized to create DACA, it could not do so without undertaking an administrative rulemaking. The fact that DHS did not engage in this process likely provides an independent basis for rescinding DACA. But at the very least, this **\*1927** procedural defect compounds the absurdity of the majority's position in these cases.

As described above, DACA fundamentally altered the immigration laws. It created a new category of aliens who, as a class, became exempt from statutory removal procedures, and it gave those aliens temporary lawful presence. Both changes contravened statutory limits. DACA is thus what is commonly called a substantive or legislative rule. [8] As the name implies, our precedents state that legislative rules are those that "have the force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 295, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (internal quotation marks omitted).

EXHIBIT A
Page 22

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

Our precedents allow the vast majority of legislative rules to proceed through so-called "informal" notice and comment rulemaking. See *United States v. Florida East Coast R. Co.*, 410 U.S. 224, 237–238, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).[9] But under our precedents, an agency must engage in certain procedures mandated by the APA before its rule carries legal force. *Kisor* v. *Wilkie*, 588 U.S. ——, ——, 139 S.Ct. 2400, 2420, 204 L.Ed.2d 841 (2019) (plurality opinion) ("[A] legislative rule, ... to be valid[,] must go through notice and comment"); *id.*, at ——, 139 S.Ct., at 2434 (GORSUCH, J., concurring in judgment) (same); *Perez v. Mortgage Bankers Assn.*, 575 U.S. 92, 96, 135 S.Ct. 1199, 191 L.Ed.2d 186 (2015); cf. *Azar* v. *Allina Health Services*, 587 U.S. ——, ——, 139 S.Ct. 1804, 1808, 204 L.Ed.2d 139 (2019) (same with respect to materially identical procedures under the Medicare Act). These procedures specify that the agency "shall" publish a notice of proposed rulemaking in the Federal Register, justify the rule by reference to legal authority, describe "the subjects and issues involved" in the rule, and allow interested parties to submit comments. 5 U.S.C. §§ 553(b)–(c); see also *Kisor*, 588 U.S., at ——, 139 S.Ct., at 2434 (opinion of GORSUCH, J.). As we have recognized recently, use of the word "shall" indicates that these procedures impose mandatory obligations on the agency before it can adopt a valid binding regulation. See *Maine Community Health Options* v. *United States*, 590 U.S. ——, ——, 140 S.Ct. 1308, 1320, —— L.Ed.2d —— (2020). After undergoing notice and comment, the agency then publishes the final rule, which must "articulate a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal quotation marks omitted). Only after completing this process is the legislative rule a valid law. See *K isor*, 588 U.S., at ——, 139 S.Ct., at 2434 (opinion of GORSUCH, J.).[10]

Because DACA has the force and effect of law, DHS was required to observe the **\*1928** procedures set out in the APA if it wanted to promulgate a legislative rule. It is undisputed, however, that DHS did not do so. It provided no opportunity for interested parties to submit comments regarding the effect that the program's dramatic and very significant change in immigration law would have on various aspects of society. It provided no discussion of economic considerations or national security interests. Nor did it provide any substantial policy justifications for treating young people brought to this country differently from other classes of aliens who have lived in the country without incident for many years. And, it did not invoke any law authorizing DHS to create such a program beyond its inexplicable assertion that DACA was consistent with existing law. Because DACA failed to engage in the statutorily mandated process, DACA never gained status as a legally binding regulation that could impose duties or obligations on third parties. See *id.*, at ——, 139 S.Ct., at 2420 (plurality opinion); *id.*, at ——, 139 S.Ct., at 2434 (opinion of GORSUCH, J.).

Given this state of affairs, it is unclear to me why DHS needed to provide any explanation whatsoever when it decided to rescind DACA. Nothing in the APA suggests that DHS was required to spill *any* ink justifying the rescission of an invalid legislative rule, let alone that it was required to provide policy justifications beyond acknowledging that the program was simply unlawful from the beginning. And, it is well established that we do not remand for an agency to correct its reasoning when it was required by law to take or abstain from an action. See *Morgan Stanley Capital Group Inc. v. Public Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 544–545, 128 S.Ct. 2733, 171 L.Ed.2d 607 (2008). Here, remand would be futile, because no amount of policy explanation could cure the fact that DHS lacked statutory authority to enact DACA in the first place.

Instead of recognizing this, the majority now requires the rescinding Department to treat the invalid rule as though it were legitimate. As just explained, such a requirement is not supported by the APA.[11] It is also absurd, as evidenced by its application to DACA in these cases. The majority insists that DHS was obligated to discuss its choices regarding benefits and forbearance in great detail, even though no such detailed discussion accompanied DACA's issuance. And, the majority also requires DHS to discuss reliance interests at length, even though deferred action traditionally does not take reliance interests into account and DHS was not forced to explain its treatment of reliance interests in the first instance by going through notice and comment. See *infra*, at 1930 – 1931. The majority's demand for such an explanation here simply makes little sense.

At bottom, of course, none of this matters, because DHS *did* provide a sufficient explanation for its action. DHS' statement that DACA was ultra vires was more than sufficient to justify its rescission.[12] By requiring more, the majority has distorted the APA review process beyond recognition, further burdening all future attempts to rescind unlawful programs.

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 28 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

Plaintiffs frequently bring successful challenges to agency actions by arguing that the agency has impermissibly dressed up a legislative rule as a policy statement and must comply **\*1929** with the relevant procedures before functionally binding regulated parties. See, *e.g.*, *Mendoza v. Perez*, 754 F.3d 1002 (CADC 2014); *Natural Resources Defense Council v. EPA*, 643 F.3d 311 (CADC 2011); *National Family Planning & Reproductive Health Assn., Inc. v. Sullivan*, 979 F.2d 227 (CADC 1992). But going forward, when a rescinding agency inherits an invalid legislative rule that ignored virtually every rulemaking requirement of the APA, it will be obliged to overlook that reality. Instead of simply terminating the program because it did not go through the requisite process, the agency will be compelled to treat an invalid legislative rule as though it were legitimate. [13]

## IV

Even if I were to accept the majority's premise that DACA's rescission required additional policy justifications, the majority's reasons for setting aside the agency's decision still fail.

## A

First, the majority claims that the Fifth Circuit discussed only the legality of the 2014 memorandum's conferral of benefits, not its "forbearance component"—*i.e.*, the decision not to place DACA recipients into removal proceedings. *Ante*, at 1911. The majority, therefore, claims that, notwithstanding the then-Attorney General's legal conclusion, then-Acting Secretary Duke was required to consider revoking DACA recipients' lawful presence and other attendant benefits while continuing to defer their removal. *Ante*, at 1912 – 1913. Even assuming the majority correctly characterizes the Fifth Circuit's opinion, it cites no authority for the proposition that arbitrary and capricious review *requires* an agency to dissect an unlawful program piece by piece, scrutinizing each separate element to determine whether it would independently violate the law, rather than just to rescind the entire program. [14]

**\*1930** The then-Attorney General reviewed the thorough decisions of the District Court and the Fifth Circuit. Those courts exhaustively examined the INA's text and structure, the relevant provisions of other federal immigration statutes, the historical practice of deferred action, and the general grants of statutory authority to set immigration policy. Both decisions concluded that DAPA and expanded DACA violated the carefully crafted federal immigration scheme, that such violations could not be justified through reference to past exercises of deferred action, and that the general grants of statutory authority did not give DHS the power to enact such a sweeping nonenforcement program. Based on the reasoning of those decisions, then-Attorney General Sessions concluded that DACA was likewise implemented without statutory authority. He directed DHS to restore the rule of law. DHS followed the then-Attorney General's legal analysis and rescinded the program. This legal conclusion more than suffices to supply the "reasoned analysis" necessary to rescind an unlawful program. *State Farm*, 463 U.S. at 42, 103 S.Ct. 2856 .

The majority has no answer except to suggest that this approach is inconsistent with *State Farm* . See *ante*, at 1911 – 1913. But in doing so, the majority ignores the fact that, unlike the typical "prior policy" contemplated by the Court in *State Farm* , DACA is unlawful. Neither *State Farm* nor any other decision cited by the majority addresses what an agency must do when it has inherited an unlawful program. It is perhaps for this reason that, rather than responding with authority of its own, the majority simply opts to excise the "unlawful policy" aspect from its discussion.

## B

Second, the majority claims that DHS erred by failing to take into account the reliance interests of DACA recipients. *Ante*, at 1913 – 1915. But reliance interests are irrelevant when assessing whether to rescind an action that the agency lacked statutory authority to take. No amount of reliance could ever justify continuing a program that allows DHS to wield power that neither Congress nor the Constitution gave it. Any such decision would be "not in accordance with law" or "in excess of statutory ... authority." 5 U.S.C. §§ 706(2)(A), (C). Accordingly, DHS would simply be engaging in yet another exercise of unlawful power if it used reliance interests to justify continuing the initially unlawful program, and a court would be obligated to set aside that action. [15]

Even if reliance interests were sometimes relevant when rescinding an ultra vires action, the rescission still would not be arbitrary and capricious here. Rather, as the majority does not dispute, the rescission is consistent with how deferred

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 29 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

action has always worked. As a general matter, deferred action creates no rights—it exists at the Government's discretion and can be revoked at any time. See App. to Pet. for Cert. in No. 18–587, at 104a (DACA and expanded DACA); 8 CFR § 214.11(j)(3) (T visas); § 214.14(d)(2) (U visas); 62 Fed. Reg. 63249, 63253 (1997) (discussing Exec. Order No. 12711 for certain citizens of the People's Republic of China). The Government has made clear time and again that, because "deferred action is not an immigration status, no alien has the right to deferred action. It is **\*1931** used solely in the discretion of the [Government] and confers no protection or benefit upon an alien." DHS Immigration and Customs Enforcement Office of Detention and Removal, Detention and Deportation Officers' Field Manual § 20.8 (Mar. 27, 2006); see also Memorandum from D. Meissner, Comm'r, INS, to Regional Directors et al., pp. 11–12 (Nov. 17, 2000); Memorandum from W. Yates, Assoc. Director of Operations, DHS, Citizenship and Immigration Servs., to Director, Vt. Serv. Center, p. 5 (2003). Thus, contrary to the majority's unsupported assertion, *ante*, at 1913, this longstanding administrative treatment of deferred action provides strong evidence and authority for the proposition that an agency need not consider reliance interests in this context. [16]

Finally, it is inconceivable to require DHS to study reliance interests before rescinding DACA considering how the program was previously defended. DHS has made clear since DACA's inception that it would not consider such reliance interests. Contemporaneous with the DACA memo, DHS stated that "DHS can terminate or renew deferred action at any time at the agency's discretion." Consideration of Deferred Action for Childhood Arrivals Process, 89 Interpreter Releases 1557, App. 4, p. 2 (Aug. 20, 2012). In fact, DHS repeatedly argued in court that the 2014 memorandum was a valid exercise of prosecutorial discretion in part *because* deferred action created no rights on which recipients could rely. Before the Fifth Circuit, DHS stated that "DHS may revoke or terminate deferred action and begin removal proceedings at any time at its discretion." Brief for Appellants in *Texas v. United States*, No. 1540238, p. 7; see also *id.*, at 45–46. And before this Court, in that same litigation, DHS reiterated that "DHS has absolute discretion to revoke deferred action unilaterally, without notice or process." Brief for United States in *United States* v. *Texas*, O.T. 2015, No. 15–674, p. 5; see also *id.*, at 37. If that treatment of reliance interests was incorrect, it provides yet one more example of a deficiency in DACA's issuance, not its rescission.

\* \* \*

President Trump's Acting Secretary of Homeland Security inherited a program created by President Obama's Secretary that was implemented without statutory authority and without following the APA's required procedures. Then-Attorney General Sessions correctly concluded that this ultra vires program should be rescinded. These cases could—and should—have ended with a determination that his legal conclusion was correct.

Instead, the majority today concludes that DHS was required to do far more. Without grounding its position in either the APA or precedent, the majority declares that DHS was required to overlook DACA's obvious legal deficiencies and provide additional policy reasons and justifications before restoring the rule of law. This holding is incorrect, and it will hamstring all future agency attempts to undo actions that exceed statutory authority. I would therefore reverse the judgments below and remand with instructions to dissolve the nationwide injunctions.

Justice ALITO, concurring in the judgment in part and dissenting in part.

**\*1932** Anyone interested in the role that the Federal Judiciary now plays in our constitutional system should consider what has happened in these cases. Early in the term of the current President, his administration took the controversial step of attempting to rescind the Deferred Action for Childhood Arrivals (DACA) program. Shortly thereafter, one of the nearly 700 federal district court judges blocked this rescission, and since then, this issue has been mired in litigation. In November 2018, the Solicitor General filed petitions for certiorari, and today, the Court still does not resolve the question of DACA's rescission. Instead, it tells the Department of Homeland Security to go back and try again. What this means is that the Federal Judiciary, without holding that DACA cannot be rescinded, has prevented that from occurring during an entire Presidential term. Our constitutional system is not supposed to work that way.

I join Justice THOMAS's opinion. DACA presents a delicate political issue, but that is not our business. As Justice THOMAS explains, DACA was unlawful from the start, and that alone is sufficient to justify its termination. But even if DACA were lawful, we would still have no basis for overturning its rescission. First, to the extent DACA

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 30 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

represented a lawful exercise of prosecutorial discretion, its rescission represented an exercise of that same discretion, and it would therefore be unreviewable under the Administrative Procedure Act. 5 U.S.C. § 701(a)(2); see *Heckler v. Chaney*, 470 U.S. 821, 831–832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). Second, to the extent we could review the rescission, it was not arbitrary and capricious for essentially the reasons explained by Justice KAVANAUGH. See *post*, at 1933 – 1936 (opinion concurring in the judgment in part and dissenting in part).

Justice KAVANAUGH, concurring in the judgment in part and dissenting in part.

For the last 20 years, the country has engaged in consequential policy, religious, and moral debates about the legal status of millions of young immigrants who, as children, were brought to the United States and have lived here ever since. Those young immigrants do not have legal status in the United States under current statutory law. They live, go to school, and work here with uncertainty about their futures. Despite many attempts over the last two decades, Congress has not yet enacted legislation to afford legal status to those immigrants.

In 2012, exercising its view of the Executive's prosecutorial discretion under Article II and the immigration laws, President Obama's administration unilaterally instituted a program known as Deferred Action for Childhood Arrivals, or DACA. Under DACA, eligible young immigrants may apply for and receive deferred action. They must renew their DACA status every two years. Under the program, the Executive Branch broadly forbears from enforcing certain immigration removal laws against DACA recipients. And by virtue of the forbearance, DACA recipients also become eligible for work authorization and other benefits.

Since 2017, President Trump's administration has sought to rescind DACA based on its different and narrower understanding of the Executive's prosecutorial discretion under Article II and the immigration laws. In its view, the Executive Branch legally may not, and, as a policy matter should not, *unilaterally* forbear from enforcing the immigration laws against such a large class of individuals. The current **\*1933** administration has stated that it instead wants to work with Congress to enact comprehensive legislation that would address the legal status of those immigrants together with other significant immigration issues.

The question before the Court is whether the Executive Branch acted lawfully in ordering rescission of the ongoing DACA program. To begin with, all nine Members of the Court accept, as do the DACA plaintiffs themselves, that the Executive Branch possesses the legal authority to rescind DACA and to resume pre-DACA enforcement of the immigration laws enacted by Congress. Having previously adopted a policy of prosecutorial discretion and nonenforcement with respect to a particular class of offenses or individuals, the Executive Branch has the legal authority to rescind such a policy and resume enforcing the law enacted by Congress. The Executive Branch's exercise of that rescission authority is subject to constitutional constraints and may also be subject to statutory constraints. The narrow legal dispute here concerns a statutory constraint—namely, whether the Executive Branch's action to rescind DACA satisfied the general arbitrary-and-capricious standard of the Administrative Procedure Act, or APA.

The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. As the Court has long stated, judicial review under that standard is deferential to the agency. The Court may not substitute its policy judgment for that of the agency. The Court simply ensures that the agency has acted within a broad zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision. See *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009); *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

The Executive Branch explained its decision to rescind DACA in two sequential memorandums by successive Secretaries of Homeland Security: the 2017 Duke Memorandum and the 2018 Nielsen Memorandum. The Duke Memorandum focused on DACA's perceived legal flaws. The Court today finds the Duke Memorandum insufficient under the APA's arbitrary-and-capricious standard.

But regardless of whether the Court is correct about the Duke Memorandum, the Nielsen Memorandum more fully explained the Department's legal reasons for rescinding DACA, and clarified that even if DACA were lawful, the Department would still rescind DACA for a variety of policy reasons. The Nielsen Memorandum also expressly addressed the reliance interests of DACA recipients. The question under the APA's deferential arbitrary-and-capricious standard is not whether we agree with the Department's

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 31 of 63
Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)
20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

decision to rescind DACA. The question is whether the Nielsen Memorandum reasonably explained the decision to rescind DACA. Under ordinary application of the arbitrary-and-capricious standard, the Nielsen Memorandum—with its alternative and independent rationales and its discussion of reliance—would pass muster as an explanation for the Executive Branch's action.

The Nielsen Memorandum was issued nine months after the Duke Memorandum. Under the Administrative Procedure Act, the Nielsen Memorandum is itself a "rule" setting forth "an agency statement of general ... applicability and future effect designed to implement ... policy." 5 U.S.C. § 551(4). Because it is a rule, the Nielsen Memorandum constitutes "agency action." § 551(13). As the Secretary of Homeland **\*1934** Security, Secretary Nielsen had the authority to decide whether to stick with Secretary Duke's decision to rescind DACA, or to make a different decision. Like Secretary Duke, Secretary Nielsen chose to rescind DACA, and she provided additional explanation. Her memorandum was akin to common forms of agency action that follow earlier agency action on the same subject—for example, a supplemental or new agency statement of policy, or an agency order with respect to a motion for rehearing or reconsideration. Courts often consider an agency's additional explanations of policy or additional explanations made, for example, on agency rehearing or reconsideration, or on remand from a court, even if the agency's bottom-line decision itself does not change.

Yet the Court today jettisons the Nielsen Memorandum by classifying it as a *post hoc* justification for rescinding DACA. *Ante*, at 1908 – 1909. Under our precedents, however, the *post hoc* justification doctrine merely requires that courts assess agency action based on the official explanations of the agency decisionmakers, not based on after-the-fact explanations advanced *by agency lawyers during litigation* (or by judges). See, *e.g., State Farm*, 463 U.S. at 50, 103 S.Ct. 2856 ("courts may not accept appellate counsel's *post hoc* rationalizations for agency action"); *FPC v. Texaco Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974) (same); *NLRB v. Metropolitan Life Ins. Co.*, 380 U.S. 438, 443–444, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965) (same); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) (same). As the D. C. Circuit has explained, the *post hoc* justification doctrine "is not a time barrier which freezes an agency's exercise of its judgment after an initial decision has been made and bars it from further articulation of its reasoning. It is a rule directed at reviewing courts which forbids judges to uphold agency action on the

basis of rationales offered by anyone other than the proper decisionmakers." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (2006) (Garland, J.) (internal quotation marks omitted).

Indeed, the ordinary judicial remedy for an agency's insufficient explanation is to remand for further explanation by the relevant agency personnel. It would make little sense for a court to exclude official explanations by agency personnel such as a Cabinet Secretary simply because the explanations are purportedly *post hoc*, and then to turn around and remand for further explanation by those same agency personnel. Yet that is the upshot of the Court's application of the *post hoc* justification doctrine today. The Court's refusal to look at the Nielsen Memorandum seems particularly mistaken, moreover, because the Nielsen Memorandum shows that the Department, back in 2018, considered the policy issues that the Court today says the Department did not consider. *Ante,* at 1911 – 1915.

To be sure, cases such as *Overton Park* and *Camp* v. *Pitts* suggest that courts reviewing certain agency *adjudications* may in some circumstances decline to examine an after-the-fact agency explanation. See *Camp v. Pitts*, 411 U.S. 138, 142–143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ( *per curiam* ); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419–421, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). But agency adjudications are "concerned with the determination of past and present rights and liabilities," Attorney General's Manual on the Administrative Procedure Act 14 (1947), and implicate the due process interests of the individual parties to the adjudication. Judicial review of an adjudication therefore ordinarily focuses on what happened during the agency's adjudication **\*1935** process of deciding that individual case.

Even if certain agency adjudications have a slightly more stringent restriction on *post hoc* explanations, the APA is "based upon a dichotomy between rule making and adjudication," *ibid*., and this case involves an ongoing agency rule that has future effect—the rescission of DACA. The Nielsen Memorandum implements and explains the rescission of DACA. I am aware of no case from this Court, and the Court today cites none, that has employed the *post hoc* justification doctrine to exclude an agency's official explanation of an agency rule. For purposes of arbitrary-and-capricious review, it does not matter whether the latest official explanation was two years ago or three years ago. What matters is whether the explanation was reasonable and followed the requisite procedures. In my view, the Court should consider the Nielsen Memorandum in deciding

EXHIBIT A
Page 27

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 32 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

whether the Department's rescission of DACA satisfies the APA's arbitrary-and-capricious standard.

Because the Court excludes the Nielsen Memorandum, the Court sends the case back to the Department of Homeland Security for further explanation. Although I disagree with the Court's decision to remand, the only practical consequence of the Court's decision to remand appears to be some delay. The Court's decision seems to allow the Department on remand to relabel and reiterate the substance of the Nielsen Memorandum, perhaps with some elaboration as suggested in the Court's opinion. *Ante,* at 1913 – 1915.[1]

* * *

The Court's resolution of this narrow APA issue of course cannot eliminate the broader uncertainty over the status of the DACA recipients. That uncertainty is a result of Congress's inability thus far to agree on legislation, which in turn has forced successive administrations to improvise,

thereby triggering many rounds of relentless litigation with the prospect of more litigation to come. In contrast to those necessarily short-lived and stopgap administrative measures, the Article I legislative process could produce a sturdy and enduring solution to this issue, one way or the other, and thereby remove the uncertainty that has persisted for years for these young immigrants and the Nation's immigration system. In the meantime, as to the narrow APA question presented here, I appreciate the Court's careful analysis, **\*1936** but I ultimately disagree with its treatment of the Nielsen Memorandum. I therefore respectfully dissent from the Court's judgment on plaintiffs' APA claim, and I concur in the judgment insofar as the Court rejects plaintiffs' equal protection claim.

### All Citations

140 S.Ct. 1891, 20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909, 28 Fla. L. Weekly Fed. S 345

## Footnotes

\*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See  *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499 .

1   Plaintiffs also raised notice and comment claims, which uniformly failed below, and assorted due process challenges, some of which survived motions to dismiss. Those claims are not before us.

2   In a related challenge not at issue here, the District Court for the District of Maryland granted partial summary judgment in favor of the Government. *Casa de Maryland v. United States Dept. of Homeland Security*, 284 F.Supp.3d 758 (2018). After the Government filed petitions for certiorari in the instant cases, the Fourth Circuit reversed that decision and vacated Acting Secretary Duke's rescission as arbitrary and capricious. *Casa de Maryland v. United States Dept. of Homeland Security*, 924 F.3d 684 (2019), cert. pending, No. 18–1469. The Fourth Circuit has since stayed its mandate.

3   Justice KAVANAUGH further argues that the contemporaneous explanation requirement applies only to agency adjudications, not rulemakings. *Post,* at 1934 – 1936 (opinion concurring in judgment in part and dissenting in part). But he cites no authority limiting this basic principle—which the Court regularly articulates in the context of rulemakings—to adjudications. The Government does not even raise this unheralded argument.

4   The Government contends that Acting Secretary Duke also focused on litigation risk. Although the background section of her memo references a letter from the Texas Attorney General threatening to challenge DACA, the memo never asserts that the rescission was intended to avert litigation. And, given the Attorney General's conclusion that the policy was unlawful—and thus presumably could not be maintained or defended in its current form—it is difficult to see how the risk of litigation carried any independent weight.

5   As the Fifth Circuit noted, DAPA recipients were eligible for Social Security and Medicare benefits because they had been designated "lawfully present."  *Texas,* 809 F.3d at 168. Lawful presence is a statutory

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

Case 3:20-cv-03982-LB   Document 57   Filed 07/28/20   Page 33 of 63

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

prerequisite for receipt of certain benefits. See *id.,* at 148 (citing 8 U.S.C. § 1611). It is not the same as forbearance nor does it flow inexorably from forbearance. Thus, while deferred action recipients have been designated lawfully present for purposes of Social Security and Medicare eligibility, see 8 CFR § 1.3; 42 CFR § 417.422(h), agencies can also exclude them from this designation, see 45 CFR § 152.2(8) (2019) (specifying that DACA recipients are not considered lawfully present for purposes of coverage under the Affordable Care Act).

6    The three-page memorandum that established DACA is devoted entirely to forbearance, save for one sentence directing USCIS to "determine whether [DACA recipients] qualify for work authorization." App. to Pet. for Cert. 101a. The benefits associated with DACA flow from a separate regulation. See 8 CFR § 1.3(a)(4)(vi); see also 42 CFR § 417.422(h) (cross-referencing 8 CFR § 1.3). Thus, DHS could have addressed the Attorney General's determination that such benefits were impermissible under the INA by amending 8 CFR § 1.3 to exclude DACA recipients from those benefits without rescinding the DACA Memorandum and the forbearance policy it established. But Duke's rescission memo shows no cognizance of this possibility.

7    Our affirmance of the *NAACP* order vacating the rescission makes it unnecessary to examine the propriety of the nationwide scope of the injunctions issued by the District Courts in *Regents* and *Batalla Vidal* .

1    I concur in the judgment insofar as the majority rejects respondents' equal protection claim.

2    See Immigrant Children's Educational Advancement and Dropout Prevention Act of 2001, H. R. 1582, 107th Cong., 1st Sess.; Student Adjustment Act of 2001, H. R. 1918, 107th Cong., 1st Sess.; DREAM Act, S. 1291, 107th Cong., 1st Sess. (2001); DREAM Act, S. 1545, 108th Cong., 1st Sess. (2003); Student Adjustment Act of 2003, H. R. 1684, 108th Cong., 1st Sess.; DREAM Act, S. 2863, 108th Cong., 2d Sess., Tit. XVIII (2003); DREAM Act of 2005, S. 2075, 109th Cong., 1st Sess.; Comprehensive Immigration Reform Act of 2006, S. 2611, 109th Cong., 2d Sess., Tit. VI, Subtitle C; American Dream Act, H. R. 5131, 109th Cong., 2d Sess. (2006); DREAM Act of 2007, S. 774, 110th Cong., 1st Sess.; DREAM Act of 2007, S. 2205, 110th Cong., 1st Sess.; STRIVE Act of 2007, H. R. 1645, 110th Cong., 1st Sess., Tit. VI, Subtitle B; Comprehensive Immigration Reform Act of 2007, S. 1348, 110th Cong., 1st Sess., Tit. VI, Subtitle C; DREAM Act of 2009, S. 729, 111th Cong., 1st Sess.; American Dream Act, H. R. 1751, 111th Cong., 1st Sess.; Comprehensive Immigration Reform Act of 2010, S. 3932, 111th Cong., 2d Sess., Tit. V, Subtitle D; DREAM Act of 2010, S. 3827, 111th Cong., 2d Sess.; DREAM Act of 2010, S. 3962, 111th Cong., 2d Sess.; DREAM Act of 2010, S. 3963, 111th Cong., 2d Sess.; DREAM Act of 2010, S. 3992, 111th Cong., 2d Sess.; DREAM Act of 2010, H. R. 6497, 111th Cong., 2d Sess.; DREAM Act of 2011, S. 952, 112th Cong., 1st Sess.

3    See J. Passel & M. Lopez, Pew Research Center, Up to 1.7 Million Unauthorized Immigrant Youth May Benefit From New Deportation Rules (Aug. 14, 2012).

4    The immigration statutes also provide for conditional lawful permanent residence status. See § 1186a(b)(1)(A)(i) (two years for spouses to demonstrate that the marriage "was [not] entered into for the purpose of procuring an alien's admission as an immigrant"); § 1186b (qualifying business entrepreneurs).

5    For instance, Congress has carved out rules for aliens who served in the Armed Forces, §§ 1438–1440, and alien spouses who have been subject to domestic abuse, §§ 1186a(c)(4)(C)–(D).

6    In the DAPA litigation, DHS noted that some deferred-action programs have been implemented by the Executive Branch without explicit legislation. But " 'past practice does not, by itself, create [executive] power.' " *Medellín v. Texas,* 552 U.S. 491, 532, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (quoting *Dames & Moore v. Regan,* 453 U.S. 654, 686, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981)). If any of these programs had been challenged, it would seem that they would be legally infirm for the same reasons as DACA. Moreover, if DHS had the authority to create new categories of aliens eligible for deferred action, then all of Congress' deferred-action legislation was but a superfluous exercise. *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). Finally, whereas some deferred-action programs were followed by legislation, DACA has existed for eight years, and Congress is no closer to a legislative solution than it was in 2012. See, *e.g.,* American Dream and Promise Act of 2019, H. R. 6, 116th Cong., 1st Sess.

7    It is uncontested that deferred action frequently occurs on a case-by-case basis, often justified on the grounds that the agency lacks resources to remove all removable aliens. Even assuming that these ad hoc exercises

Case 3:20-cv-03982-LB   Document 57   Filed 07/28/20   Page 34 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)

20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

of discretion are permissible, however, we have stated that "[a]n agency confronting resource constraints may change its own conduct, but it cannot change the law." *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 327, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014).

8   The majority tacitly acknowledges as much, as it must. See *ante*, at 1906 – 1907. Otherwise, the majority would have to accept that DACA was nothing more than a policy of prosecutorial discretion, which would make its rescission unreviewable. See *Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

9   As I have previously pointed out, "the APA actually contemplated a much more formal process for most rulemaking." *Perez v. Mortgage Bankers Assn.*, 575 U.S. 92, 128, n. 5, 135 S.Ct. 1199, 191 L.Ed.2d 186 (2015) (opinion concurring in judgment).

10   The APA also provides certain exceptions from notice and comment rulemaking. For example, an agency may promulgate a legally binding rule without notice and comment if good cause exists to do so. 5 U.S.C. § 553(b)(B). This text would become a nullity if the agency could achieve the same effect by simply dispensing with notice and comment procedures altogether.

11   Thus, it is not that the APA "*should* not" be construed to support the majority's result, *ante*, at 1914 (emphasis added), it is that the APA does not and *cannot* support that result.

12   I express no view on what other reasons would justify an agency's decision to rescind a procedurally unlawful action. I merely point out that correctly concluding that the program was illegal is sufficient.

13   In my view, even if DACA were permitted under the federal immigration laws and had complied with the APA, it would still violate the Constitution as an impermissible delegation of legislative power. See *Department of Transportation v. Association of American Railroads*, 575 U.S. 43, 77, 135 S.Ct. 1225, 191 L.Ed.2d 153 (2015) (THOMAS, J., concurring in judgment). Putting aside this constitutional concern, however, the notice and comment process at least attempts to provide a "surrogate political process" that takes some of the sting out of the inherently undemocratic and unaccountable rulemaking process. Asimow, Interim-Final Rules: Making Haste Slowly, 51 Admin. L. Rev. 703, 708 (1999).

14   The majority's interpretation of the Fifth Circuit's opinion is highly questionable. Because a grant of deferred action renders DACA recipients eligible for certain benefits and work authorization, it is far from clear that the Department could separate DACA's "forbearance component" from the major benefits it conferred without running into yet another APA problem. The majority points to the fact that, under the Patient Protection and Affordable Care Act of 2010, relevant regulations exclude those receiving deferred action through DACA from coverage. *Ante*, at 1911, n. 5. But that misses the point. Those regulations were promulgated before "anyone with deferred action under the DACA process applie[d]" for those benefits. See 77 Fed. Reg. 52616 (2012). By contrast, DACA recipients have been eligible for and have received Medicare, Social Security, and work authorization for years. DHS therefore is not writing on a blank slate. Under the majority's rule, DHS would need to amend all relevant regulations and explain why *all* recipients of deferred action who have previously received such benefits may no longer receive them. Alternatively and perhaps more problematically, it would need to provide a reason why other recipients of deferred action should continue to qualify, while DACA recipients should not. It thus seems highly likely that the majority's proposed course of action would be subject to serious arbitrary and capricious challenges.

15   The majority contends that this argument does not carry force because the rescission implemented a winddown period during which recipients would continue to receive benefits. But whether DHS' decision to wind down DACA was lawful is a separate question from whether DHS was required to consider reliance interests before discontinuing an unlawful program.

16   The majority's approach will make it far more difficult to change deferred-action programs going forward, which is hardly in keeping with this Court's own understanding that deferred action is an "exercise in administrative discretion" used for administrative "convenience." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999). Agencies will likely be less willing to grant deferred action knowing that any attempts to undo it will require years of litigation and time-consuming rulemakings.

Case 3:20-cv-03982-LB   Document 57   Filed 07/28/20   Page 35 of 63

Department of Homeland Security v. Regents of the..., 140 S.Ct. 1891 (2020)
20 Cal. Daily Op. Serv. 5524, 2020 Daily Journal D.A.R. 5909...

1    Because I conclude that the Executive Branch satisfied the APA's arbitrary-and-capricious standard, I need not consider whether its prosecutorial enforcement policy was "committed to agency discretion by law" and therefore not subject to APA arbitrary-and-capricious review in the first place. 5 U.S.C. § 701(a)(2). Several judges have advanced arguments suggesting that DACA—at least to the extent it was simply an exercise of forbearance authority—and the repeal of DACA are decisions about whether and to what extent to exercise prosecutorial discretion against a class of offenses or individuals, and are therefore unreviewable under the APA as "committed to agency discretion by law." *Ibid.* ; see *Casa De Maryland v. United States Dept. of Homeland Security*, 924 F.3d 684, 709–715 (CA4 2019) (Richardson, J., concurring in part and dissenting in part); *Regents of Univ. Cal. v. United States Dept. of Homeland Security*, 908 F.3d 476, 521–523 (CA9 2018) (Owens, J., concurring in judgment); see also *Texas v. United States*, 809 F.3d 134, 196–202 (CA5 2015) (King, J., dissenting); *Texas v. United States*, 787 F.3d 733, 770–776 (CA5 2015) (Higginson, J., dissenting); cf. *Heckler v. Chaney*, 470 U.S. 821, 831–835, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); *ICC v. Locomotive Engineers*, 482 U.S. 270, 277–284, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987); *United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *In re Aiken County*, 725 F.3d 255, 262–264 (CADC 2013).

---

**End of Document**                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

106 Fed. R. Evid. Serv. 233

298 F.Supp.3d 209
United States District Court, District of Columbia.

NATIONAL ASSOCIATION
FOR THE ADVANCEMENT OF
COLORED PEOPLE, et al., Plaintiffs,
v.
Donald J. TRUMP, et al., Defendants.
Trustees of Princeton University, et al., Plaintiffs,
v.
United States of America, et al., Defendants.

Civil Action No. 17–1907 (JDB),
Civil Action No. 17–2325 (JDB)
|
Signed 04/24/2018

**Synopsis**
**Background:** Civil rights organization, undocumented alien, and others brought actions challenging the Department of Homeland Security's (DHS) rescission of the Deferred Action for Childhood Arrivals (DACA) program for undocumented aliens, asserting both constitutional claims and claims under the Administrative Procedure Act (APA). DHS moved to dismiss. Plaintiffs moved for summary judgment on APA claim or for preliminary injunctive relief.

**Holdings:** The District Court, John D. Bates, J., held that:

Immigration and Nationality Act did not divest district court of subject-matter jurisdiction;

alien had Article III standing;

organization had associational standing;

rescission was not exempt from review under APA;

rescission was not subject to notice-and-comment procedures under APA;

DHS failed to adequately explain its conclusion that DACA program for undocumented aliens was unlawful;

DHS conclusion regarding litigation risk was arbitrary and capricious; and

vacatur of rescission was proper remedy, but vacatur would be stayed for 90 days to allow DHS to issue fuller explanation for its determination.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion for Summary Judgment; Motion for Preliminary Injunction; Motion to Dismiss for Failure to State a Claim; Motion to Dismiss for Lack of Subject Matter Jurisdiction; Motion to Dismiss for Lack of Standing.

**Attorneys and Law Firms**

**\*215** Douglas James McNamara, Julia Horwitz, Julie S. Selesnick, Joseph M. Sellers, Cohen, Milstein, Sellers & Toll, Washington, DC, for Plaintiffs.

Kate Bailey, Rachael Lynn Westmoreland, U.S. Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM OPINION

JOHN D. BATES, United States District Judge

These cases present an array of administrative and constitutional challenges to the Department of Homeland Security's ("DHS") rescission of the Deferred Action for Childhood Arrivals ("DACA") program. Though the government disputes these challenges on the merits, its primary defenses concern the Court's authority to hear the cases: the government contends that most plaintiffs lack standing, that the Immigration and Nationality Act ("INA") deprives the Court of subject-matter jurisdiction, and that the Department's decision to rescind DACA is not subject to review under the Administrative Procedure Act ("APA") because it was committed to agency discretion by law. The government has moved to dismiss the complaint in its entirety, and plaintiffs have moved for summary judgment only on their APA claims.

These are just two of a series of challenges to the September 2017 rescission of DACA that have already been before several district courts, two circuit courts of appeals, and the Supreme Court on two occasions. At this time, two preliminary injunctions are in place that require DHS to accept applications for the renewal of DACA benefits, but not to accept new DACA applications. Here, through their pending motions, plaintiffs seek permanent injunctive relief,

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 38 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

although only on their APA claims. And the relief they seek would reach new as well as renewal DACA applications.

For the reasons that follow, the Court concludes that it has both jurisdiction and statutory authority to hear plaintiffs' APA and constitutional claims. The Court further concludes that, under the APA, DACA's rescission was arbitrary and capricious because the Department failed adequately **\*216** to explain its conclusion that the program was unlawful. Neither the meager legal reasoning nor the assessment of litigation risk provided by DHS to support its rescission decision is sufficient to sustain termination of the DACA program. Thus, plaintiffs' motion for summary judgment will be granted in part, and the decision to rescind DACA will be vacated and remanded to DHS. Vacatur of DACA's rescission will mean that DHS must accept and process new as well as renewal DACA applications. The Court will stay its order of vacatur for ninety days, however, to allow the agency an opportunity to better explain its rescission decision.

### BACKGROUND

### I. THE IMPLEMENTATION AND RESCISSION OF DACA

#### A. Deferred Action for Childhood Arrivals

In 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program, which allowed certain undocumented aliens [1] who had been brought to the United States as children to be treated as low priorities for removal under the federal immigration laws. See AR 1. [2] According to the Secretary's memorandum (the "DACA Memo"), these young people generally "lacked the intent to violate the law" when they entered the United States as children and, in many cases, "kn[e]w only this country as home" and had "contributed to [the] country in significant ways." AR 1–2. DACA was therefore undertaken as "an exercise of ... prosecutorial discretion" to "ensure that our enforcement resources are not expended on these low priority cases." AR 1.

DACA was available to any undocumented alien who: (1) came to the United States when she was under the age of sixteen; (2) had lived in the United States continuously since at least June 15, 2007; (3) was enrolled in school or had graduated from high school or been honorably discharged from the military; (4) had not been convicted of certain criminal offenses and posed no threat to national security or

public safety; and (5) was under the age of thirty. AR 1. Aliens who met these criteria were eligible for renewable, two-year grants of "deferred action" on their removal from the United States. AR 2–3; see 8 C.F.R. § 274a.12(c)(14) (defining deferred action as "an act of administrative convenience to the government which gives some [removal] cases lower priority"). As the DACA Memo was careful to point out, however, the program "confer[red] no substantive right, immigration status or pathway to citizenship," as "[o]nly the Congress, acting through its legislative authority, can confer these rights." AR 3.

Individuals who received deferred action under DACA were also eligible for a host of other benefits under preexisting statutes and DHS regulations. These benefits included work authorization, 8 C.F.R. § 274a.12(a)(11), social security numbers, **\*217** id. § 1.3(a)(4)(vi), advance parole (i.e., preauthorization to travel to the United States without a visa), id. § 212.5, and a limited class of public assistance, such as state and federal aid for medical emergencies, 8 U.S.C. §§ 1611(b)(1), 1621(b)(1). Benefits like these allowed DACA recipients to work, travel abroad, access credit, and otherwise lead productive lives during their periods of deferred action.

To be considered for deferred action under DACA, an applicant had to provide DHS with certain identifying information, including her name, mailing address, and contact information. See Decl. of Maria De La Cruz Perales Sanchez ("Perales Decl.") [ECF No. 28–8] ¶ 11; see also Form I–821D, U.S. Citizenship and Immigration Servs., Consideration for Deferred Action for Childhood Arrivals, https://www.uscis.gov/i-821d. Although many applicants feared that this information would later be used to initiate removal proceedings against them, see Perales Decl. ¶¶ 10, 24, the Department assured applicants that their information would in most cases be "protected from disclosure to [U.S. Immigration and Customs Enforcement ("ICE") ] and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings." See U.S. Citizenship and Immigration Servs., Instructions for Consideration of Deferred Action for Childhood Arrivals, https://www.uscis.gov/i-821d. Relying on these representations, hundreds of thousands of undocumented aliens applied for and received deferred action under the DACA program. See, e.g., Perales Decl. ¶ 10; Decl. of John Doe # 1 ¶ 6; Decl. of John Doe # 2 ¶ 5. By late 2017, nearly 800,000 individuals had been granted deferred action under DACA. AR 242.

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 39 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...
106 Fed. R. Evid. Serv. 233

### B. Deferred Action for Parents of Americans

Two years after DACA's implementation, DHS issued a second memorandum, this time purporting to establish a deferred-action program called Deferred Action for Parents of Americans ("DAPA"). AR 37–41. As its name suggests, DAPA would have offered deferred action to parents of U.S. citizens or lawful permanent residents who were themselves unlawfully present in the United States.[3] AR 40–41. The DAPA memorandum also purported to expand the DACA program in certain respects: it would have removed the thirty-year age cap, made the deferred-action grants last for three years instead of two, and required that an alien need only have been present in the United States since January 1, 2010 to be eligible. AR 39–40.

Before DAPA took effect, a coalition of states, led by Texas, sued to block its implementation on grounds that it violated both the APA and the Take Care Clause of the Constitution. See Texas, 86 F.Supp.3d at 604 & n.1, 607 (citing U.S. Const. art. II, § 3). The district court granted the states' motion for a preliminary injunction, concluding that they were likely to succeed on their procedural APA claim that DAPA (including its expansion of DACA) should have been promulgated using notice and comment. Id. at 671–72; see 5 U.S.C. § 553. In part, this was because the Department's implementation of DACA suggested that DAPA would not "genuinely leave[ ] the agency and its employees free **\*218** to exercise discretion." Texas, 86 F.Supp.3d at 604 at 670 (emphasis, alterations, and internal quotation marks omitted). The district court found that only about 5% of all DACA applications had been denied, and the government could not say how many of those had been denied for discretionary reasons. Id. at 609. This led the court to conclude that the DAPA Memo's suggestion that immigration officers could exercise case-by-case discretion was "merely pretext." Id. at 669 n. 101; see Texas, 809 F.3d at 173 (agreeing that although "[t]he DACA and DAPA Memos purport to grant discretion, ... there was evidence from DACA's implementation that DAPA's discretionary language was pretextual").

The Fifth Circuit affirmed, holding that the states had demonstrated a likelihood of success on the merits not only of their procedural APA claim, but also on their substantive APA claim, because DAPA seemed to conflict with the INA's "intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status."[4] Texas, 809 F.3d at 179. But the court expressly declined to address the states' constitutional challenges. See

id. at 146 n.3 (finding it "unnecessary" to address those claims "at this early stage of the proceedings"). It also rejected the government's threshold arguments—similar to the ones offered here—that the states lacked standing, see id. at 150–63, that the INA deprived the court of subject-matter jurisdiction, see id. at 164–65, and that DAPA's implementation was unreviewable under the APA, see id. at 165–72.[5] The government petitioned for certiorari, and in June 2016, an eight-Justice Supreme Court affirmed the Fifth Circuit's judgment by an equally divided vote. See United States v. Texas, —— U.S. ——, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) (mem).

On January 20, 2017, President Donald J. Trump was sworn into office, and his nominee for Secretary of Homeland Security, John F. Kelly, was confirmed that same day. Six months later, Secretary Kelly issued a memorandum rescinding DAPA, including its expansion of DACA, but leaving the original DACA program in place. AR 235–236. The Texas plaintiffs voluntarily dismissed their challenge to DAPA a few months later. See Pls.' Stipulation of Voluntary Dismissal, Texas v. United States, No. 14–CV–254, 2017 WL 5476770 (S.D. Tex. Sep. 12, 2017), ECF No. 473.

### C. The Rescission of DACA

On September 5, 2017, three months after DAPA's rescission, then-Acting Secretary of Homeland Security Elaine C. Duke issued a five-page memorandum rescinding DACA (the "Rescission Memo").[6] **\*219** See AR 252–56. The Rescission Memo began by canvassing the procedural history of the Texas litigation, and then noted that "[a]lthough the original DACA policy was not challenged in [that] lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum." AR 253. Specifically, the memorandum noted that "[t]he Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary," and that "[b]oth the district court and the Fifth Circuit concluded that implementation of the program did not comply with the [APA] because the Department did not implement it through notice-and-comment rulemaking." AR 253–54.

The memorandum also stated that in June 2017, after DAPA had been rescinded but before the Texas litigation was voluntarily dismissed, Texas and the other state plaintiffs in that case had sent a letter to Attorney General Jeff Sessions threatening to challenge DACA in court unless he rescinded the program by September 5, 2017. AR 254;

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 40 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...
106 Fed. R. Evid. Serv. 233

<u>see</u> AR 238–240 (Texas's demand letter). Attorney General Sessions then sent a one-page letter to Acting Secretary Duke (the "Sessions Letter") instructing her to rescind DACA. AR 251. The Sessions Letter explained that the program had been "effectuated by the previous administration through executive action, without proper statutory authority and ... after Congress' repeated rejection of proposed legislation that would have accomplished a similar result," and that "[s]uch an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." <u>Id.</u> The letter also noted that because DACA suffered from "the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." <u>Id.</u> The letter instructed Acting Secretary Duke to "consider" implementing "an orderly and efficient wind-down process" for the program. <u>Id.</u>

In light of the <u>Texas</u> litigation and the Sessions Letter, the Rescission Memo concluded, "it is clear that the ... DACA program should be terminated." AR 255. Given "the complexities associated with winding down the program," however, the Department decided to "provide a limited window in which it will adjudicate certain requests for DACA and associated applications." <u>Id.</u> Thus, the Department would adjudicate any properly filed DACA applications that were pending as of September 5, 2017, as well as any new applications for the renewal of DACA benefits that were filed on or before October 5, 2017 by persons whose benefits were set to expire on or before March 5, 2018. It would also honor (in most cases) existing grants of deferred action, work authorization, and advance parole. But it would reject all other DACA applications, including any initial applications filed after September 5, 2017, and all pending and future applications for advance parole under the DACA program. Effectively, then, DACA benefits were made unavailable to any alien who had not already applied, and existing DACA grants would be allowed to expire permanently beginning in March 2018. Finally, like the earlier DACA and DAPA memorandums, the Rescission Memo stated that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." AR 256.

## II. LEGAL CHALLENGES TO DACA'S RESCISSION

Since September 2017, legal challenges to DACA's rescission have been filed in federal district courts throughout the country. Two of these challenges have made their way to the federal courts of **\*220** appeals, and one has been to the Supreme Court. Because these challenges generally involve similar administrative and constitutional claims, the Court will not address the plaintiffs' assertions in each case in detail. Nevertheless, a brief overview of this pending litigation landscape will be useful to understand the state of DACA's rescission today. [7]

### A. <u>Regents of the University of California v. DHS</u>

The first set of challenges to DACA's rescission was filed in September 2017 in federal district court in California. <u>See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.</u>, 279 F.Supp.3d 1011, 1026 (N.D. Cal. 2018). The plaintiffs in those cases are the University of California, the State of California and several other states, a group of individual DACA recipients, two California municipalities, and a labor union. <u>See id.</u> Though not formally consolidated, the cases were all assigned to U.S. District Judge William H. Alsup. <u>See</u> Case Management Scheduling Order, <u>Regents</u>, No. 17–5211 (N.D. Cal. Sept 22, 2017), ECF No. 49.

Shortly after the actions were filed, the government filed an administrative record consisting of "fourteen documents comprising 256 pages of which 187 consisted of published opinions from the DAPA litigation." <u>Regents</u>, 279 F.Supp.3d at 1028. "All non-public materials, some eighty-four documents, actually reviewed by the Acting Secretary remained withheld as privileged." <u>Id.</u> (citation omitted). The district court ordered the government to complete the record, denying many of the government's claims of privilege. <u>Id.</u> at 1028–29. The government petitioned the Ninth Circuit for a writ of mandamus, but the court of appeals denied the petition. <u>See In re United States</u>, 875 F.3d 1200 (9th Cir. 2017). The government then sought the same relief from the Supreme Court, which construed the government's mandamus petition as a petition for a writ of certiorari, granted it, vacated the Ninth Circuit's order, and directed the district court to "first resolve[ ] the Government's threshold arguments," since those arguments, "if accepted, likely would eliminate the need for the District Court to examine a complete administrative record." <u>In re United States</u>, —— U.S. ——, 138 S.Ct. 443, 444–45, 199 L.Ed.2d 351 (2017) (per curiam).

While the litigation over the administrative record was pending, the plaintiffs filed a motion for preliminary injunctive relief, and the government moved to dismiss the plaintiffs' complaints both for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to

Case 3:20-cv-03982-LB   Document 57   Filed 07/28/20   Page 41 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...
106 Fed. R. Evid. Serv. 233

state a claim under Rule 12(b)(6). See Regents, 279 F.Supp.3d at 1029. Then, following the Supreme Court's instruction to first address the government's threshold arguments, the district court denied the government's Rule 12(b)(1) motion and granted the plaintiffs' motion for a preliminary injunction. Id. at 1036–37. The injunction directed DHS to resume accepting applications for the renewal of DACA benefits, although it did not require the agency to accept new DACA applications or to afford current DACA beneficiaries advance parole. See id. at 1048–49.

In a separate order entered a few days later, the district court denied the government's Rule 12(b)(6) motion except as to the plaintiffs' notice-and-comment and Regulatory Flexibility Act claims. See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., No 17-CV-05211, 2018 WL 401177, at *2 (N.D. Cal. Jan. 12, 2018). The **\*221** government appealed both orders, and the Ninth Circuit set an expedited briefing schedule. See Order, Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., No. 18–15068 (9th Cir. Jan. 17, 2018), ECF No. 2. The government also petitioned the Supreme Court for a writ of certiorari before judgment, but the Supreme Court denied the petition. See Order, Dep't of Homeland Sec. v. Regents of the Univ. of Cal., No. 17–1003 (U.S. Feb. 26, 2018). The government's appeal is currently pending before the Ninth Circuit.

**B.** Batalla Vidal v. Duke

The second challenge also came about in September 2017 when Martin Batalla Vidal, an individual DACA beneficiary who was already engaged in litigation with the Department over the revocation of his employment authorization, amended his complaint to assert a challenge to DACA's rescission. See Batalla Vidal v. Duke, No. 16-CV-4756, 2017 WL 5201116, at *4 (E.D.N.Y. Nov. 9, 2017). His challenge was later consolidated with two others before Judge Nicholas G. Garaufis of the U.S. District Court for the Eastern District of New York. Id. The plaintiffs in the three cases include Mr. Batalla Vidal, the State of New York, fourteen other states and the District of Columbia, and Make the Road New York, a nonprofit. See id. at *4 & n.5.

Shortly after the consolidation of the three actions, another dispute arose regarding the scope of the administrative record. The district court ordered the government to produce certain documents, see id. at *6–7, and, on the government's petition for mandamus, the Second Circuit stayed discovery pending the district court's resolution of "issues of jurisdiction and

justiciability." Id. at *8. The government then filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6). Id.

The district court denied the government's Rule 12(b)(1) motion (except as to some plaintiffs that the court found lacked standing), see id. at *20, but it later certified its decision for an interlocutory appeal, see Batalla Vidal v. Nielsen, 16–CV–4756, 2018 WL 333515, at *1 (E.D.N.Y. Jan. 8, 2018). The Second Circuit then held the government's petition for leave to file an interlocutory appeal in abeyance pending the district court's resolution of the government's Rule 12(b)(6) motion and the plaintiffs' motion for a preliminary injunction, which the plaintiffs had filed while issues related to the interlocutory appeal were being litigated. See Certified Order, Nielsen v. Vidal, No. 18–122 (2d Cir. Jan. 31, 2018), ECF No. 46.

A few weeks later, the district court granted the plaintiffs' motion for a preliminary injunction. See Batalla Vidal v. Nielsen, 279 F.Supp.3d 401, 437–38 (E.D.N.Y. 2018). The scope of the court's injunction was the same as in Regents: it required the Department to resume consideration of renewal applications but did not require the consideration of initial applications or applications for advance parole. Id. at 437–38. The government took an interlocutory appeal, and the next day, the Second Circuit denied the mandamus petition that it had previously held in abeyance and vacated its earlier discovery stay. See Certified Order, In re Nielson, No. 17–3345 (2d Cir. Feb. 21, 2018), ECF No. 181. The Second Circuit thereafter granted the government's motion to expedite the appeal, which is pending at this time. See Certified Order, Vidal v. Nielsen, No. 18–485 (2d Cir. Mar. 8, 2018), ECF No. 62.

While the expedited appeal was pending, the district court granted in part and denied in part the government's pending 12(b)(6) motion.[8] See **\*222** Batalla Vidal v. Nielsen, No. 16-cv-4756, 2018 WL 1532370, at *1 (E.D.N.Y. Mar. 29, 2018). The court denied the motion as to plaintiffs' substantive APA claims for substantially the same reasons that it had previously found a substantial likelihood of success on the merits of those claims, id. at *3, but granted the motion as to their procedural APA and Regulatory Flexibility Act ("RFA") claims. Id. at *5–6. The court also denied the motion as to the plaintiffs' equal protection claims, id. at *6–10, although it granted the motion as to their information-sharing claim, concluding that the plaintiffs had "not plausibly alleged that DHS actually changed its information-sharing policy," id. at *11. Finally, the court granted the motion as to

106 Fed. R. Evid. Serv. 233

plaintiffs' procedural due process claim, except as to certain plaintiffs who alleged that their renewal applications had been improperly rejected as untimely or were erroneously deemed to contain minor clerical errors. Id. at *14.

### C. Casa de Maryland v. DHS

The plaintiffs in the third case, CASA de Maryland v. U.S. Dep't of Homeland Security, 284 F.Supp.3d 758 (D. Md. 2018), are individual DACA recipients and several nonprofit organizations. In March 2018, the district court (Judge Roger W. Titus) ruled that although DACA's rescission was reviewable, it did not violate the APA or the Equal Protection or Due Process Clauses. See id. at 770, 773–77, 779. The district court summarized its decision to depart from the Regents and Batalla Vidal courts on the substantive APA claim as follows:

> The decisions to date by courts in California and New York are premised on the legal conclusion that DACA is lawful, and therefore, a decision to rescind DACA on the basis of unlawfulness is necessarily arbitrary and capricious. Respectfully, this Court disagrees. Regardless of the lawfulness of DACA, the appropriate inquiry is whether or not DHS made a reasoned decision to rescind DACA based on the Administrative Record .... Given the fate of DAPA, the legal advice provided by the Attorney General, and the threat of imminent litigation, it was reasonable for DHS to have concluded—right or wrong —that DACA was unlawful and should be wound down in an orderly manner. Therefore, its decision to rescind DACA cannot be arbitrary and capricious.

Id. at 767–768 (citation omitted). However, the district court did grant one form of relief not granted by the courts in Regents or Batalla Vidal: it enjoined DHS from "using information provided by Dreamers through the DACA program for enforcement purposes," explaining that so doing would violate applicable principles of equitable estoppel. Id.

at 779. As of the date of this decision, neither party has appealed the district court's order, although the time in which to do so has not yet expired. See Fed. R. App. P. 4 (a)(1)(B).

### III. THE PRESENT CHALLENGES TO DACA'S RESCISSION

The cases currently before this Court, NAACP v. Trump and Princeton v. United States, were filed in September and November 2017, respectively, and have been consolidated for purposes of the dispositive motions pending in each. The plaintiffs in the Princeton action are Princeton University, Microsoft Corporation, and Maria de la Cruz Perales Sanchez, a DACA beneficiary and Princeton undergraduate. See Compl. ("Princeton Compl.") [ECF No. 1] at 12. The plaintiffs in the NAACP action **\*223** are the National Association for the Advancement of Colored People ("NAACP"), the American Federation of Teachers ("AFT"), and the United Food and Commercial Workers International Union ("UFCW"). See First Amended Complaint at 3–5, NAACP, No. 17–cv–1907 (D.D.C. Oct. 24, 2017), ECF No. 10 ("NAACP FAC"). Both sets of plaintiffs challenge DACA's rescission on various administrative and constitutional grounds, including that it was arbitrary and capricious, see Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. ("Princeton MSJ") at 11–38; that it should have undergone notice-and-comment procedures, see id. at 38–41; that its effects on "small entities" should have been analyzed pursuant to the RFA, 5 U.S.C. §§ 601–12, see NAACP FAC 16–17; and that it violates the Equal Protection and Due Process Clauses of the Fifth and Fourteenth Amendments, see Princeton Compl. at 35–40.

The government has filed motions to dismiss in both actions. It argues: (1) that plaintiffs' APA claims should be dismissed because DACA's rescission was "committed to agency discretion by law" and is therefore unreviewable under 5 U.S.C. § 701(a)(2), see Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Princeton MTD") [ECF No. 8] at 14–21; (2) that a provision of the INA, 8 U.S.C. § 1252(g), deprives the Court of subject-matter jurisdiction, see id. at 21–24; (3) that all plaintiffs but Ms. Perales Sanchez lack Article III and prudential standing, see id. at 24–25; Mem. in Supp. of Defs.' Mot. to Dismiss, No. 17–cv–1907 (D.D.C. Nov. 8, 2018) ("NAACP MTD") at 14–18; and (4) that plaintiffs have failed to state a claim under the APA, the RFA, and the Constitution, Princeton MTD at 27–44.

Plaintiffs have moved for summary judgment only on their APA claims, or alternatively, for preliminary injunctive relief

"[t]o the extent the Court wishes to see [the discovery] issues [in Regents and Batalla Vidal] litigated before granting final judgment to the Plaintiffs." Princeton MSJ at 3 & n.1. Unlike the plaintiffs in Regents and Batalla Vidal, however, plaintiffs here have not challenged the completeness of the administrative record, see 5 U.S.C. § 706 (providing that, in reviewing agency action, "the court shall review the whole record or those parts of it cited by a party" (emphasis added) ), and the government urges the Court to decide the pending motions on the current record, see Princeton MTD at 3 ("[T]he Court should either uphold the Rescission Policy and grant this motion if it agrees that the record supports Defendants' position, or set aside the Rescission Policy if it disagrees."). Finally, plaintiffs here also have moved for a preliminary injunction preventing DHS from sharing or otherwise using DACA beneficiaries' personal information for immigration enforcement purposes. See Princeton MSJ at 48–53.

The Court initially set a motions hearing in this case for February 2018, but the hearing was continued at the parties' request pending the government's petition for certiorari before judgment in the Regents case. See January 26, 2018 Min. Order. That petition was denied in late February, and the Court held a motions hearing in mid-March. The parties' motions are now ripe for decision.

## DISCUSSION

## I. SUBJECT–MATTER JURISDICTION

### A. The Immigration and Nationality Act

The government argues that the Court lacks jurisdiction over all of plaintiffs' claims—administrative and constitutional —under 8 U.S.C. § 1252(g), a provision of the INA that states that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney **\*224** General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." On its face, that language removes jurisdiction only as to the three listed actions of the Attorney General. The government argues that "[t]he denial of deferred action is a step toward the commencement of removal proceedings against an alien" and that "the INA's careful scheme for [removal] proceedings" suggests that such denials may be challenged only through individual removal proceedings, and hence § 1252(g) strips the Court of jurisdiction over plaintiffs' challenge here. Defs.'

Reply in Supp. of their Mot. to Dismiss ("Defs.' Reply") [ECF No. 56] at 10.

The government's position contradicts not only the plain language of § 1252(g) but also the Supreme Court's interpretation of that language in Reno v. American–Arab Anti–Discrimination Committee ("AAADC"), where the Court specifically rejected the argument that "the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." 525 U.S. 471, 482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999). Rather, the Court explained, § 1252(g) applies "only to three discrete actions that the Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.' " Id. (listing "part[s] of the deportation process" that fall outside of § 1252(g)'s scope, including "decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order"). Because the rescission of DACA is neither the commencement of a proceeding, the adjudication of a case, nor the execution of a removal order, § 1252(g) is inapplicable here pursuant to the provision's plain language.

The government's only response is that DACA's rescission is a "step toward" the removal of specific aliens. See Defs.' Reply at 10; but see id. at 2 (stressing elsewhere that rescission "does not, in itself, exert the agency's coercive power over any individual"). True, the Supreme Court said in AAADC that § 1252(g) was "specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings." 525 U.S. at 487, 119 S.Ct. 936. But there is no allegation here that removal proceedings have yet been initiated against any DACA beneficiary, so there are no pending removal proceedings with which plaintiffs' challenge might interfere. Cf. id. (concluding that § 1252(g) stripped jurisdiction over selective deportation claims brought by six aliens who were then in removal proceedings). Thus, the government's reliance on AAADC is misplaced, and § 1252(g) does not bar review here. Accord Regents, 279 F.Supp.3d at 1031–1033 (rejecting the government's § 1252(g) argument); Batalla Vidal, 2017 WL 5201116, at *12–13 (same).

### B. Article III Standing

The government also asks the Court to dismiss the claims brought by Princeton and Microsoft, Princeton MTD at 24–

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

106 Fed. R. Evid. Serv. 233

25, and by all plaintiffs in the NAACP action, see NAACP MTD at 14–17, for lack of Article III standing. In so moving, the government urges the Court to conduct a "claim-by-claim analysis" of each plaintiff's standing as to each claim. Defs.' Reply 11.

Such a detailed analysis is unnecessary, however, at least in Princeton. The government does not dispute that the individual plaintiff, Ms. Perales Sanchez, has Article III standing to assert each claim in the complaint. [9] See Princeton MTD 24–25 **\*225** (seeking dismissal only as to the "[n]on-[i]ndividual [p]laintiffs"); Princeton Compl. 30–38 (listing Ms. Perales Sanchez as a plaintiff on each count). And as the Supreme Court has recently reaffirmed, Article III requires only that "[a]t least one plaintiff ...have standing to seek each form of relief requested in the complaint." Town of Chester v. Laroe Estates, Inc., —— U.S. ——, 137 S.Ct. 1645, 1651, 198 L.Ed.2d 64 (2017). In Princeton, that "one plaintiff" is Ms. Perales Sanchez, and no further analysis of any other plaintiff's standing is necessary.

In NAACP, however, there is no individual plaintiff. The organizational plaintiffs—the NAACP and two labor unions —therefore must rely on their own standing to survive the government's motion to dismiss. These plaintiffs assert that they have "associational standing," which requires each of them to plead that "(1) at least one of its members would have standing to sue in his or her own right; (2) the interests it seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of an individual member of the organization in the suit." AARP v. EEOC, 226 F.Supp.3d 7, 16 (D.D.C. 2016) (citation omitted). As in Princeton, if one of the three NAACP plaintiffs has standing, then an analysis of the remaining plaintiffs' standing is unnecessary.

The parties do not dispute that the NAACP plaintiffs meet the third prong of the test for representational standing— they do. See NAACP MTD at 16–17 (not arguing that the participation of individual members should be required). And although the government contends that the NAACP plaintiffs fail the first prong because their complaint does not "name a specific member with standing," see id. at 16, each plaintiff provided an anonymous affidavit from at least one of its members stating that the member was a DACA beneficiary, see, e.g., Princeton MSJ, Ex. W [ECF No. 28–17] (declaration of NAACP member), and the government does not seriously dispute—nor could it—that these affidavits are sufficient. [10] Thus, **\*226** the only remaining issue is whether

the rescission of DACA is germane to the organizational plaintiffs' purposes.

The germaneness requirement is "undemanding" and requires "mere pertinence between litigation subject and organizational purpose." Humane Soc. of the U.S. v. Hodel, 840 F.2d 45, 58 (D.C. Cir. 1988). Here, the NAACP has alleged that its purpose is to "ensure the political, educational, social, and economic equality of all persons," particularly "people of color." NAACP Compl. at 3–4. This mission is "pertinent" to the subject of the litigation here, because plaintiffs have alleged that "[n]early all of the DACA registrants—more than 95%—are people of color," id. at 12, and that DACA confers various educational, social, and economic benefits on those individuals, see id. at 2. At this stage of the litigation, these allegations are sufficient to establish the NAACP's standing—which, in turn, is sufficient to establish the standing of the other two plaintiffs in the NAACP action. See Hodel, 840 F.2d at 59 (concluding that an association's "members' aesthetic interest in viewing live animals and birds" was sufficiently germane to a lawsuit whose purpose was "keeping animals and birds alive and well"). Thus, at least one plaintiff has standing to assert every claim in both of the actions currently before the Court, and the government's motions to dismiss for lack of standing will be denied.

## II. ADMINISTRATIVE CHALLENGES

As noted above, plaintiffs assert various administrative challenges to DACA's rescission, including that it was arbitrary and capricious, that it required notice and comment, and that it ran afoul of RFA's requirement that an agency consider the effects of its actions on small entities. The government raises two threshold arguments that apply only to plaintiffs' administrative claims: first, that DACA's rescission was unreviewable under the APA's carve-out for actions "committed to agency discretion by law," 5 U.S.C. § 701(a) (2); [11] and second, that plaintiffs fall outside the "zone of interests" protected by the APA and RFA. The Court will first address the government's threshold arguments and then proceed to the merits of plaintiffs' claims.

### A. Reviewability
The APA "applies, according to the provisions thereof, except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The Supreme Court has explained the difference between § 701(a)(1) and (a)(2) as follows:

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 45 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

106 Fed. R. Evid. Serv. 233

The former applies when Congress has expressed an intent to preclude judicial review. The latter applies in different circumstances; even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely.

Heckler v. Chaney, 470 U.S. 821, 828, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (emphasis added). Thus, in determining whether a particular agency action is "committed to agency discretion by law," courts ask whether "statutes are drawn in such broad **\*227** terms that in a given case there is no law to apply." Id. (citations and internal quotation marks omitted); see also Drake v. FAA, 291 F.3d 59, 70 (D.C. Cir. 2002) ("[T]he 'no law to apply' formula has come to refer to the search for substantive legal criteria against which an agency's conduct can be seriously evaluated.").

One category of agency action that the Court has held to be "presumptively unreviewable" under § 701(a)(2) is an agency's decision "not to institute enforcement proceedings." Lincoln v. Vigil, 508 U.S. 182, 191, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (citing Chaney, 470 U.S. at 831, 105 S.Ct. 1649). The Supreme Court first identified this presumption in Chaney, a case in which a group of death-sentenced prisoners petitioned the Food and Drug Administration ("FDA") to prevent the use in lethal injections of certain drugs that the agency had not approved for that purpose. See 470 U.S. at 823, 105 S.Ct. 1649. The FDA refused, explaining not only that was it "unclear" that it had "jurisdiction over the unapproved use of approved drugs for human execution," but also that given the absence of any "danger to the public health or a blatant scheme to defraud," even if the agency did have jurisdiction, it would "decline to exercise [that jurisdiction] under [its] inherent discretion to decline to pursue certain enforcement matters." Id. at 824–25, 105 S.Ct. 1649. The plaintiffs filed suit, seeking an order directing the FDA to take enforcement action. The district court granted summary

judgment for the agency, holding that its decision not to act was unreviewable under § 701(a)(2), but the court of appeals reversed with instructions to order the agency to "fulfill its statutory function." Id. at 825–27, 105 S.Ct. 1649.

The Supreme Court granted certiorari and reversed. "[A]gency decisions to refuse enforcement," the Court explained, are "general[ly] unsuit[able] for judicial review" for several reasons. Id. at 831, 105 S.Ct. 1649. Such decisions call for "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall policies." Id. Moreover, nonenforcement decisions generally do not involve the exercise of "coercive power over an individual's liberty or property rights"; they provide no "focus for judicial review"; and they "share[ ] to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." Id. at 832, 105 S.Ct. 1649. For these reasons, such decisions have "traditionally been 'committed to agency discretion,' and we believe that the Congress enacting the APA did not intend to alter that tradition." Id. Thus, the Court concluded, "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)." Id. The Court was careful to note, however, that this presumption of unreviewability "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." Id. at 833, 105 S.Ct. 1649. Critically for purposes of this case, moreover, the Court reserved judgment on whether the presumption applies where an agency "refuse[s] ... to institute proceedings based solely on the belief that it lacks jurisdiction." Id. at 833 n.4, 105 S.Ct. 1649 (internal quotation marks omitted).

Although the Supreme Court has not yet answered the question reserved in Chaney, the D.C. Circuit has addressed it. In Crowley Caribbean Transport, Inc. v. Pena, for example, the issue was whether Chaney's presumption of unreviewability applied to **\*228** the Maritime Administration's refusal to take an enforcement action under a provision of the Merchant Marine Act of 1936 (the "1936 Act") that the agency thought was inapplicable as a matter of law. See 37 F.3d at 672–73. The D.C. Circuit began by noting that Chaney had reserved judgment on almost exactly this issue and then observed that two intervening

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 46 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

106 Fed. R. Evid. Serv. 233

circuit decisions seemed to have answered the question in contradictory ways. See id. at 675–76 (citing Safe Energy Coal. of Mich. v. U.S. Nuclear Regulatory Comm'n, 866 F.2d 1473, 1477 (D.C. Cir. 1989) (presumption of unreviewability applied to the agency's refusal, based on its interpretation of its own regulations, to take enforcement action against a nuclear reactor); Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock, 783 F.2d 237, 244–45 (D.C. Cir. 1986) (presumption of unreviewability did not apply to the Department of Labor's refusal, based on its interpretation of the labor laws, to take enforcement action in response to a union complaint) ).

After noting that "[a]s a circuit, we seem to have no explicit rule on how to proceed when we have inconsistent precedents," id. at 675, the court relied on language from an intervening Supreme Court decision, ICC v. Brotherhood of Locomotive Engineers ("BLE"), 482 U.S. 270, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987), to resolve the intra-circuit split. BLE held that an agency's refusal to reconsider a decision on the basis of "material error"—that is, because it was erroneous when made, not because of changed circumstances or newly discovered evidence—is "committed to agency discretion by law" under § 701(a)(2), even if it is based on the agency's interpretation of a statute. Id. at 278–84, 107 S.Ct. 2360. In reaching this conclusion, the Supreme Court rejected what it took to be the concurrence's suggestion that "if [an] agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." [12] Id. at 283, 107 S.Ct. 2360. To refute this proposition, the Court explained,

> it is enough to observe that a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction. That is surely an eminently "reviewable" proposition, in the sense that courts are well qualified to consider the point; yet it is entirely clear that the refusal to prosecute cannot be the subject of judicial review.

Id. Citing this passage, the Crowley court concluded that BLE, "though not in the Chaney context, squarely rejects the notion of carving reviewable legal rulings out from the middle of non-reviewable actions." Crowley, 37 F.3d at 676. Thus, the court held, there was "no basis for review of the Maritime Administrator's single-shot non-enforcement decision." Id.

The D.C. Circuit in Crowley was careful to preserve another line of circuit precedent, however, which holds that Chaney's presumption of unreviewability does not apply to "an agency's announcement of its interpretation of a statute, even when that interpretation is advanced in the context of a decision not to take enforcement action." Edison Elec. Inst. v. EPA, 996 F.2d 326, 333 (D.C. Cir. 1993) (citations and internal **229** quotation marks omitted). [13] The key difference, the Crowley court explained, was that while the case before it involved an agency's refusal to act on a single complaint, those prior cases involved "an agency's statement of a general enforcement policy" that was either "expressed ... as a formal regulation after the full rulemaking process ... or ... otherwise articulated ... in some form of universal policy statement." Crowley, 37 F.3d at 676. The court then pointed out the "ample reasons for distinguishing the two":

> [First,] general statements [of enforcement policy] ... are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as Chaney recognizes, peculiarly within the agency's expertise and discretion. Second, an agency's pronouncement of a broad policy against enforcement poses special risks that it 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities,' a situation in which the normal presumption of non-reviewability may be inappropriate. Finally, an agency will generally present a clearer (and more easily reviewable) statement of its reasons for acting when formally articulating a broadly applicable enforcement policy ....

Id. at 677 (quoting Chaney, 470 U.S. at 833 n.4, 105 S.Ct. 1649). Thus, the court concluded in Crowley, an individual nonenforcement decision is presumptively unreviewable even if it is based solely on legal grounds, even though "an agency's statement of a general enforcement policy may be reviewable for legal sufficiency." Id. at 676–677.

The D.C. Circuit has applied Crowley only once, in OSG Bulk Ships, Inc. v. United States, 132 F.3d 808 (D.C. Cir. 1998). In that case, a plaintiff challenged the Maritime Administration's longstanding policy of refusing to enforce

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 47 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

106 Fed. R. Evid. Serv. 233

a different provision of the 1936 Act against certain vessels. See id. at 811 (explaining that the agency had "long allowed" vessels built with the aid of a federal subsidy that was reserved for ships that would be operated exclusively in foreign trade to enter the domestic shipping market at the end of their economic lives). Citing Crowley for the proposition that while "agencies' nonenforcement decisions are generally unreviewable ..., an agency's adoption of a general enforcement policy is subject to review," the court concluded that the Maritime Administration's policy was not presumptively unreviewable because it was not a "single-shot non-enforcement decision." Id. at 812 (citation omitted).

The government contends that Chaney's presumption of unreviewability applies here. See Princeton MTD at 17. Like the FDA's refusal to take the enforcement actions at issue in Chaney, the government argues, DHS's decision to rescind a deferred-action policy like DACA involves a "complicated balancing" of the agency's enforcement and resource-allocation priorities, and it resembles the "[c]hanges in policy as to criminal prosecutorial *230 discretion" that "regularly occur within and between presidential administrations." Defs.' Reply at 2–3, 26. Moreover, the Supreme Court has said that the concerns that counsel against judicial review in the criminal context are "greatly magnified in the deportation context," where delaying removal "is often the principal object of resistance to a deportation proceeding" and where delays "permit and prolong a continuing violation" of the federal immigration laws. AAADC, 525 U.S. at 490, 119 S.Ct. 936. Nor do Crowley and OSG apply here, the government argues, because those cases involved an agency's interpretation of a specific statutory provision, whereas this case involves the agency's evaluation of its overall statutory authority.

Plaintiffs resist the application of Chaney's presumption on two grounds. First, they argue, Chaney itself involved a decision not to enforce a statute, whereas DACA's rescission was, in essence, a decision to resume enforcing the immigration laws. Pls.' Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n") [ECF No. 23] at 6. This matters because two of Chaney's reasons for its presumption apply "unique[ly] to non-enforcement decisions": the absence of the exercise of "coercive power" over any person, and the lack of any "focus for judicial review." Id.

This distinction is unpersuasive. For one thing, the rescission of DACA does not actually require the Department to initiate removal proceedings against any specific alien; rather,

it simply removes a mechanism by which certain aliens otherwise could have been considered for deferred action. Thus, like the FDA's nonenforcement decision in Chaney, there are no agency proceedings here to provide a "focus for judicial review," 470 U.S. at 832, 105 S.Ct. 1649, and DACA's rescission does not itself involve the exercise of coercive power over any person. [14]

Moreover, Chaney's remaining rationales apply here with equal force. An agency's decision to revoke a nonenforcement policy involves the same prioritization and resource-allocation considerations as its decision to implement such a policy. See Chaney, 470 U.S. at 831, 105 S.Ct. 1649. And both types of decisions are substantially immunized from judicial review in the criminal context. See United States v. Armstrong, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) ("[T]he decision whether or not to prosecute ... generally rests entirely in [the prosecutor's] discretion[,] ... subject to constitutional constraints." (citations omitted) ). Thus, although the D.C. Circuit has at times warned against extending Chaney "outside of [the] context" of "decisions not to take enforcement action," Robbins v. Reagan, 780 F.2d 37, 46 (D.C. Cir. 1985) (rejecting Chaney's application to a decision to withhold federal funding from a homeless shelter), *231 this Court has little difficulty concluding that Chaney extends to the revocation of nonenforcement decisions.

Second, plaintiffs contend that under Crowley and OSG, any general enforcement policy is exempt from Chaney's presumption of unreviewability, regardless of whether it is premised on a legal interpretation. See Pls.' Opp'n at 7; Tr. Of Mots. Hr'g [ECF No. 64] ("Oral Arg. Tr.") at 21:6–11. Concededly, there is some language in the post-Crowley case law to support this view. See, e.g., OSG, 132 F.3d at 812 (stating that "an agency's adoption of a general enforcement policy is subject to review"); Ass'n of Civilian Technicians, Inc. v. Fed. Labor Relations Auth., 283 F.3d 339, 343 (D.C. Cir. 2002) (noting "our assumption in Crowley that a district court might have jurisdiction over an agency's articulation of its general enforcement policy").

But plaintiffs' reading of this language is unpersuasive for at least two reasons. First, it is in substantial tension with Chaney itself, where the plaintiffs had asked the FDA to take "various investigatory and enforcement actions" against drug manufacturers, state prisons, and "all those in the chain of distribution who knowingly distribute or purchase the drugs [at issue] with intent to use them for human execution." 470 U.S. at 824, 105 S.Ct. 1649; see id. at 842, 105 S.Ct.

EXHIBIT B
Page 11

Case 3:20-cv-03982-LB   Document 57   Filed 07/28/20   Page 48 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

106 Fed. R. Evid. Serv. 233

1649 (Marshall, J., concurring in the judgment) (noting that "the number of people currently affected by the alleged misbranding is around 200"). These facts suggest that the FDA's refusal to act in that case was more than just a one-off nonenforcement decision. [15] Second, plaintiffs' broad reading of <u>Crowley</u> and <u>OSG</u> is unnecessary to support the holdings of those cases, which both involved nonenforcement decisions based solely on agency statutory interpretation. See <u>Crowley</u>, 37 F.3d at 672–73; <u>OSG</u>, 132 F.3d at 810 Better, then, to adhere to the lines that the D.C. Circuit and the Supreme Court have actually drawn: between legal interpretations couched as broad enforcement policies (which are reviewable, as in <u>OSG</u>), individual enforcement decisions (which are presumptively unreviewable, as in <u>Crowley</u>), and discretionary enforcement policies (which are presumptively unreviewable, as in <u>Chaney</u> itself).

Indeed, the government's reading of <u>Crowley</u> and <u>OSG</u> proceeds essentially along these lines. In the government's view, those cases stand for the proposition that "if [an] agency's <u>interpretation of a statute</u> is embedded in a non-reviewable enforcement policy, the former may be reviewable as such," but "the enforcement policy itself" is presumptively insulated from review. Defs.' Reply at 6 (emphasis added). Thus, according to the government, <u>Crowley</u> and <u>OSG</u> address the "flipside" of the Supreme Court's <u>dictum</u> in <u>BLE</u>: just as an otherwise unreviewable agency action (like a refusal to reconsider an earlier decision, as in <u>BLE</u>, or a nonenforcement decision, as in <u>Chaney</u> and <u>Crowley</u>) does not become reviewable simply because the agency acts on the basis of its interpretation of a statute, an otherwise reviewable interpretation of a statute does not become presumptively unreviewable simply because the agency characterizes it as an exercise of enforcement discretion. See Oral Arg. Tr. at 15:5–13.

The Court has no quarrel with this statement of the law as a general matter, but it is unpersuaded by the government's **\*232** attempt to apply that law to this case. The government contends that the <u>Crowley/OSG</u> exception does not apply here because the Rescission Memo "does not contain an embedded interpretation of the INA (or any other statute)." Defs.' Reply at 6. But the Sessions Letter makes clear that DACA's rescission was based (at least in significant part) on the Attorney General's view that the program lacked "proper statutory authority." AR 251.

As best the Court can tell, the government's response is that <u>Crowley</u> and <u>OSG</u> are distinguishable because they involved an agency's determination that a specific statutory provision applied to a particular course of conduct, whereas this case—like <u>Chaney</u>—involves an agency's determination as to the scope of its statutory (and here, also constitutional) authority. See Oral Arg. Tr. at 57:24–58:9 (arguing that <u>Crowley</u> applies only "where there's an interpretation of a substantive provision of the statute"); <u>id.</u> at 8:12–15 ("Plaintiffs nowhere point to any provision in the INA that would substantively constrain the Secretary's decision ... to rescind or discontinue DACA."). But this strikes the Court as a distinction without a difference. To say that a particular agency action is "without statutory authority" is simply to say that no statutory provision authorizes that action; in a sense, therefore, it is a determination of the substantive content of each statutory provision that might plausibly apply. See, e.g., 6 U.S.C. § 202(5) (authorizing the Department to "[e]stablish[ ] national immigration enforcement policies and priorities"). The Court fails to perceive any meaningful difference between an agency's conclusion that it lacks statutory authority and its interpretation of a specific statutory provision. See <u>City of Arlington v. FCC</u>, 569 U.S. 290, 299–300, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013) (rejecting, for purposes of determining the proper standard of judicial review, a similar distinction between "jurisdictional" and "nonjurisdictional" agency interpretations and concluding that "there is <u>no difference</u>, insofar as the validity of agency action is concerned, between an agency's exceeding the scope of its authority (its 'jurisdiction') and its exceeding authorized application of authority that it unquestionably has"). The government's attempt to avoid <u>Crowley</u> and <u>OSG</u> on these grounds therefore fails.

The government's reliance on <u>BLE</u> is equally unavailing. For one thing, as <u>Crowley</u> recognized, <u>BLE</u> addressed the reviewability of enforcement decisions only in <u>dictum</u>; its actual holding concerned the reviewability of an agency's refusal to reconsider a prior decision. See <u>Crowley</u>, 37 F.3d at 676; <u>BLE</u>, 482 U.S. at 278–84, 107 S.Ct. 2360. Moreover, the best account of <u>BLE</u> is the one that the D.C. Circuit actually gave in <u>Crowley</u>, where the court relied on <u>BLE</u> to conclude that <u>Chaney's</u> presumption of unreviewability applies to <u>individual</u> nonenforcement decisions. See <u>Crowley</u>, 37 F.3d at 676–77. In the same breath, however, the D.C. Circuit reaffirmed its view that general enforcement policies are exempt from <u>Chaney's</u> presumption of unreviewability where they are predicated solely on the agency's view of what the law requires. See <u>id.</u> This treatment of <u>BLE</u> by the <u>Crowley</u> court is not only sensible—after all, <u>BLE's</u>

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

106 Fed. R. Evid. Serv. 233

dictum concerned a prosecutor's decision not to bring a single criminal charge—but it is also binding on this Court.

Nor do the concerns that counsel against judicial review in the immigration context carry much force where, as here, a party seeks judicial review of a legal judgment embedded in an immigration enforcement policy. Unlike judicial review of individual removal proceedings, review of an enforcement policy does not itself delay the removal of any specific alien. See AAADC, 525 U.S. at 490–91, 119 S.Ct. 936 (noting that delay "is often the principal object of **\*233** resistance to a deportation proceeding" and that it prolongs "an ongoing violation of United States law"). And there is no danger of "chilling law enforcement by subjecting the [agency's] motives ... to outside inquiry," since the court need only examine the immigration authority's legal reasoning. Id. at 490, 119 S.Ct. 936 (alteration omitted). Although many immigration decisions touch on subjects that courts are ill-equipped to consider, such as diplomacy or national security, see id. at 491, 119 S.Ct. 936, an agency's interpretation of a statute is a much more natural subject for judicial review. Thus, while immigration policies are generally "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference," there are good reasons to scrutinize a policy more carefully when it is based solely on an agency's reading of domestic statutory law. Saavedra Bruno v. Albright, 197 F.3d 1153, 1159 (D.C. Cir. 1999).

Properly understood, then, the Crowley/OSG exception to Chaney's presumption of unreviewability applies to a legal interpretation phrased as a general enforcement policy, even if that interpretation concerns the scope of the agency's lawful enforcement authority. And that is essentially what we have here.

But the government has one final line of defense. According to the government, DACA was rescinded not only because of its supposed illegality, but also because of the Attorney General's assessment of what the government now calls "litigation risk"—that is, the likelihood that DACA would have been invalidated had it been challenged in the Texas litigation. See Defs.' Reply at 17; AR 254–55. At first blush, this seems to be a "discretionary" consideration that makes this case more like Chaney, where the agency refused to take enforcement action not only because it thought that it lacked jurisdiction (a legal reason), but also because the alleged violations did not implicate the agency's enforcement

priorities (a discretionary reason). See 470 U.S. at 824–25, 105 S.Ct. 1649.

It is not difficult to imagine a case where a court's preliminary disapproval of an agency's nonenforcement policy could lead the agency to rescind that policy for bona fide discretionary reasons. See Chaney, 470 U.S. at 831, 105 S.Ct. 1649 (identifying "whether the agency is likely to succeed if it acts" as one of several such reasons). For example, the agency could conclude that the costs of defending the policy in court would outweigh its benefits to the public, or that the negative publicity that would surround the litigation would undermine the policy's effectiveness. In such cases, the decision to rescind would be "discretionary" in a meaningful sense: the agency would have weighed the policy's costs and benefits and decided that the former outweighed the latter.

But where an agency asserts that a nonenforcement policy is unlawful and then asserts "litigation risk" as a separate ground for the policy's rescission, there are reasons to be more suspicious. After all, if an agency could insulate from judicial review any legal interpretation simply by framing it as an enforcement policy and then offering as an additional, "discretionary" justification the assertion that a court would likely agree with the agency's interpretation, then Crowley would be a dead letter. Moreover, because such an assertion would depend (at least in part) on the correctness of the agency's view of the policy's unlawfulness, it would be unlike the independent discretionary ground that triggered the presumption of unreviewability in Chaney itself. See 470 U.S. at 824–25, 105 S.Ct. 1649 (noting the FDA's statement that even if it had jurisdiction, it would still decline to act pursuant to its **\*234** "inherent discretion to decline to pursue certain enforcement matters"). For these reasons, litigation-strategy justifications deserve closer scrutiny when they are accompanied by agency assertions of unlawfulness.

Here, the Department rescinded DACA for legal reasons—its purported statutory and constitutional defects—and then offered as an additional reason the fact that a federal court of appeals had held that DAPA, a related but distinct deferred-action program, likely suffered from similar defects. See Defs.' Reply at 17 (citing the "litigation risk posed by the proceedings in Texas and the consequent potential for massive disruption were the policy [to be] immediately enjoined"). Although this additional justification was not a bare assertion that a court would likely agree with the agency's view of the law—since it relied on an actual court's view of a concededly similar legal issue—it nonetheless raises many of

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 50 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

106 Fed. R. Evid. Serv. 233

the same concerns. The Crowley/OSG rule would be seriously undermined if an agency could insulate from judicial review any legal interpretation stated as a general enforcement policy simply by pointing to one case where one court tentatively agreed with the agency on a similar legal issue. Moreover, the Department's conclusion that the Fifth Circuit's decision to uphold a preliminary injunction of DAPA suggests that a court would likely also impose a preliminary injunction of DACA necessarily relies on the Department's legal analysis of the similarities between the two policies—which, like the Department's view of DACA's legality itself, does not qualify for Chaney's presumption of unreviewability. Thus, the Court concludes that the Department's litigation-risk justification was too closely bound up with its evaluation of DACA's legality to trigger Chaney's presumption of unreviewability here.

When the litigation-risk justification falls away, all that is left to support DACA's rescission is the Department's determination that the program was implemented without proper statutory and constitutional authority—a legal determination which, when made in the context of a general enforcement policy, is not subject to Chaney's presumption of unreviewability. Thus, like every other court that has considered the question thus far, the Court concludes that DACA's rescission was not "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); see Regents, 279 F.Supp.3d at 1029–31; Batalla Vidal, 2017 WL 5201116, at *9–12; Casa De Maryland, 284 F.Supp.3d at 770. The Court will therefore proceed to the merits of plaintiffs' APA claims.

* * *

To summarize: an agency's decision whether to take an enforcement action is presumptively unreviewable, and that presumption can normally be rebutted only by pointing to statutory language that constrains the agency's exercise of its enforcement discretion. See Chaney, 470 U.S. at 832–33, 105 S.Ct. 1649. Under circuit precedent, however, an enforcement decision is exempt from the presumption of unreviewability if: (1) it is expressed as a general enforcement policy; and (2) it relies solely on the agency's view of what the law requires. See OSG, 132 F.3d at 812; Crowley, 37 F.3d at 676–677. This rule not only accords with the applicable case law, but it also preserves the judiciary's role as the ultimate arbiter of statutory meaning while at the same time affording agencies breathing space to adopt enforcement policies for discretionary reasons.

Here, DACA's rescission was a general enforcement policy predicated on DHS's legal determination that the program was invalid when it was adopted. And although **235 the government has sought to cast the Department's assessment of "litigation risk" as a discretionary justification that brings this case within Chaney's ambit, that justification is insufficiently independent from the agency's evaluation of DACA's legality to trigger Chaney's presumption of unreviewability. Thus, the Crowley/OSG exemption applies, and the government's motions to dismiss will be denied to the extent that they assert § 701(a)(2) as a bar to APA review.

**B. Whether Plaintiffs Possess a Cause of Action Under the APA and RFA**

The government also argues that the non-individual plaintiffs "lack a cause of action under the APA" because they "cannot meet the zone-of-interest test" used to determine prudential standing. Defs.' Reply at 13–14; see also NAACP MTD at 18 (framing this argument as one of "prudential standing"). However, "[f]or each claim, if constitutional and prudential standing can be shown for at least one plaintiff, [the Court] need not consider the standing of the other plaintiffs to raise that claim." Mt. States Legal Found. v. Glickman, 92 F.3d 1228, 1232 (D.C. Cir. 1996). Thus, because it is undisputed that Ms. Perales Sanchez's interests fall within the zone regulated by the INA, [16] the Court need not consider prudential standing in Princeton. And the NAACP plaintiffs have prudential standing for essentially the same reason as Ms. Perales Sanchez: each has members who are DACA beneficiaries and whose interests consequently fall within the zone of interests regulated by the INA. See Hodel, 840 F.2d at 61 (concluding that, "[f]or similar reasons [that the court found Article III standing], the interests of [the association's] members also fall within the zone of interests protected by the Endangered Species Act").

The NAACP plaintiffs' RFA claims are another matter. See NAACP FAC 75–82 (alleging that the Department failed to conduct an analysis of the effect of DACA's rescission on "small entities," as required by the RFA). "The RFA provides that 'a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review ....' " Nw. Min. Ass'n v. Babbitt, 5 F.Supp.2d 9, 13 (D.D.C. 1998) (quoting 5 U.S.C. § 611(a)(1) ); see also 5 U.S.C. § 601(6) (defining a "small entity" to mean, as relevant here, a "small organization"); id. § 601(4) (defining a "small organization" to be "any not-for-profit enterprise

which is independently owned and operated and is not dominant in its field"). Given this statutory language, "the RFA extends standing to seek judicial review only to a 'small entity.' " Babbitt, 5 F.Supp.2d at 13. But as the government points out, the NAACP plaintiffs' complaint "contains only a single conclusory allegation that [they] fall within the statutory definition, and any factual support for that claim is missing from (and arguably contradicted by) the declarations submitted in support of their motion for summary judgment." Defs.' Reply at 14 (citation omitted) (quoting Princeton MSJ, Ex. R at 2595 [ECF No. 28–17] (declaration from the president of the AFT, stating that "[t]he AFT is a national labor union representing approximately 1.7 million members"); id. at 2618 (declaration from **\*236** the president of the NAACP, stating that "[t]he NAACP is the nation's largest ... civil rights organization"); id. at 2639–40 (declaration from the president of the UFCW, stating that the union "is a labor organization" representing "1.3 million members") ). Thus, the NAACP plaintiffs have not established prudential standing on their RFA claim, and that claim will be dismissed.

### C. Procedural Validity

The Court turns now to the merits of plaintiffs' administrative claims, beginning with their argument that DACA's rescission should have undergone notice-and-comment rulemaking. The APA generally requires notice-and-comment procedures whenever an agency creates, amends, or repeals a rule.[17] See 5 U.S.C §§ 551(5), 553(b)–(c). A rule is exempt from this requirement, however, if it is an "interpretative rule[ ], general statement[ ] of policy, or rule[ ] of agency organization, procedure, or practice." Id. § 553(b)(A). Here, plaintiffs assert that DACA's rescission was a "substantive" or "legislative" rule that should have undergone notice and comment, Princeton MSJ at 38–41, while the government contends that DACA's rescission was "a general statement of policy regarding how DHS will exercise its enforcement discretion," Defs.' Reply at 27. On this point, the government has the better of the argument. Accord Regents, 2018 WL 401177, at \*2 (dismissing the notice-and-comment challenge to DACA's rescission); Batalla Vidal, 2018 WL 1532370, at \*5–6 (same); Casa De Maryland, 284 F.Supp.3d at 772 (same).

The key question in distinguishing between legislative rules (which must undergo notice and comment) and general statements of policy (which need not) is whether the statement in question has a "present binding effect." Elec. Privacy

Info. Ctr. (EPIC) v. DHS, 653 F.3d 1, 7 (D.C. Cir. 2011). "An agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." Id. (citation omitted); see Lincoln, 508 U.S. at 197, 113 S.Ct. 2024 (describing general statements of policy as "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power" (citation omitted) ).

Plaintiffs contend that DACA's rescission has a present binding effect because it "presently bars DACA beneficiaries from obtaining advance parole or applying to renew DACA relief" and "presently bars DACA officials from exercising their prior discretion in reviewing DACA applications or advance-parole applications." Princeton MSJ at 40. But this characterization of DACA's rescission is misleading. The Rescission Memo states the Department's intent to "reject all DACA initial requests" filed after September 5, 2017 and "not [to] approve any new ... applications for advance parole," AR 255; thus, its binding effect is "prospective[ ]," Lincoln, 508 U.S. at 197, 113 S.Ct. 2024 (citation omitted), rather than "present," EPIC, 653 F.3d at 7 (citation omitted).[18] Moreover, the memo expressly **\*237** states that it places "no limitations ... on the otherwise lawful enforcement or litigation prerogatives of DHS," AR 255, which further suggests that it is without present binding effect, cf. McLouth Steel Products Corp. v. Thomas, 838 F.2d 1317, 1319 (D.C. Cir. 1988) ("If a statement denies the decisionmaker discretion ... so that he, she, or they will automatically decline to entertain challenges to the statement's position, then the statement is binding ....").

Finally, the fact remains that the Rescission Memo withdrew a prior memorandum, which was itself issued without notice and comment, regarding how DHS intended to "exercise [its] prosecutorial discretion." AR 1. The Rescission Memo is therefore a clear example of a "statement[ ] by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." Lincoln, 508 U.S. at 197, 113 S.Ct. 2024 (citation omitted); see Regents, 2018 WL 401177, at \*2 ("For the same reasons that the promulgation of DACA needed no notice and comment, its rescission needed no notice and comment."). Hence, the rescission of DACA was exempt from notice and comment as a general statement of agency policy.[19]

### D. Substantive Validity

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 52 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

106 Fed. R. Evid. Serv. 233

The APA provides that a court "shall ... hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To satisfy this standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Encino Motorcars, LLC v. Navarro, ––– U.S. ––––, 136 S.Ct. 2117, 2125, 195 L.Ed.2d 382 (2016) (quoting Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ). "[I]f an agency relies on two grounds for a decision, a court may sustain it if one is valid and if the agency would clearly have acted on that ground even if the other were unavailable." Syracuse Peace Council v. FCC, 867 F.2d 654, 657 (D.C. Cir. 1989). However, because "a reviewing court ... must judge the propriety of [agency] action solely by the grounds invoked by the agency," post hoc explanations that the agency did not articulate when it acted are insufficient. SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947).

Here, the Department never stated, and the government does not now contend, that DACA's rescission reflected a change in the agency's immigration enforcement priorities. Instead, the government points to two reasons for DACA's rescission: first, the Department's legal conclusion that DACA was unconstitutional and without statutory authority; and second, its assessment of what it now calls "litigation risk"—the likelihood that DACA would **238** have been abruptly enjoined in the Texas litigation. Because these were the only reasons given by the agency, DACA's rescission can be sustained only on those grounds, even if the agency could have validly rescinded DACA as an exercise of its enforcement discretion. See Sea–Land Serv., Inc. v. Dep't of Transp., 137 F.3d 640, 646 (D.C. Cir. 1998) ("An agency action, however permissible as an exercise of discretion, cannot be sustained 'where it is based not on the agency's own judgment but on an erroneous view of the law.' " (citation omitted) ).

### 1. The Department's Conclusion that DACA Was Unlawful

Plaintiffs first attack DHS's reliance on DACA's purported unlawfulness as a reason to rescind DACA. They argue both that DHS failed adequately to explain its legal conclusion, see Princeton MSJ at 11–17, and that even if DHS's explanation

were adequate, its conclusion was erroneous, see id. at 17–27. The Court agrees that DHS's decision was inadequately explained, and hence it need not address the alternative argument that DHS's conclusion was substantively incorrect.

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." Encino Motorcars, 136 S.Ct. at 2125. Thus, when an agency reverses a prior decision, it must "provide a reasoned explanation for the change." Id. That explanation need not be "more detailed ... than what would suffice for a new policy created on a blank slate," but it must address the "facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests." Id. at 2125–26 (quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) ); see also id. at 2126 ("[A]n 'unexplained inconsistency' in agency policy 'is a reason for holding an interpretation to be an arbitrary and capricious change ....' " (alterations and citation omitted) ).

In concluding that DACA was unlawful, DHS purported to identify both statutory and constitutional defects with the program. For its part, the Rescission Memo pointed to "the Supreme Court's and the Fifth Circuit's rulings" in the Texas litigation and then cited the Sessions Letter, see AR 255, which stated that "DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress's repeated rejection of proposed legislation that would have accomplished a similar result." AR 251. The Sessions Letter also stated that "[s]uch an open-ended circumvention of the immigration laws was an unconstitutional exercise of authority by the Executive Branch," and later, in its concluding paragraph, it cited the Executive's duty to "faithfully execute the laws passed by Congress." Id. It also opined that "the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA." Id.

This scant legal reasoning was insufficient to satisfy the Department's obligation to explain its departure from its prior stated view that DACA was lawful. In concluding that DACA was implemented "without statutory authority," neither the Sessions Letter nor the Rescission Memo cited any statutory provision with which DACA was in conflict. Cf. Encino Motorcars, 136 S.Ct. at 2127 (rejecting as inadequate an agency's statement that a particular statutory exemption "does not include [certain] positions and the

Case 3:20-cv-03982-LB   Document 57   Filed 07/28/20   Page 53 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

106 Fed. R. Evid. Serv. 233

[agency] recognizes that there are circumstances under which the requirements for the exemption would not be met"). True, both documents pointed to the Fifth Circuit's decision in Texas, which held that DAPA likely conflicted with the **\*239** INA's "intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status." Texas, 809 F.3d at 179. But the government does not meaningfully dispute that, unlike DAPA, "DACA has 'no analogue in the INA.' " Defs.' Reply at 22 (quoting Regents, 279 F.Supp.3d at 1042). Thus, the Fifth Circuit's statutory analysis is inapposite.[20] The Department's conclusion that DACA was implemented without statutory authority—based only on an incongruous reference to the Fifth Circuit's decision on DAPA—therefore cannot support the program's rescission.

The Department's explanation for its conclusion that DACA was unconstitutional was equally opaque. The Sessions Letter made a fleeting reference to the Attorney General's "duty to ... faithfully execute the laws passed by Congress," AR 251, which could be read to invoke the President's constitutional duty to "take Care that the Laws be faithfully executed." See U.S. Const. art. II, § 3. But the letter made no attempt to explain why DACA breached that duty.[21] This failure was particularly acute in light of a thirty-three page memorandum prepared in 2014 by the Office of Legal Counsel ("OLC"), which deduced "from the nature of the Take Care duty" no fewer than "four general ... principles governing the permissible scope of enforcement discretion" and concluded that DAPA, a similar deferred-action program, was consistent with all of them. AR 9–10, 14–36.[22] And although the **\*240** Sessions Letter asserted that DACA suffered from "the same ... constitutional defects that the courts recognized as to DAPA," AR 251, the Fifth Circuit's decision in Texas did not actually identify any such defects. Indeed, it expressly declined to address the plaintiffs' constitutional claims. See 809 F.3d at 146 n.3. Like its evaluation of its statutory authority to implement DACA, then, the Department's analysis of DACA's constitutionality was so barebones that the Court cannot "discern[ ]" the "path" that the agency followed. Encino Motorcars, 136 S.Ct. at 2125 (citation omitted).[23] Thus, it too cannot support DACA's rescission.

The Department's failure to give an adequate explanation of its legal judgment was particularly egregious here in light of the reliance interests involved. See Encino Motorcars, 136 S.Ct. at 2126. The Rescission Memo made no mention of the fact that DACA had been in place for five years and had engendered the reliance of hundreds of thousands of beneficiaries, many of whom had structured their education, employment, and other life activities on the assumption that they would be able to renew their DACA benefits.[24] The Supreme Court has set aside changes in agency policy for failure to consider reliance interests that pale in comparison to the ones at stake here. See, e.g., Encino Motorcars, 136 S.Ct. at 2126 (setting aside the Department of Labor's interpretation of a statutory exemption from the Fair Labor Standards Act's overtime-pay requirements, in part because the agency had failed to address "decades of industry reliance" on its prior view that the exemption applied to a particular class of employees). Because DHS failed to even acknowledge how heavily DACA beneficiaries had come to rely on the expectation that they would be able to renew their DACA benefits, its barebones legal interpretation was doubly insufficient and cannot support DACA's rescission.

**\*241  2. Litigation Risk**

The Department's second justification for DACA's rescission was its conclusion that, if DACA were challenged in the Texas litigation, the district court there would enter a "nationwide injunction" that "would have prompted an immediate—and chaotic—end to the policy." Defs.' Reply at 15. Plaintiffs contend that this "litigation risk" conclusion was arbitrary and capricious and hence cannot sustain DACA's rescission. Princeton MSJ at 28–36. They are correct.

As an initial matter, plaintiffs assert that the government's litigation-risk argument is an "impermissible post hoc rationalization" of the Department's decision to rescind DACA. Princeton MSJ at 28. Here, plaintiffs miss the mark. Although both the Rescission Memo and the Sessions Letter focused primarily on DACA's statutory and constitutional defects, the Sessions Letter did state that DAPA was "enjoined on a nationwide basis" and that "it is likely that potentially imminent litigation would yield similar results with respect to DACA." AR 251. Moreover, the Rescission Memo went on to cite this concern as grounds for its decision to "wind [DACA] down in an efficient and orderly manner." AR 254. Together, these statements were sufficient to express the Department's concern that a nationwide injunction in the Texas litigation would abruptly shut down the DACA program. See Chenery, 332 U.S. at 196, 67 S.Ct. 1760.

Nevertheless, this concern does not withstand review under the familiar arbitrary and capricious standard. See State Farm, 463 U.S. at 43, 103 S.Ct. 2856. First, as already noted, there was good reason to doubt that the second of the Fifth Circuit's holdings in Texas—that DAPA conflicted with the express provisions of the INA, see 809 F.3d at 178–86—would extend to DACA, because the INA does not prescribe a statutory naturalization process for DACA-eligible individuals. And although the Fifth Circuit's holding that DAPA should have undergone notice-and-comment rulemaking likely would have extended to DACA, [25] see id. at 170–78, it simply does not follow that the district court in Texas was likely to issue an injunction bringing DACA to an abrupt halt.

For one thing, it is black-letter administrative law that when a court sets aside an agency action as procedurally invalid, the proper remedy is to remand the action to allow the agency an opportunity to conduct the required notice-and-comment procedures. See Sugar Cane Growers Co-op. of Fla. v. Veneman, 289 F.3d 89, 98 (D.C. Cir. 2002) (observing that "[w]e have previously remanded without vacating when the agency failed to follow notice-and-comment procedures"); C. & S.W. Services, Inc. v. EPA, 220 F.3d 683, 692 (5th Cir. 2000) (remanding without vacatur where the agency "may well be able to justify its decision ... and it would be disruptive to vacate [the challenged] rule"). It is true, as the government points out, that in Texas the district court preliminarily enjoined DAPA based solely on the program's failure to have undergone notice-and-comment rulemaking. See Texas, 86 F.Supp.3d at 677. DAPA was challenged before it took effect, however. See Texas, 809 F.3d at 149. By contrast, as of September 5, 2017 (the date by which the Texas plaintiffs **242** had threatened to challenge DACA, see AR 239), DACA would have been in place for over five years, and hundreds of thousands of applicants would have already been granted deferred action under the program. Thus, assuming that the district court in the Texas litigation would have found DACA defective only on procedural grounds (as a fair reading of the Fifth Circuit's opinion would suggest), it seems doubtful that the court would have preliminarily enjoined DACA instead of remanding it to the Department, perhaps without vacatur, to undergo notice-and-comment rulemaking.

On the other hand, if the Texas district court were to find that DACA was substantively invalid—or indeed, unconstitutional—injunctive relief rather than remand may have been the more likely remedy. But it still does not follow that the district court's injunction would have brought the DACA program to an "immediate" and "chaotic" halt. Defs.'

Reply at 15. As the Fifth Circuit has repeatedly recognized, district courts have "broad discretion" to "fashion[ ] equitable relief," Crawford v. Silette, 608 F.3d 275, 278 (5th Cir. 2010), including injunctive relief, see ODonnell v. Harris County, 882 F.3d 528, 537 (5th Cir. 2018) (noting that a district court's injunction is reviewed for abuse of discretion). In light of this discretion, it strains credulity to suggest that the district court would have enjoined DACA immediately and completely without allowing DHS any opportunity to wind the program down. Thus, regardless of the grounds on which the district court in Texas might have ultimately invalidated DACA, the Department's insistence that an "immediate—and chaotic— end to the policy" would have resulted, Defs.' Reply at 15, is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," State Farm, 463 U.S. at 43, 103 S.Ct. 2856, and was therefore arbitrary and capricious.

* * *

If, as the Court has concluded, see supra Part II.A, an agency's general enforcement policy is reviewable to the extent that it is premised on a legal judgment, it follows that the agency must explain that judgment in sufficient detail to permit meaningful judicial review. [26] See **243** Encino Motorcars, 136 S.Ct. at 2127. Here, the Department's conclusory statements were insufficient to explain the change in its view of DACA's lawfulness. [27] Moreover, the agency's prediction regarding the outcome of threatened litigation over DACA's validity —specifically, that the district court in the Texas litigation would immediately halt the program, without any opportunity for a wind-down—was so implausible that it fails even under the deferential arbitrary and capricious standard. DACA's rescission will therefore be set aside. [28]

### E. Remedy

Having concluded that DACA's rescission violated the APA, the question of remedy remains. As an initial matter, the Court will reject the government's invitation to confine its grant of relief strictly to the plaintiffs in this action. See Defs.' Reply at 44–45. As plaintiffs point out, the D.C. Circuit has previously rejected an agency's suggestion that "the named plaintiffs alone should be protected by [an] injunction," explaining that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated —not that their application to the individual petitioners is proscribed." Harmon v. Thornburgh, 878 F.2d 484, 495 n.21

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 55 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

106 Fed. R. Evid. Serv. 233

(D.C. Cir. 1989). Moreover, as the Fifth Circuit noted in Texas, the immigration context counsels strongly in favor of nationwide relief: "the Constitution requires 'an uniform Rule of Naturalization,' " 809 F.3d at 187 (quoting U.S. Const. art. I, § 8), "Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and uniformly,' " id. at 187–88 (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384), "and the Supreme Court has described immigration policy as 'a comprehensive and unified system,' " id. at 188 (quoting Arizona v. United States, 567 U.S. 387, 401, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) ). Thus, the Court concludes that nationwide relief is appropriate here.

The only remaining issue, then, is what form the Court's relief should **\*244** take. "[U]nsupported agency action normally warrants vacatur." Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1151 (D.C. Cir. 2005). But courts have discretion to remand without vacatur if "there is at least a serious possibility that the [agency] will be able to substantiate its decision," and if "vacating would be disruptive." Radio–TV News Directors Ass'n v. FCC, 184 F.3d 872, 888 (D.C. Cir. 1999) (alteration in original) (citation omitted); see Allied–Signal, Inc. v. U.S. Nuclear Reg. Comm'n, 988 F.2d 146, 150–51 (D.C. Cir. 1993) ("The decision whether to vacate depends on the seriousness of the order's deficiencies ... and the disruptive consequences of an interim change that may itself be changed." (citation omitted) ). Alternatively, a court may vacate the unlawful action but stay its order of vacatur for a limited time to allow the agency to attempt to cure the defects that the court has identified. See Friends of Earth, Inc. v. EPA, 446 F.3d 140, 148 (D.C. Cir. 2006) (remanding to the district court with instructions to vacate an agency rule but noting that the district court possessed "remedial discretion ... to stay [its] order on remand"); Nat. Res. Def. Council, Inc. v. EPA, Civ. Action No. 16-1861 (JDB), 2018 WL 1568882, at \*8 (D.D.C. Mar. 30, 2018) (vacating a rule but staying the order of vacatur until such time as the agency promulgated a replacement); see also A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (remanding and providing for "automatic[ ]" vacatur unless the agency justified its decision within 90 days); Rodway v. USDA, 514 F.2d 809, 817–18 (D.C. Cir. 1975) (remanding and giving the agency 120 days to complete the rulemaking process).

Here, the first Allied–Signal factor—the seriousness of the action's defects—favors remand without vacatur, although not unequivocally. On the one hand, it is certainly possible

that the Department could articulate a valid reason for DACA's rescission. For example, it could offer a coherent legal argument that DACA conflicts with the INA or violates the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, or it could explain why, as a matter of policy, DACA-eligible individuals should no longer be low-priority targets for removal. Accord Batalla Vidal, 279 F.Supp.3d at 408 ("Defendants indisputably can end the DACA program."). But there is some evidence in the record to suggest that the Department would not have rescinded DACA but for its supposed illegality. See, e.g., Ex. 119 to Princeton MSJ [ECF No. 28–15] at 2003 (congressional testimony of DHS officials that DACA beneficiaries are "a benefit to the country" and that "[w]e need to regularize their status through some legal means"). And although it seems that no court has yet passed judgment on DACA's constitutionality, at least one court in this district has concluded that DACA was likely "consistent with, rather than contrary to, congressional policy." Arpaio v. Obama, 27 F.Supp.3d 185, 208–09 (D.D.C. 2014) (concluding that the plaintiff's substantive APA challenge to DACA was unlikely to succeed on the merits), aff'd, 797 F.3d 11 (D.C. Cir. 2015) (affirming only on standing grounds). Thus, although the substantive flaws in DACA's rescission are curable in theory, the Department may face practical obstacles when attempting to remedy them. Nonetheless, there remains a "nontrivial likelihood" that the agency could justify DACA's rescission on remand, WorldCom, Inc. v. FCC, 288 F.3d 429, 434 (D.C. Cir. 2002), so the first Allied–Signal factor supports remand without vacatur.

The second Allied–Signal factor—the risk of disruption—also tips slightly in favor of remand without vacatur. On the one hand, two courts have already preliminarily **\*245** enjoined DACA's rescission, see Regents, 279 F.Supp.3d at 1047–50; Batalla Vidal, 279 F.Supp.3d at 437–38, which suggests that vacatur would cause little disruption, at least initially.[29] On the other hand, neither injunction applies to initial DACA applications, which the Department has stopped accepting. Thus, vacating DACA's rescission could lead to "an interim change"—an influx of initial DACA applications—"that may itself be changed" if DHS later provides a sufficient explanation for DACA's rescission.[30] Allied–Signal, 988 F.2d at 150–151 (citation omitted). On balance, therefore, the two Allied–Signal factors tend to favor remand without vacatur.

However, the Court is also mindful that, as several judges of the D.C. Circuit have noted, remand without vacatur

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 56 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

106 Fed. R. Evid. Serv. 233

"sometimes invites agency indifference." In re Core Comm'n, Inc., 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) (urging courts "to consider the alternatives to the open-ended remand without vacatur"); see Nat. Res. Def. Council v. EPA, 489 F.3d 1250, 1262–64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."). This concern is particularly acute here, where each day that the agency delays is a day that aliens who might otherwise be eligible for initial grants of DACA benefits are exposed to removal because of an unlawful agency action. Moreover, although the preliminary injunctions in Regents and Batalla Vidal currently protect aliens who have already received DACA grants, those injunctions are both on expedited appeals and hence could be reversed in the not-too-distant future. These concerns suggest that time is of the essence here, and the Court need not ignore this reality in crafting a remedy. Cf. Rodway, 514 F.2d at 817–18 (ordering that regulations concerning the food stamp system be revised "with expedition"—that is, within 120 days—because "[i]n matters as vital as basic nutrition there is no excuse for delay").

In light of the Allied–Signal factors, which tip in favor of remand without vacatur, and the troubling humanitarian consequences of the delays that remedy might invite, the Court will adopt an intermediate course: it will vacate DACA's rescission but stay its order of vacatur for 90 days. During that time, the Secretary of Homeland Security or her delegate may reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority. Should the Department fail to issue such a memorandum within 90 days, however, the Rescission Memo will be vacated in its **246** entirety, and the original DACA program will be restored in full. This means, among other things, that the agency will be required to resume accepting initial DACA applications and applications for advanced parole.

## III. CONSTITUTIONAL CHALLENGES

The government has also moved under Rule 12(b)(6) to dismiss the three constitutional claims asserted in plaintiffs' complaints for failure to state a claim. See Princeton MTD 37–44; NAACP MTD 37–43. Two of these claims—one grounded in equal protection, see Pls.' Opp'n at 24–27, and the other in due process, id. at 27–32—are challenges to DACA's rescission itself. The third argues that the Department may not, consistent with applicable due process principles, use

DACA beneficiaries' personal identifying information to initiate immigration enforcement proceedings against them, and plaintiffs seek a preliminary injunction to that effect. Id. at 32–35.

In light of its decision to vacate DACA's rescission, the Court will defer ruling on the government's motion to dismiss plaintiffs' first two constitutional challenges. Because plaintiffs have failed to plausibly allege facts to support their information-sharing claim, however, that claim will be dismissed without prejudice.

### A. Challenges to DACA's Rescission

As noted, plaintiffs' constitutional challenges to DACA's rescission proceed along two lines. First, plaintiffs argue that DACA's rescission violates the equal protection guarantee of the Fifth and Fourteenth Amendments, because it deprives undocumented aliens of certain benefits that remain available to aliens who are lawfully present in the United States. Pls.' Opp'n at 24–27 (citing Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); then Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) ). Second, plaintiffs maintain that DACA's rescission deprives existing DACA beneficiaries of their liberty and property interests in renewing their DACA benefits without due process of law. Id. at 27–31.

The Court will defer ruling on the government's motions to dismiss these two constitutional claims. To begin with, because the Court has already concluded that DACA's rescission violates the APA, it is not necessary to address plaintiffs' constitutional claims now. See Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 205, 129 S.Ct. 2504, 174 L.Ed.2d 140 (2009) (noting that courts generally avoid deciding constitutional issues unnecessarily); Texas, 809 F.3d at 146 n.3 (declining to reach plaintiffs' constitutional challenges to DAPA and instead affirming only on APA grounds). Moreover, litigation over similar constitutional issues has either reached or progressed past the motion-to-dismiss stage in three other cases, see Regents, 2018 WL 401177, at *2–7; Batalla Vidal, 2018 WL 1532370, at *6–14; Casa de Maryland, 284 F.Supp.3d at 773–777, and the Court is especially reluctant unnecessarily to address constitutional issues that have already been thoroughly considered by other courts. Finally, the Department could, on remand, alter DACA's rescission in ways that might affect the merits of plaintiffs' constitutional claims.[31] At this stage of the proceedings, then, the Court will defer ruling on

EXHIBIT B
Page 20

Case 3:20-cv-03982-LB  Document 57  Filed 07/28/20  Page 57 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...
106 Fed. R. Evid. Serv. 233

the government's motion to dismiss plaintiffs' constitutional challenges to DACA's rescission.

### *247 B. Information–Sharing Claim

Plaintiffs seek a preliminary injunction preventing DHS from sharing DACA beneficiaries' personal information with immigration enforcement authorities or otherwise using it for immigration enforcement purposes. See Princeton MSJ at 48–53; Pls.' Opp'n at 32–35. The government has moved to dismiss plaintiffs' information-sharing claim, arguing primarily that DHS had previously stated its intent not to use DACA beneficiaries' personal information in this way and that plaintiffs have not plausibly alleged that the agency has since changed its policy. See Princeton MTD at 41–42; Defs.' Reply at 36–37. The government also contends that even if the Department had changed its information-sharing policy, there would be no due-process violation, because that policy has always stated that it "may be modified, superseded, or rescinded at any time." Princeton MTD at 43 (citation omitted); Defs.' Reply at 37–39 (citation omitted).

To secure preliminary injunctive relief, plaintiffs "must establish (1) that [they are] likely to succeed on the merits, (2) that [they are] likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in [their] favor, and (4) that an injunction is in the public interest." Winter, 555 U.S. at 20, 129 S.Ct. 365. Here, the third and fourth prongs of this test—the equities and the public interest—clearly favor plaintiffs, who allege that the Department intends to use DACA beneficiaries' identifying information against them despite its earlier assurances that it would not do so, which induced the beneficiaries to provide the information in the first place.

Plaintiffs have also demonstrated a likelihood of success on the merits—as least as to their legal theory. Plaintiffs rely on two cases, Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), and Raley v. Ohio, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959), for the general proposition that "[d]ue process forbids the Government from making and then breaking promises about the legal consequences of a specific action." Princeton MSJ at 48. In Raley, the Supreme Court found a due process violation where four individuals were convicted of failing to answer questions posed by Ohio's Un–American Activities Commission after the chairman of that commission had specifically represented to the individuals that they could refuse to answer pursuant to a state-law privilege. See 360 U.S. at 437–38, 79 S.Ct. 1257; see also id. at 438, 79 S.Ct. 1257 ("[T]o sustain the

judgment of the Ohio Supreme Court on such a basis after the Commission had acted as it did would be to sanction the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him."). And in Cox, the Court, relying on Raley, held that it violated due process to convict demonstrators under a statute that prohibited demonstrating "near" a courthouse where "the highest police officials of the city ... in effect told the demonstrators that they could meet where they did." 379 U.S. at 571, 85 S.Ct. 476; see also Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) (recognizing a substantive due process right to enforce the terms of a plea agreement). This argument is sufficiently persuasive to support preliminary injunctive relief.

The sticking point here is the second prong—the likelihood of irreparable harm. Several factors convince the Court that the harm to DACA beneficiaries of having their information shared with immigration enforcement authorities, though likely irreparable, is insufficiently imminent to justify preliminary injunctive relief. League of Women Voters of U.S. v. Newby, 838 F.3d 1, 7–8 (D.C. Cir. 2016) *248 (harm is irreparable only if it is "so 'imminent that there is a clear and present need for equitable relief ....' " (alterations and citation omitted) ). For one thing, the Department has recently reaffirmed that its "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017 memo starting a wind-down of the DACA policy." USCIS, DHS, Frequently Asked Questions: Rejected DACA Requests Q5, https://www.uscis.gov/daca2017/mail-faqs (last updated Feb. 14, 2018). [32] This fact was enough to persuade one other district court to dismiss a similar information-sharing claim. See Batalla Vidal, 2018 WL 1532370, at *10–11. On the other hand, two courts have reached the opposite conclusion, see Regents, 2018 WL 401177, at *4–5; Casa de Maryland, 284 F.Supp.3d at 777–79, and one of those courts has already granted the injunctive relief that plaintiffs seek here, see Amended Order, Casa de Maryland, No. 17–cv–2942 (D. Md. Mar. 15, 2018), ECF No. 49 (enjoining the Department from (1) using or sharing DACA beneficiaries' personal information except as originally specified on the DACA application forms and instructions and (2) changing its information-sharing policy without the Court's preapproval). But that injunction now in place further belies any suggestion that irreparable harm to DACA beneficiaries is imminent—their information cannot now be used as they fear. Hence, the Court concludes that plaintiffs have failed to demonstrate

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-03982-LB Document 57 Filed 07/28/20 Page 58 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

106 Fed. R. Evid. Serv. 233

that they are entitled to preliminary injunctive relief on their information-sharing claim, and their motion for preliminary injunctive relief will be denied.

The Court also concludes that plaintiffs have failed to state a claim. See Fed. R. Civ. P. 12(b)(6). Plaintiffs point to a discrepancy between a prior statement by the Department that DACA beneficiaries' information would be "protected from disclosure" and a later statement issued on the date of DACA's rescission that the information would not be "proactively" provided to immigration enforcement authorities. See Princeton Compl. ¶ 51. Even if this discrepancy were sufficient to plausibly allege that DACA beneficiaries' information has been or will be used inconsistently with DHS's stated information-sharing policy, the agency has since reaffirmed its commitment to that prior policy, and the Court may take judicial notice of that fact in ruling on the government's motion to dismiss. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ); Vasser v. McDonald, 228 F.Supp.3d 1, 10 (D.D.C. 2016) ("Courts may take judicial notice of matters of a general public nature without converting the motion to dismiss into one for summary judgment." (alterations and citation omitted) ). [33] Thus, the government's Rule 12(b)(6) motion will be granted as to plaintiffs' information-sharing claim.

## *249 CONCLUSION

Executive Branch officials possess relatively unconstrained authority to enforce the law against certain violators but not others. Ordinarily, the exercise of that authority is subject to review not in a court of law, but rather in the court of public opinion: members of the public know how their elected officials have used their enforcement powers, and they can hold those officials accountable by speaking out, by petitioning their representatives, or ultimately at the ballot box. When an official claims that the law requires her to exercise her enforcement authority in a certain way, however, she excuses herself from this accountability. Moreover, if her view of the law is incorrect, she may needlessly forego the opportunity to implement appropriate enforcement priorities and also to demonstrate those priorities to the public.

Fortunately, neither Supreme Court nor D.C. Circuit precedent compels such a result. Rather, the cases are clear that courts have the authority to review an agency's interpretation of the law if it is relied on to justify an enforcement policy, even when that interpretation concerns the lawful scope of the agency's enforcement discretion. See Chaney, 470 U.S. at 832–33, 105 S.Ct. 1649; OSG, 132 F.3d at 812; Crowley, 37 F.3d at 676–77. Under this rule, an official cannot claim that the law ties her hands while at the same time denying the courts' power to unbind her. She may escape political accountability or judicial review, but not both.

Here, the Department's decision to rescind DACA was predicated primarily on its legal judgment that the program was unlawful. That legal judgment was virtually unexplained, however, and so it cannot support the agency's decision. And although the government suggests that DACA's rescission was also predicated on the Department's assessment of litigation risk, this consideration is insufficiently distinct from the agency's legal judgment to alter the reviewability analysis. It was also arbitrary and capricious in its own right, and thus likewise cannot support the agency's action. For these reasons, DACA's rescission was unlawful and must be set aside.

For the reasons given above, then, the Court will vacate the Department's September 5, 2017 decision to rescind the DACA program. The Court will stay its order of vacatur for 90 days, however, to afford DHS an opportunity to better explain its view that DACA is unlawful. The Court will also deny the government's motion to dismiss for lack of subject-matter jurisdiction, its motion to dismiss plaintiffs' APA claims on reviewability grounds, and its motion to dismiss plaintiffs' substantive APA claim; grant the government's motion to dismiss plaintiffs' procedural APA claim, the NAACP plaintiffs' RFA claim, and plaintiffs' information-sharing claim; and defer ruling on the government's motion to dismiss plaintiffs' remaining constitutional claims. Finally, the Court will also grant plaintiffs' motion for partial summary judgment as to their substantive APA claim, deny that motion as to their procedural APA claim, and deny their motion for preliminary injunctive relief on their information-sharing claim. A separate order has been issued on this date.

## All Citations

298 F.Supp.3d 209, 106 Fed. R. Evid. Serv. 233

## Footnotes

1     Some courts, including the Supreme Court, have referred to aliens who are unlawfully present in the United States as "illegal" instead of "undocumented." See, e.g., Texas v. United States, 809 F.3d 134, 148 n.14 (5th Cir. 2015) (explaining that this "is the term used by the Supreme Court in its latest pronouncement pertaining to this area of the law" (citation omitted) ); but see Mohawk Indust., Inc. v. Carpenter, 558 U.S. 100, 103, 130 S.Ct. 599, 175 L.Ed.2d 458 (2009) (using the term "undocumented immigrants"). Because both terms appear in the record materials here, and because, as at least one court has noted, "there is a certain segment of the population that finds the phrase 'illegal alien' offensive," Texas v. United States, 86 F.Supp.3d 591, 605 n.2 (S.D. Tex. 2015), the Court will use the term "undocumented."

2     Citations to "AR" refer to the administrative record. See Joint Appendix [ECF No. 60].

3     DAPA would have applied to any alien who: (1) had a son or daughter who was a U.S. citizen or lawful permanent resident; (2) had continuously resided in the United States since before January 1, 2010; (3) was physically present in the United States both on November 20, 2014 and the date of her application; (4) had no lawful basis to be present in the United States on November 20, 2014; (5) did not meet certain enforcement priorities; and (6) did not otherwise raise concerns that would make deferred action inappropriate in the agency's discretion. See AR 40.

4     According to the Fifth Circuit, under the INA, the parent must generally "(i) have a U.S. citizen child who is at least twenty-one years old, (ii) leave the United States, (iii) wait ten years, and then (iv) obtain one of the limited number of family-preference visas from a United States consulate." Texas, 809 F.3d at 179–80.

5     All parties agreed that DAPA was "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), to the extent that it "involve[d] the Secretary's decision—at least temporarily—not to enforce the immigration laws as to a class of what he deems to be low-priority illegal aliens," Texas, 809 F.3d at 166 ("[Plaintiffs] have not challenged the priority levels [the Secretary] has established, and neither the [district court's] preliminary injunction nor compliance with the APA requires the Secretary to remove any alien or to alter his enforcement priorities"). But the Fifth Circuit nonetheless found DAPA to be reviewable because it was "much more than nonenforcement: [i]t would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens." Id.

6     Secretary Kelly had since been appointed to serve as President Trump's chief of staff.

7     One case, Park v. Sessions, No. 17–cv–1332 (E.D. Va. filed Nov. 21, 2017), was dismissed pursuant to a stipulation by all parties on March 1, 2018, before any relief was granted. The Court will not discuss that case further.

8     That motion also sought dismissal under Rule 12(b)(1) (on standing and mootness grounds) of the Batalla Vidal plaintiffs' procedural due process claim, which had been presented for the first time in their third amended complaint. Batalla Vidal, 2018 WL 1532370, at *12–13. The court denied the motion to dismiss on that ground.

9     Nor could they. Ms. Perales Sanchez clearly satisfies the "irreducible constitutional minimum" of standing as to DACA's rescission: her inability to renew her DACA benefits is (1) an "injury in fact," which is "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical"; it is (2) "fairly traceable" to DHS's decision to rescind DACA; and it is (3) "likely to be redressed" by a decision of this Court invalidating DACA's rescission. Spokeo, Inc. v. Robins, ––– U.S. ––––, 136 S.Ct. 1540, 1547–48, 194 L.Ed.2d 635 (2016) (internal quotation marks omitted). And although the Court ultimately concludes that plaintiffs fail to state a claim as to DHS's alleged plans to share DACA beneficiaries' information with immigration enforcement agencies, the Court concludes—and the government does not dispute—that Ms. Perales Sanchez has standing to assert that claim as well. See Princeton Compl. ¶ 108 (alleging that DHS has "revised [its] assurances about information sharing" and now "offer[s] only to prevent personal information from being provided 'proactively' to agencies responsible for facilitating removal"); cf. Clapper v. Amnesty Int'l, 568 U.S. 398, 411, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (finding that the plaintiffs' asserted injury was

EXHIBIT B
Page 23

Case 3:20-cv-03982-LB  Document 57  Filed 07/28/20  Page 60 of 63
National Association for the Advancement of Colored..., 298 F.Supp.3d 209...
106 Fed. R. Evid. Serv. 233

too speculative when it relied on a hypothetical sequence of government actions that culminated in their communications being monitored).

10 The government initially argued that the organizational plaintiffs had to name these members. See NAACP MTD at 16. The authority for that proposition is tenuous, however, see Young Am.'s Found. v. Gates, 560 F.Supp.2d 39, 49 (D.D.C. 2008) ("[I]t is not clear that [associational standing] actually requires a name-specific identification."), aff'd, 573 F.3d 797 (D.C. Cir. 2009); Doe v. Stincer, 175 F.3d 879, 884 (11th Cir. 1999) ("[W]e have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought ...."), and the government did not renew the argument in its reply brief, see Defs.' Reply at 12–13.

11 "[A] complaint seeking review of agency action 'committed to agency discretion by law' has failed to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6), not under the jurisdictional provision of Rule 12(b)(1)." Sierra Club v. Jackson, 648 F.3d 848, 854 (D.C. Cir. 2011) (citations omitted).

12 The concurrence disputed this characterization of its argument. See id. at 290 n.2, 107 S.Ct. 2360 (Stevens, J., concurring in the judgment). Its point was that because an agency's action can be sustained only on the grounds invoked by the agency, "when an agency explains that it has denied a petition for reopening based on ... its reading of a statute or a constitutional provision, its decision cannot be sustained on the conjecture that it has the discretion to deny reopening on a variety of grounds." BLE, 482 U.S. at 290–291, 107 S.Ct. 2360 (Stevens, J., concurring in the judgment).

13 See id. (holding that the presumption of unreviewability did not apply to the agency's determination that a statutory requirement applied to the plaintiffs, even though that determination was made in a policy statement that communicated the agency's intent not to enforce that requirement); Nat'l Wildlife Fed'n v. EPA, 980 F.2d 765, 773 (D.C. Cir. 1992) ("[T]he presumption of unreviewability of agency nonenforcement decisions is inapplicable or at least rebutted [where a plaintiff] raises a facial challenge to [an agency's] statutory interpretation embodied in [a regulation] and does not contest a particular enforcement decision.").

14 True, there is an element of coercion in the revocation of work authorization and other benefits associated with DACA. But the revocation of those benefits is not itself an enforcement decision and is therefore not properly analyzed under Chaney. See 470 U.S. at 832, 105 S.Ct. 1649. Indeed, at least one other court has concluded that the withholding of work authorization and similar discretionary benefits is unreviewable under § 701(a)(2) simply because "[t]here are no statutory standards ... to apply." See Perales v. Casillas, 903 F.2d 1043, 1048 (5th Cir. 1990) (holding that § 701(a)(2) precluded review of a categorical refusal by a district office of the then-Immigration and Naturalization Service to grant work authorization and pre-hearing voluntary departure to a certain class of eligible aliens over a three-year period); cf. Texas, 809 F.3d at 166–68 (holding that conferring such benefits, especially "in light of the INA's intricate regulatory scheme for changing immigration classifications and issuing employment authorization," was a nondiscretionary determination sufficient to permit APA review).

15 Justice Brennan joined the Court's opinion on the understanding that it applied only to "[i]ndividual, isolated nonenforcement decisions." Id. at 839, 105 S.Ct. 1649 (Brennan, J., concurring). Seven other justices joined the majority opinion in full, however, and none of them took Justice Brennan's view.

16 Nor could there be any dispute. As a DACA beneficiary, Ms. Perales Sanchez is "[her]self the subject of the contested regulatory action." Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) ("The 'zone of interest' test is a guide for deciding whether ... a particular plaintiff should be heard to complain of a particular agency decision.... [It] denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.").

17 The parties do not dispute that DACA's rescission is a "rule" for APA purposes. See 5 U.S.C. § 551(4) (defining a "rule," in relevant part, as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency"); see also Texas, 809 F.3d at 171 n.122 (noting that the government likewise did not dispute that DAPA was a rule).

106 Fed. R. Evid. Serv. 233

18    Although technically the memo does "presently bar DHS officials" from considering DACA and advance-parole applications, Princeton MSJ at 40, this argument proves too much. Any general statement of agency policy will presently bind the agency's employees; the question, rather, is whether the statement "purport[s] to bind those subject to it." EPIC, 653 F.3d at 7 (citation omitted). The Rescission Memo does not.

19    Plaintiffs also argue that DACA's rescission " 'alter[s] the rights or interests of parties' " (and hence is not a rule of "agency organization, procedure, or practice") and "makes a 'substantive change' to the statutory or regulatory regime" (and hence is not an interpretive rule). Princeton MSJ at 39–40 (quoting EPIC, 653 F.3d at 5–7). The government does not contend that DACA falls under either of these alternative exceptions to the notice-and-comment requirement, however, and the Court therefore will not address these arguments.

20    The Fifth Circuit also concluded that "there was evidence from DACA's implementation that DAPA's discretionary language was pretextual." Texas, 809 F.3d at 173; see id. at 172–176 (upholding the district court's factual finding that although "the DACA Memo instructed agencies to review applications on a case-by-case basis and exercise discretion, ... those statements were 'merely pretext' because only about 5% of [DACA] applications ... had been denied" and because the government could not identify how many of those had been denied for discretionary reasons (footnote omitted) ). But the Fifth Circuit relied on that finding only to conclude that DAPA should have been promulgated using notice-and-comment rulemaking, not that it conflicted substantively with the INA. See id. at 171–178. And although OLC had orally advised the Department that "it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria," AR 21 n.8, neither the Rescission Memo nor the Sessions Letter identified this purported flaw as a reason for DACA's invalidity.

21    At least one commentator has identified a second possible constitutional argument in the Sessions Letter: "The Obama administration's open-ended reading of certain definitional provisions of the Immigration and Nationality Act (INA) would run afoul of the nondelegation doctrine." See Josh Blackman, Understanding Sessions's Justification to Rescind DACA, Lawfare (Jan. 16, 2018, 8:00 AM) https://www.lawfareblog.com/understanding-sessionss-justification-rescind-daca; see also Texas, 809 F.3d at 150 (noting that the plaintiffs there had asserted "constitutional claims under the Take Care Clause" and the "separation of powers doctrine"). The government does not raise these arguments, however, so the Court will not consider them.

22    The OLC memorandum did not directly address the Department's authority to implement DACA. See AR 5–14 (discussing the agency's authority to "prioritize the removal of certain categories of aliens over others"); AR 14–36 (discussing the agency's authority to implement DAPA). However, the memo did state that OLC had "orally advised" the Department that DACA was lawful so long as "immigration officials retained discretion to evaluate each application on an individualized basis." AR 21 n.8 ("[T]he concerns animating DACA were ... consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion.").

23    Neither Encino Motorcars nor any of its predecessor cases explicitly required an agency to address its prior views on the legality of its prior policy. See, e.g., Fox, 556 U.S. at 515, 129 S.Ct. 1800 (explaining that "[a]n agency may not ... depart from a prior policy sub silentio" (first emphasis added) ). But where, as here, the OLC provides an agency with an opinion that suggests a legal framework for evaluating the legality of a particular program and the agency later rescinds that policy on legal grounds, failure to even consider OLC's thorough analysis is arbitrary and capricious. See Trevor W. Morrison, Stare Decisis in the Office of Legal Counsel, 110 Colum. L. Rev. 1448, 1464 (2010) ("OLC's legal advice is treated as binding within the Executive Branch until withdrawn or overruled."); Hispanic Affairs Project v. Acosta, 263 F.Supp.3d 160, 178 (D.D.C. 2017) (concluding that an "agency's non-consideration of [certain] OLC memoranda—whether deliberate or inadvertent—is all the more reason to consider them in reviewing the agency's action," because "[a] contrary result would permit agencies to toss aside OLC memoranda that contain legal conclusions contrary to the agency's preferred policy choices").

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

106 Fed. R. Evid. Serv. 233

24     See, e.g., Perales Decl. ¶¶ 21–22 (if DACA were rescinded, Ms. Perales Sanchez would have to abandon her plans of conducting postgraduate research in Mexico and then applying to law school, because she could no longer travel abroad, take out student loans, or work lawfully in the United States); Decl. of Jane Doe # 2, Ex. S to Princeton MSJ [ECF No. 28–17] ¶¶ 11–13 (current special education teacher and DACA beneficiary would lose her job and would have to abandon her plans of pursuing a doctorate in audiology); Decl. of Jane Doe # 5, Ex. X to Princeton MSJ [ECF No. 28–17] ¶ 11 (current undergraduate student and DACA beneficiary would have to abandon her plans of attending law school). Plaintiffs filed a motion for leave to file pseudonymous declarations with their summary judgment motion. See Pls.' Mot. for Leave to Allow Three Declarants to Proceed by Pseudonym [ECF No. 22]. The government did not oppose the motion, so the Court will treat it as conceded and grant it. See Local Civ. R. 7(b).

25     Because DAPA had not yet been implemented, the Fifth Circuit relied in large part on "extrapolation" from evidence regarding DACA's implementation to conclude that DAPA would not "genuinely leave the agency and its employees free to exercise discretion" and hence was a substantive rule that should have undergone notice and comment. Texas, 809 F.3d at 171–176. The government is correct that "[w]hile that finding had to be 'extrapolated' to invalidate DAPA, it directly dooms DACA itself," at least as far as notice and comment are concerned. Defs.' Reply at 22 (citations omitted).

26     The parties dispute the standard of review that would apply to the agency's statutory and constitutional analysis had it been adequately explained. The government maintains that it would be reviewed for a "clear error of judgment"—that is, under the ordinary test for arbitrary and capricious agency action. State Farm, 463 U.S. at 43, 103 S.Ct. 2856 (citation omitted); see Oral Arg. Tr. at 68:5–18. Plaintiffs contend that review would be de novo. See Teva Pharm. USA, Inc. v. FDA, 441 F.3d 1, 5 (D.C. Cir. 2006) (finding agency action arbitrary and capricious where the agency "mistakenly thought itself bound" by certain D.C. Circuit precedent); Prill v. NLRB, 755 F.2d 941, 947 (D.C. Cir. 1985) ("An agency decision cannot be sustained, however, where it is based not on the agency's own judgment but on an erroneous view of the law."). The district court in Batalla Vidal has suggested a third option: because "neither the Sessions Letter nor the DACA Rescission Memo carry the 'force of law,' " that court concluded, the Department's "interpretation of the legality of the DACA program is [not] entitled to formal or controlling deference." Batalla Vidal, 279 F.Supp.3d at 421 n.9 (E.D.N.Y. 2018) (quoting Mead, 533 U.S. at 226–27, 121 S.Ct. 2164). Rather, it would be treated only as persuasive. See Mead, 533 U.S. at 234–35, 121 S.Ct. 2164 (explaining that agency interpretations "contained in policy statements, agency manuals, and enforcement guidelines" are "beyond the Chevron pale" and instead deserve "respect proportional to [their] 'power to persuade' " (quoting Christensen v. Harris Cty., 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); then Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) ). Because the Court does not reach the merits of the Department's conclusions that DACA lacked statutory and constitutional authority, however, it expresses no opinion as to what standard of review would apply.

27     The district court in Casa de Maryland reached the opposite conclusion. See 284 F.Supp.3d at 772 (finding that DHS had a "reasonable basis" to conclude that DACA was unlawful based on "the DAPA litigation, the threatened legal challenge, and the Attorney General's advisory letter"). But that court's brief discussion of the issue failed to address the limited applicability of the Fifth Circuit's Texas decision to DACA, the inadequacy of the Sessions Letter itself, DHS's failure to address DACA beneficiaries' reliance interests, and the implausibility of an injunction issuing in the Texas litigation that would put an immediate end to DACA. Therefore, this Court respectfully disagrees with the Casa de Maryland court's analysis.

28     The government also urges the Court to construe the Department's statement that DACA was "unconstitutional in part because it was an 'open-ended' policy that closely tracked 'proposed legislation' that Congress had repeatedly rejected" as an "independent policy judgment" that "immigration decisions of [DACA's] magnitude should be left to Congress." Defs.' Reply at 21 (quoting AR 251 and citing Syracuse Peace Council, 867 F.2d at 657–58 (holding that if an agency offers two justifications for its decision, one constitutional and one discretionary, and if a court is "persuaded" that the agency would have reached the same result on discretionary grounds had it "foregone its ruminations on the constitutional issue," the

Case 3:20-cv-03982-LB  Document 57  Filed 07/28/20  Page 63 of 63

National Association for the Advancement of Colored..., 298 F.Supp.3d 209...

106 Fed. R. Evid. Serv. 233

court may avoid the constitutional issue and uphold the agency action only on the discretionary ground) ). But the government offers no support for the proposition that an agency's view as to which branch of government ought to address a particular policy issue is an assessment appropriately committed to the agency's discretion. <u>Cf. Chaney</u>, 470 U.S. at 831, 105 S.Ct. 1649 (listing such assessments).

29    True, both preliminary injunctions are currently the subjects of expedited appeals. This fact actually favors vacatur, however, because if both injunctions are overturned, then this Court's order of vacatur would preserve DACA pending the Department's revised explanation for the program's rescission, thereby maintaining the status quo.

30    Nor would it be proper for the Court to vacate DACA's rescission except as to initial applications. While a court has discretion to craft preliminary injunctive relief based on a number of equitable factors, <u>see Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 20, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), its discretion in fashioning administrative remedies is somewhat more limited, <u>see Harmon</u>, 878 F.2d at 494–95 ("Courts ordinarily do not attempt, even with the assistance of agency counsel, to fashion a valid regulation from the remnants of the old rule ... [or to] draw[ ] a line which the agency itself has never drawn."). Here, there is no principled basis to distinguish between initial DACA applications and renewal applications, since the Rescission Memo's substantive invalidity stems chiefly from its inadequately explained rationale. The Court therefore will not fashion an <u>ad hoc</u> order of vacatur along these lines.

31    For example, the Department might provide for procedures through which an existing DACA recipient could contest the revocation of her DACA benefits—something that the current Rescission Memo does not do. Such procedures could, at least in theory, be relevant to plaintiffs' procedural due process claim.

32    This document does not appear in the administrative record, but the Court takes judicial notice of it. <u>See</u> Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

33    For similar reasons, the Court will not address the argument made by amici LatinoJustice PRLDEF (and others) that DHS's breach of the information-sharing policy would violate the Privacy Act of 1974, 5 U.S.C. § 552a, and the agency's own privacy rules. <u>See</u> Br. of LatinoJustice PRLDEF, et al., as Amicus Curiae [ECF No. 36–2].

---

**End of Document**                                 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.