United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| DEJA VU–SAN FRANCISCO LLC, et al., | Case No. 20-cv-03982-LB |
| Plaintiffs, | |
| v. | **ORDER DENYING THE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| UNITED STATES SMALL BUSINESS ADMINISTRATION, et al., | Re: ECF No. 33 |
| Defendants. | |

## INTRODUCTION

The Coronavirus Aid, Relief, and Economic Security ("CARES") Act allocated substantial funds to the Small Business Administration ("SBA") through the Paycheck Protection Program ("PPP"), a loan program for small businesses suffering economic injury as a result of the COVID-19 pandemic. 15 U.S.C. § 9009. Under the PPP, businesses can apply for low-interest loans, called economic-injury disaster loans ("EIDL" or "disaster loans"), which the SBA forgives if the businesses use the money to pay workers during the crisis. The plaintiffs are commercial establishments that "present . . . live female performance dance entertainment that is fully clothed, at times topless, and at times for certain Plaintiffs, fully nude."[1] The SBA denied their loan

---

[1] Verified Second Am. Compl. ("SAC") – ECF No. 66 at 13–14 (¶ 70). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

United States District Court
Northern District of California

applications under its regulations, which prohibit EIDL loans to certain businesses, including those that present live performances of a "prurient sexual nature." 13 C.F.R. § 123.201(f).

The plaintiffs sued the SBA, claiming that its denial of the loans (1) violated the First Amendment to the U.S. Constitution, (2) violated the Fifth Amendment, and (3) was not a lawful exercise of the SBA's rulemaking authority (in part because the Small Business Act prohibits financial assistance only to businesses judged "obscene" (by a court) and in part because the SBA exceeded its authority under the CARES Act, in violation of the Administrative Procedure Act ("APA")).[2] They moved for a preliminary injunction.[3] The SBA opposed the motion on the ground that the plaintiffs do not establish their entitlement to a preliminary injunction: (1) they are not likely to succeed on the merits because they lack Article III standing, do not have viable APA and constitutional claims, and cannot obtain injunctive relief from the SBA; (2) they lack evidence of irreparable harm; and (3) a preliminary injunction is contrary to the public interest.[4] The court denies the plaintiffs' motion on the ground that they are not likely to succeed on their claims.

## STATEMENT

The plaintiffs — adult nightclubs in California (seven), Colorado (one), Oregon (one), and Washington (six) — applied for EIDL loans under the CARES Act, and the SBA denied the loans on the ground that the businesses were ineligible because they were businesses of a prurient sexual nature.[5] The plaintiffs then sued the defendants and moved for a temporary restraining order and a preliminary injunction to enjoin the SBA from applying 13 C.F.R. § 203.201(f) — the prurient-business regulation — to them and to require the SBA to process their loan applications.[6]

---

[2] *Id.* at 17–20 (¶¶ 103-113).

[3] Mot. – ECF No. 33; Pl. Supp. Brief – ECF No. 67.

[4] Opp'n – ECF No. 48-1.

[5] SAC – ECF No. 31 at 14–15 (¶¶ 74–91).

[6] Compl. – ECF No. 1; Mot. – ECF No. 33.

United States District Court
Northern District of California

The plaintiffs allege in their verified complaint under penalty of perjury that — but for the nature of their business — they are qualified for the EIDL loans.[7] The SBA points to evidence in the public record that on its website, Déjà Vu Services, Inc. identifies 14 of the 15 plaintiffs as locations in its "massive international chain of hundreds of adult theaters and bookstores" with over 10,000 employees, which (it says) suggests that the plaintiffs are a franchise or at least under common management and therefore do not qualify for EIDL loans under the Small Business Act's affiliation rules.[8] The plaintiffs counter that they undertook an investigation and determined that, assuming affiliation within the two groups of plaintiffs — the Washington group (the Washington, Colorado, and Oregon plaintiffs) and the San Francisco group — each group employs fewer than 500 employees, is not part of a franchise, and operates independently.[9]

On August 3, 2020, at the court's request, the SBA sent a request to the plaintiffs for information regarding their affiliation, such as license and trademark agreements, tax returns, operating agreements, and payroll records.[10] The plaintiffs responded that there are no franchising agreements, there is no external control of the San Francisco or Washington groups, the groups pay no licensing fees, and there are no management or consulting agreements between any plaintiffs and Déjà Vu Services.[11] The plaintiffs offered to provide documentation (though they resisted the tax returns as intrusive) and conditioned production on the SBA's production of information about how the SBA gathers information about affiliation as part of the EIDL application process.[12]

The court had a hearing on July 30, 2020, ordered further briefing, and had a second hearing on August 27, 2020. At the August 27, 2020 hearing, the SBA said that it requests tax returns as

---

[7] SAC – ECF No. 66 at 14 (¶¶ 77).

[8] Olear Decl. – ECF No. 45-2 at 8–9 (¶¶ 22–35) (citing website). The plaintiffs did not object to the court's considering the public-record information, which is relevant to standing. *Cf. Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir. 2004) (considering evidence beyond the complaint in a Rule 12(b)(1) motion).

[9] Forbes Decl. – ECF No. 54-1 at 14–15 (¶¶ 3–8); Carouba Decl. – ECF No. 54-1 at 10–11 (¶¶ 4–10).

[10] Letter – ECF No. 68 at 3–4.

[11] Letter – ECF No. 74 at 5.

[12] *Id.* at 7.

1    part of its ordinary process for evaluating affiliation. The court suggested that the plaintiffs should

2    comply with the information requests.

3        The parties consented to the undersigned's jurisdiction.[13]

4

5                            **THE REGULATORY SCHEME**

6    **1.   Small Business Act and the SBA's Regulations**

7        The Small Business Act created the SBA to "aid, counsel, assist, and protect . . . the interest of

8    small-business concerns[.]" *SBA v. McClellan*, 364 U.S. 446, 447 (1960); *see* 15 U.S.C. 631(a).

9    The Act gives the SBA and its Administrator "extraordinarily broad powers to accomplish these

10   important objectives," including the authority to loan money to small businesses that "could not

11   get necessary loans on reasonable terms from private lenders." *Id.*; *see* 15 U.S.C. 636(a); *DV*

12   *Diamond Club of Flint, LLC v. SBA*, --- F.3d ---, No. 20-CV-10899, 2020 WL 2315880, at *2

13   (E.D. Mich. 2020), *stay denied*, No. 20-1437 (6th Cir. May 15, 2020). The SBA Administrator has

14   the authority to "make such rules and regulations as he deems necessary to carry out the authority

15   vested in him by or pursuant to this chapter" and to "take any and all actions . . . when he

16   determines such actions are necessary or desirable in making . . . loans made under" the Act. 15

17   U.S.C. § 634(6)–(7). The SBA's Loan Policy Board — the Administrator, the Secretary of the

18   Treasure, and the Secretary of Commerce — "shall establish general policies (particularly with

19   reference to the public interest involved in the granting and denial of applications for financial

20   assistance by the [SBA] and with reference to the coordination of the functions of the [SBA] with

21   other activities and policies of the Government), which shall govern the granting and denial of

22   applications for financial assistance by the Administration." *Id.* § 633(d).

23       Section 7(b) of the Small Business Act authorizes the SBA to make EIDL loans "as the

24   Administration may determine to be necessary" to "any small business concern, private nonprofit

25   organization, or small agricultural cooperative suffering substantial economic injury" as a result of

26   an officially declared disaster in the area where the entity is located. 15 U.S.C. § 636(b)(1)(C)(2);

27

28   _____
     [13] Consent Forms – ECF Nos. 10 & 19.

United States District Court
Northern District of California

13 C.F.R. § 123.300(a). The EIDL loans give capital to qualified entities to meet their expenses (if there is a disaster) until they can resume normal operations. 13 C.F.R. §§ 123.2, 123.200(a), 123.303(a).

Under SBA rules, some businesses are not eligible for the disaster loans, such as nonprofit organizations (other than private nonprofit organizations), lenders, consumer cooperatives, and businesses primarily engaged in political activities or lobbying. 13 C.F.R. § 123.301(a–c), (h). 13 C.F.R. § 123.301 excludes from the loan program the businesses listed in 13 C.F.R. § 123.201, including businesses engaged in illegal activity, government-owned entities, and, relevantly here, any business that "presents live performances of a prurient sexual nature or derives directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature." *Id.* §§ 123.301, 123.201(d)–(f). The SBA implemented the ban on financial assistance to businesses of a prurient nature in 1996 in 13 C.F.R. § 120.110(p) (business loans under section 7(a) of the Small Business Act) and extended the ban to disaster loans under section 7(b) in 1998 in 13 C.F.R. § 123.201(f). 61 Fed. Reg. 3226, 3229–40 (Jan. 31, 1996); 63 Fed. Reg. 46,643, 46,643 (Sep. 2, 1998).

15 U.S.C. § § 633(e) provides the following:

> **(e) Prohibition on provision of assistance**
>
> Notwithstanding any other provision of law, the Administration is prohibited from providing any financial or other assistance to any business concern or other person engaged in the production or distribution of any product or service that has been determined to be obscene by a court of competent jurisdiction.

The Small Business Act also has rules about a business's size and affiliations. It defines a "small business concern" (the relevant category here) as "one that is independently owned and operated and which is not dominant in its field of operation" and which is "small" based on the "number of employees, dollar volume of business, net worth, net income, a combination thereof, or other appropriate factors." 15 U.S.C. § 632(a)(1)–(2)(B); 13 C.F.R. §§ 121.101, 121.201. The SBA considers affiliation with other entities in determining whether an entity is independent and small. Affiliation exists when an entity can control another entity. 13 C.F.R. § 121.103(a). If an entity is affiliated with another entity, the SBA aggregates the employees and annual business

United States District Court
Northern District of California

receipts of the affiliated entities to determine whether the business is "small" and meets its criteria for loans. 13 C.F.R. §§ 121.103(a)(6), 121.301. Affiliation can exist based on common ownership and common management. 13 C.F.R. § 121.301(f)(1), (3). Franchise and license agreements ordinarily are not considered in the affiliation analysis: the "restraints imposed on a franchisee or licensee by its franchise or license agreement generally will not be considered in determining whether the franchisor and licensor is affiliated with an applicant franchisee or licensee provided [that] the applicant franchisee or licensee has the right to profit from its efforts and bears the risk of loss commensurate with ownership." *Id.* § 121.301(7)(i). That is because the franchise relationship does not necessarily represent a level of control resulting in affiliation between the franchisor and the franchisee.[14] But it can, and so the SBA considers franchise and license agreements to determine whether an applicant is not independent and instead is affiliated with a franchisor, licensor, or another party to the agreement.[15] If the SBA deems an applicant to be affiliated with a franchisor and the franchisor's other franchisees, then it will aggregate the employees (or other measures of size) to determine whether the applicant is small.[16] *Id.* §§ 121.103(a)(6), 121.301(a). If the applicant does not meet the criteria that the SBA considers to be small, then the SBA will grant financial assistance only if the franchisor executes an addendum that (during the life of the SBA loan) the franchisor will not enforce a provision of the franchise agreement that — according to the SBA — deprives the franchisee of its independence.[17]

## 2. CARES Act

Through the CARES Act, Congress appropriated substantial funds for the EIDL program in the form of the PPP, which is a loan program for small businesses suffering economic injury as a result of the COVID-19 pandemic. 15 U.S.C. § 9009. Under the PPP, businesses can apply for

---

[14] Olear Decl. – ECF No. 45-2 at 6 (¶ 16).

[15] *Id.* (¶ 17).

[16] *Id.* (¶ 19).

[17] *Id.* (¶ 20).

low-interest EIDL loans, which the SBA forgives if the businesses use the money to pay workers during the crisis. 15 U.S.C § 636(a)(36).

For the covered period (January to December 2020), the CARES Act expanded the class of entities eligible for loans: "in addition to small business concerns, private nonprofit organizations, and small agricultural cooperatives" [already eligible for EIDL loans], the SBA can make loans to "eligible entities," defined as businesses with not more than 500 employees, sole proprietorships, independent contractors and businesses, cooperatives with not more than 500 employees, employee stock ownership plans with not more than 500 employees, tribal business concerns with not more than 500 employees, and agricultural enterprises with not more than 500 employees. 15 U.S.C. § 9009(a)–(f).

The SBA has applied its existing loan regulations to the PPP to exclude businesses of a prurient sexual nature.

## STANDARD OF REVIEW

The standards for a TRO and a preliminary injunction are the same. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.,* 240 F.3d 832, 839 n.7 (9th Cir. 2001). A movant must demonstrate (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm that would result if an injunction were not issued, (3) the balance of equities tips in favor of the plaintiff, and (4) an injunction is in the public interest. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The irreparable injury must be both likely and immediate. *Id*. at 20–22. "[A] plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Serv. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

Before *Winter*, the Ninth Circuit employed a "sliding scale" test that allowed a plaintiff to prove either "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999) (cleaned up). On this continuum, "the greater the relative hardship to [a movant], the less probability of success must be shown." *Id*. After *Winter*, the Ninth Circuit held that although the Supreme Court invalidated one aspect of the sliding scale approach, the "serious questions" prong of the sliding scale survived if

United States District Court
Northern District of California

1    the plaintiff satisfied the other elements for preliminary relief. *Alliance for Wild Rockies v.*

2    *Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Thus, a preliminary injunction may be

3    appropriate when a movant raises "serious questions going to the merits" of the case and the

4    "balance of hardships tips sharply in the plaintiff's favor," provided that the other elements for

5    relief are satisfied. *Id.* at 1134–35.

6                                           **ANALYSIS**

7          The plaintiffs claim that by applying 13 C.F.R. § 123.201(f) and denying them the PPP loan,

8    the SBA violated the APA, the First Amendment, and the Fifth Amendment.[18] The SBA responds

9    that the plaintiffs have not established their entitlement to a preliminary injunction: (1) they are

10   not likely to succeed on the merits because they lack Article III standing, do not have viable APA

11   and constitutional claims, and cannot obtain injunctive relief from the SBA; (2) they lack evidence

12   of irreparable harm; and (3) a preliminary injunction is contrary to the public interest.[19] The court

13   denies the plaintiffs' motion. They have standing, but they are not likely to succeed on the merits

14   of their claims.

15

16   **1.   Likelihood of Success on the Merits: Standing**

17         The SBA contends that the plaintiffs are not likely to succeed on the merits, and lack standing,

18   because they cannot show that their injuries are redressable given that Déjà Vu Services has over

19   10,000 affiliated employees. Alternatively, it asks to stay the case pending an administrative

20   evaluation of whether the plaintiffs are affiliated with Déjà Vu Services.[20] The court denies the

21   request because the plaintiffs establish redressability sufficiently.

22         Federal-court jurisdiction extends only to "cases" and "controversies." *Raines v. Byrd*, 521

23   U.S. 811, 818 (1997); *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To establish

24   standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the

25

26   _____

27   [18] Mot. – ECF No. 33.

     [19] Opp'n – ECF No. 48-1.

28   [20] *Id.* at 15–16.

challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

To establish redressability, a plaintiff must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43) (cleaned up). A plaintiff's burden to demonstrate redressability is "relatively modest." *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997)). A plaintiff "need not demonstrate that there is a 'guarantee' that [her] injuries will be redressed by a favorable decision." *Id.* (quotation omitted). "[R]ather, a plaintiff need only 'show a "substantial likelihood" that the relief sought would redress the injury.'" *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (quoting *Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010)). "If, however, a favorable judicial decision would not require the defendant to redress the plaintiff's claimed injury, the plaintiff cannot demonstrate redressability, *see, e.g.*, *Mayfield*, 599 F.3d at 971, unless she adduces facts to show that the defendant or a third party are nonetheless likely to provide redress as a result of the decision, *see Lujan*, 504 U.S. at 562." *Id.*

The parties do not dispute that the SBA denied the loans only on the ground that the plaintiffs are businesses of a prurient nature that do not qualify for the loans.[21] Moreover, during the application process, the plaintiffs submitted their applications with the information that the SBA required.[22] When the SBA raised the affiliation issue in its opposition, the plaintiffs submitted declarations to counter the SBA's contentions about affiliation and redressability. Also, a franchisor can execute an addendum to address any concerns that the SBA has about a franchisee's independence. Given these circumstances, the plaintiffs established redressability

---

[21] SAC – ECF No. 66 at 14 (¶¶ 76, 78), 15 (¶¶ 79–91) (citing Rejection Notices, Exs. H–T to FAC – ECF No. 31-1 at 34–72).

[22] Forbes Decl. – ECF No. 54-1 at 115 (¶ 5); Carouba Decl. – ECF No. 54-1 at 10–11 (¶¶ 4–10).

United States District Court
Northern District of California

1    sufficiently as to the affiliation issue. They have shown that it is likely, not merely speculative,

2    that their injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 561.[23]

3

4    **2. Likelihood of Success on the Merits: APA Claim (*Chevron Analysis*)**

5        The plaintiffs contend that the SBA's regulation excluding prurient businesses from the

6    disaster-loan program violates 15 U.S.C. § 633(e)'s prohibition of financial assistance only to

7    obscene businesses (as determined by a court) and in any event is not entitled to *Chevron*

8    deference.[24] Congress has not spoken to the issue directly, and at step two of the *Chevron* analysis,

9    the court defers to the agency's reasonable interpretation of the statute.

10       Under the APA, an agency cannot take action "in excess of statutory jurisdiction, authority, or

11   limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C). When a court reviews an agency's

12   interpretation of a statute, it applies the two-step analytic framework in *Chevron, U.S.A., Inc. v.*

13   *NRDC*, 467 U.S. 837, 842–43 (1984). At step one, applying the traditional rules of statutory

14   construction, the court determines "whether Congress has directly spoken to the precise question

15   at issue." *Id.* at 842–43 & n.9. If so, and if "the intent of Congress is clear, that is the end of the

16   matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent

17   of Congress." *Id.* at 842–43. If "the statute is silent or ambiguous with respect to the specific

18   issue," then at step two, "the question for the court is whether the agency's answer is based on a

19   permissible construction of the statute." *Id.* at 843. If it is, then the court must defer to the

20   agency's "reasonable" construction of the statute. *Id* at 844.

21       The plaintiffs' main argument — raised in their supplemental brief — is that in 15 U.S.C. §

22   633(e), Congress spoke to the only type of sexual expression that the SBA can exclude from its

23   programs: "business concern[s] or other person[s] engaged in the production or distribution of any

24

25

26

27   [23] This holding about Article III standing does not bind the agency in any subsequent determination about affiliation.

28   [24] Mot. – ECF No. 33 at 22–27; Pl. Supp. Brief – ECF No. 67.

United States District Court
Northern District of California

product or service that has been judged obscene by a court of jurisdiction."[25] 15 U.S.C. § 633(e). The statute does not unambiguously support the plaintiffs' interpretation of it.

At step one of the *Chevron* analysis, the court does not examine the "particular statutory provision in isolation" and instead reads it in the context of the overall statutory scheme. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (citation omitted). Under the statutory scheme here, the SBA has broad powers to make loans to businesses during disasters and to promulgate rules in its discretion to make the loans. 15 U.S.C. §§ 636(b)(1)(a), (b)(2). It must follow certain procedures (such as accepting applications, setting interest rates, and paying contractor and lender fees). *Id.* § 636(b)(3), (9), & (11). But it has the authority to establish rules about loans "with reference to the public interest." *Id.* §§ 633(d), 634(b)(6)–(7). Pursuant to that authority, the SBA has promulgated regulations that it deems in the public interest, including the regulation excluding loans to businesses of a prurient nature. The plaintiffs contend that Congress prohibited loans only to businesses judged obscene. But the overall statutory scheme — with its delegation of authority to the SBA to make loans, considering the public interest — does not compel the conclusion that the SBA cannot prohibit loans to businesses that are prurient but not obscene. The statute says nothing one way or another.

The plaintiffs' citation to the statute's legislative history does not change this conclusion. First, the statute is plain, and there is no textual ambiguity. Second, even if the statute were ambiguous, the legislative history supports only the conclusion that Congress intended to prohibit assistance to obscene businesses. S. Rep. No. 103-332 at 23–24 (1994) (describing the prohibition of aid to businesses judged obscene without additional context). Nothing suggests that it intended to reach further to restrict the statutory delegation of authority to the SBA to exercise its discretion to promulgate lending rules that it deems in the public interest.

Thus, in 15 U.S.C. § 633(a), at step one of the *Chevron* analysis, Congress did not speak directly to the issue.

---

[25] Pl. Supp. Brief. – ECF No. 67 at 6–11.

1    Before reaching the step-two *Chevron* analysis, the court addresses the plaintiffs' second APA

2    argument under *Chevron* step one. The argument is a textual one: under the plain language of

3    CARES Act, Congress expanded eligibility for the disaster loans to — in addition to small-

4    business concerns, private nonprofit organizations, and small agricultural cooperatives (that were

5    already eligible for the loans) — "eligible entities," defined as businesses with not more than 500

6    employees, sole proprietorships, independent contractors and businesses, cooperatives with not

7    more than 500 employees, employee stock ownership plans with not more than 500 employees,

8    tribal business concerns with not more than 500 employees, and agricultural enterprises with not

9    more than 500 employees. 15 U.S.C. § 9009(a)–(b). The plaintiffs argue that (1) Congress defined

10   eligibility for the loans as being an eligible entity (relevantly here, a business with not more than

11   500 employees) during the covered period (January to December 2020), and (2) this express

12   definition meant that Congress did not intend any other criteria for loan eligibility. *DV Diamond*

13   *Club*, 2020 WL 2315880, at *10. Thus, the plaintiffs contend, the SBA violated the plain language

14   of the CARES Act when it excluded them as "prurient businesses" from the PPP.[26]

15    Two courts preliminarily enjoined (on this ground) the SBA's application of 13 C.F.R.

16   120.110(p) (and related SBA operating procedures) to deny disaster loans under the PPP to adult-

17   themed businesses. *DV Diamond Club,* 2020 WL 2315880, at *12 (E.D. Mich. 2020) ("[T]he plain

18   language of the PPP makes clear that any business concern is eligible for a PPP loan if it

19   employed the requisite number of Americans during the covered period. Thus, the Defendants

20   may not exclude Plaintiffs from participating in the PPP on the ground that they present

21   entertainment or sell products of a "prurient sexual nature."), *stay denied*, No. 20-1437 (6th Cir.

22   May 15, 2020); *Camelot Banquet Rooms, Inc. v. SBA*, --- F. Supp. 3d ----, No. 20-C-0601, 2020

23   WL 2088637, at *7 (E.D. Wis. May 1, 2020) (same), *stay denied*, No. 20-1729 (7th Cir. May 20,

24   2020). In *DV Diamond Club*, the court elaborated:

25        Congress's decision to expand funding to previously ineligible businesses is not an
          endorsement or approval of those businesses. Instead, it is a recognition that in the midst of
26

27

28   _____

     [26] Mot. – ECF No. 33 at 23.

United States District Court
Northern District of California

> this crisis, the workers at those businesses have no viable options for employment in other, favored lines of work and desperately need help.

*DV Diamond Club*, 2020 WL 2315880, at *14.

More recently, other courts have examined the CARES Act in the context of the overall statutory scheme and have held that the Congress did not intend CARES Act criteria to be the exclusive criteria for the disaster loans, did not eliminate long-standing eligibility criteria, and instead temporarily expanded eligibility regarding size for disaster loans. *Defy Ventures Inc. v. SBA*, Nos. CCB-20-1838 & CCB-20-1736, 2020 WL 3546873, at *8 (D. Md. June 29, 2020) (the CARES Act did not speak to whether the SBA may impose additional restrictions on eligibility, including the criminal-history exclusion from eligibility); *Pharaohs GC, Inc. v. SBA*, No. 20-CV-665, 2020 WL 3489404, at *4–5 (W.D.N.Y. June 26, 2020) (same regarding criminal-history and prurient-business exclusions); *Tradeways, Ltd. v. Dep't of the Treasury*, No. ELH-20-1324, 2020 WL 3447767, at *13 (D. Md. June 24, 2020) (same regarding exclusions from the PPP for debtors in bankruptcy); *Diocese of Rochester v. SBA*, No. 6:20-CV-06243 EAW, 2020 WL 3071603, at *6–7 (W.D.N.Y. June 10, 2020) (same; points to other provisions in the CARES Act that anticipate additional eligibility criteria or waive requirements; "the waivers of otherwise applicable eligibility requirements would be superfluous if the CARES Act unambiguously eliminated any requirement beyond size).

The court follows the later cases as persuasive. 15 U.S.C. § 9009 adds additional eligible entities and does not unambiguously compel the interpretation that Congress meant to eliminate all other criteria for eligibility for disaster loans. That means that at step one of the *Chevron* analysis, Congress did not speak directly to the question at issue. 467 U.S. 837, 842–43

At step two, the SBA's application of its long-standing regulations is permissible, which means the court defers to it. *Chevron*, 467 U.S. at 844; *accord Defy Ventures*, 2020 WL 3546873, at *8; *Pharaohs*, 2020 WL 3489404, at *5–6; *Tradeways*, 2020 WL 3447767, at *14–15; *Diocese of Rochester*, 2020 WL 3071603, at *8.

In sum, the plaintiffs are not likely to succeed on the merits of their APA claim.

United States District Court
Northern District of California

### 3.   Likelihood of Success on the Merits: APA Claim (*State Farm* Analysis)

The plaintiffs also contend that the SBA exceeded its authority under the APA, and thus engaged in arbitrary and capricious agency action, when it adopted § 123.201(f) and excluded prurient businesses from the section 7(b) program.[27] The plaintiffs are not likely to succeed on the merits of their challenge to § 123.201(f) as arbitrary and capricious.

Under § 706(2)(A) of the APA, a court can set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983). A rule is arbitrary and capricious if (1) the agency "has relied on factors which Congress has not intended it to consider;" (2) the agency "entirely failed to consider an important aspect of the problem;" (3) the agency's explanation "runs counter to the evidence before the agency;" or (4) the explanation "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43; *see East Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 938 (N.D. Cal. 2019) *(a *State Farm* analysis evaluates whether a rule is procedurally defective as a result of flaws in the agency's decision-making process while a *Chevron* analysis evaluates whether the agency's interpretation and conclusion (reached as a result of that process) is reasonable).

In § 123.201(f), the SBA adopted the same prurient-business restriction for section 7(b) disaster-relief loans that it previously adopted in § 120.110(p) for section 7(a) general-business loans. When it did so, it explained that its purpose was "to codify SBA's existing policy of using the same ineligibility criterial for SBA's disaster and business loan programs." 63 Fed. Reg. at 46,643. The issue is whether this explanation is too perfunctory. The court does not conclude on this record that it is. The policy is a decision, under the SBA's discretionary authority, about whether giving financial assistance to certain categories of businesses is in the public interest. 15 U.S.C. § 633(d). Including prurient businesses is an obvious judgment call that the SBA does not want to fund these particular businesses. Nothing suggests that SBA relied on impermissible

---

[27] *Id.* at 25–27.

factors, failed to consider an important aspect of the problem, or gave an explanation that was contrary to the evidence that was before it or is so implausible that it cannot be ascribed to a difference in view. *State Farm*, 463 U.S. at 43. The plaintiffs' challenge is about a difference in view, which is not arbitrary and capricious agency action.

In sum, the plaintiffs are not likely to succeed on the merits of their challenge to the SBA's agency action as arbitrary and capricious.

### 4.  Likelihood of Success on the Merits: First Amendment Claim

The plaintiffs contend that the SBA's regulation excluding prurient businesses violates the First Amendment because it (1) is an impermissible content-based and viewpoint-based restriction on speech,[28] (2) is unconstitutionally overbroad,[29] (3) does not conform to the constitutional standards of obscenity,[30] (4) violates the doctrine of unconstitutional conditions and is a prior restraint on speech and expression,[31] and (5) is impermissibly vague.[32] The plaintiffs are not likely to succeed on the merits of their First Amendment claim.

#### 4.1    Content-Based and Viewpoint-Based Restriction

The plaintiffs contend that § 123.201(f) is an impermissible content-based and viewpoint-based restriction. The plaintiffs are not likely to succeed on the merits of this argument.

To support their argument that the SBA regulation is an impermissible content-based restriction, the plaintiffs cite cases involving the government's regulating or prohibiting speech directly.[33] *Reed v. Town of Gilbert*, 576 U.S. 155, 162-65 (2015) (invalidating content-based restrictions on posting signs without a permit); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816–17 (2000) (invalidating statute mandating that adult-cable channels be blocked or

---

[28] *Id.* at 28–32.

[29] *Id.* at 32–33.

[30] *Id.* at 34–38.

[31] *Id.* at 38–40.

[32] *Id.* at 40–42.

[33] *Id.* at 28–30; Reply – ECF No. 54 at 22–24.

1   scrambled during certain hours); *Am. Booksellers Ass'n v. Hudnet*, 771 F.3d 323, 324–34 (7th Cir.

2   1985) (invalidating pornography ordinance), *aff'd*, 457 U.S. 1001 (1986). But the SBA is not

3   prohibiting or regulating speech, and these cases thus do not control the outcome here. Instead,

4   through § 123.201(f), and pursuant to its statutory authority to grant or deny loans "with reference

5   to the public interest," the SBA determined that it will not use federal funds to subsidize

6   businesses of a prurient nature. 15 U.S.C. § 633(d). The issue is whether that decision not to

7   subsidize is a permissible content-based restriction or instead whether it is "invidious viewpoint

8   discrimination."[34] *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587–88 (1998); *see*

9   *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003).

10      "[A]lthough government may not place obstacles in the path of a person's exercise of freedom

11   of speech, it need not remove those not of its own creation." *Regan v. Taxation with*

12   *Representation of Wash.,* 461 U.S. 540, 549–50 (1983) (cleaned up). "Although [an applicant who

13   is denied government funds] does not have as much money as it wants, and thus cannot exercise

14   its freedom of speech as much as it would like, the Constitution does not confer an entitlement to

15   such funds as may be necessary to realize all the advantages of that freedom." *Id.* at 550 (cleaned

16   up). "Constitutional concerns are greatest when the State attempts to impose its will by force of

17   law. [But w]here government provision of subsidies is not aimed at the suppression of dangerous

18   ideas, its power to encourage actions deemed to be in the public interest is necessarily far

19   broader." *Id.* (cleaned up). Applying this analysis, the Court has held that the government "is not

20   required by the First Amendment to subsidize lobbying" and does not infringe First Amendment

21   speech or regulate First Amendment activity by choosing not to pay for it. *Id.* at 546 (citing

22   *Cammarano v. United States*, 358 U.S. 498, 513 (1959)). Congress thus could decide that

23   nonprofit lobbying organizations were not entitled to the subsidy of tax-exempt status under 26

24   U.S.C. § 501(c)(3) of the Internal Revenue Code. *Id.* at 542, 551. The D.C. Circuit applied this

25   analysis to reject lobbyists' First Amendment challenge to the SBA's denial of their application

26

27

---

28   [34] Opp'n – ECF No. 48-1 at 15, 39; Reply – ECF No. 54 at 22.

1    for a PPP loan, holding that the program loans were like the subsidy in *Regan*. *Am. Ass'n of*

2    *Political Consultants v. SBA*, 2020 WL 3406524, at *1 (D.C. Cir. May 26, 2020).

3        What this means is that "[t]he government can make content-based distinctions when it

4    subsidizes speech." *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188–89 (2007). Those funding

5    choices do not violate the First Amendment unless they are "the product of invidious viewpoint

6    discrimination" or are "aimed at the suppression of dangerous ideas." *Finley*, 524 U.S. at 586–87;

7    *Regan*, 461 U.S. at 548 ("The case [upholding the statutory denial of § 503(c) tax-exempt status to

8    lobbyists] would be different if Congress were to discriminate invidiously in its subsidies in such a

9    way as to aim at the suppression of dangerous ideas.") (cleaned up); *Leathers v. Medlock*, 499

10   U.S. 439, 447 (1991) ("differential taxation . . . is constitutionally suspect when it threatens to

11   suppress the expression of particular ideas or viewpoints").

12       The lobbyist cases do not end the analysis: they do not involve invidious discrimination aimed

13   at the suppression of dangerous ideas and thus were not impermissible viewpoint discrimination.

14   *See Pharaohs GC*, 2020 WL 3489404, at *7. Two courts have considered whether the SBA's

15   denial of PPP loans to prurient businesses is impermissible viewpoint discrimination. They split

16   on the issue: the court in *Camelot Banquet Rooms* found a likelihood of success on the First

17   Amendment claim, 2020 WL 2088637, at *11, and the court in *Pharaohs GC* did not, 2020 WL

18   3489404, at *8.

19       In *Camelot Banquet Rooms*, the government contended that the obstacle to erotic-dance

20   entertainment was the COVID-19 pandemic, not the federal government. 2020 WL 2088637, at

21   *8. The court rejected that contention as flawed: by "remov[ing] the COVID-19 obstacle from the

22   path of nearly every other small business in the United States" and by leaving the obstacle in the

23   prurient businesses' path, the SBA singled them out for unfavorable treatment based on the

24   content of their speech without articulating any legitimate government interest. *Id.* The CARES

25   Act's purpose was to make favorable loans to small businesses, and — the court held — the

26   government had no legitimate purpose in excluding the prurient businesses. *Id.* at 8–9

27   (distinguishing *Rust v. Sullivan*, 500 U.S. 173, 178–95 (1991), where the statute funded family-

28   planning services except for programs involving abortion, on the ground that Congress's lawful

1    purpose — funding family planning services leading to conception and childbirth — meant that it

2    was not constitutionally required to fund abortion, did not discriminate based on viewpoint, and

3    merely chose to fund one activity over another), 9–10 (distinguishing *Regan*, 461 U.S. at 545–548,

4    on the ground that Congress prohibited all lobbying).

5        In *Pharaohs GC*, the court, following the lobbyist cases, found that PPP loans were subsidies.

6    2020 WL 3489404, at *7. It held that SBA's funding choice to deny PPP loans to prurient

7    businesses was not "the product of invidious viewpoint discrimination" or "ai[med] at the

8    suppression of dangerous ideas," and thus did not violate the First Amendment, because it did not

9    exclude only adult-entertainment businesses and instead excluded other businesses, such as those

10   with more than one-third of gross revenues from legal gambling, businesses that limited

11   membership for reasons other than capacity, businesses engaged in teaching or religious

12   instruction, counseling, or indoctrination, and businesses engaged in political or lobbying

13   activities. *Id.* (quoting *Finley*, 524 U.S. at 587 and citing 13 C.F.R. § 120.110). Thus, the court

14   held, *Camelot Banquet Room* wrongly said that the government had removed the COVID-19

15   obstacle from nearly every other small business but prurient businesses because 13 C.F.R. §

16   120.110 excludes more than a dozen types of business. *Id.* The court also noted that in the Second

17   Circuit, lascivious dancing, unlike lobbying, does not convey a specific message. *Id* at 8. (citing

18   *General Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 281 (2nd Cir. 1997), a case upholding a

19   law prohibiting the sale on military bases of materials depicting nudity and rejecting the argument

20   that the law targeted a viewpoint about sexual desire and lasciviousness). It applied that case to

21   hold that — because the PPP was content-based, not viewpoint-based — it did not violate the First

22   Amendment. *Id.*; *cf. PMG Int'l Div. L.L.C. v. Rumsfeld*, 303 F.3d 1163, 1165–66, 1171 (9th Cir.

23   2002) (followed *General Media*).

24       Citing *Pharaohs* GC, 2020 WL 3489404, at *7–8, and the lobbyist cases, the SBA contends

25   that the prohibition of loans to prurient businesses is viewpoint-neutral because the SBA prohibits

26   the loans without regard to any idea that the plaintiffs want to convey through their

27

28

United States District Court
Northern District of California

performances.[35] They could promote eroticism or oppose eroticism, and the outcome would be the same: the SBA would not fund the loans.[36] The plaintiffs counter that the viewpoint discrimination is that the SBA prohibits loans only to businesses presenting prurient entertainment and does not prohibit loans to businesses that present erotic (but not prurient) entertainment or to businesses that give up erotic entertainment entirely to access the loans.[37] (One can imagine a continuum of entertainment from nude performances to cabaret to Flashdance-type performances to ballroom dancing. Bookstores similarly have a continuum of products.)

The SBA's decision not to fund prurient businesses, and its choices about where to allocate scarce funds, amount to a selective subsidy, not a targeted viewpoint discrimination, in the pre-CARES Act context, at least on this record. The traditional argument — those who do not receive the subsidy can continue their speech — rings true. *See Regan,* 461 U.S. at 550. The SBA has "broad discretion to make content-based distinctions when subsidizing speech" (as opposed to regulating it). *Davenport*, 551 U.S. at 188–89. And it can allocate funding that would be impermissible if it were regulating speech directly so long as it does not engage in invidious discrimination aimed at the suppression of dangerous ideas. *Finley*, 524 U.S. at 586–87.

The CARES Act presents a different context, at least for the scope of the subsidies it offers: it is the largest economic relief package in American history meant to address an existential threat to small businesses.[38] The failure to qualify for the forgivable loan means that workers do not get paid, and businesses close. Moreover, the government's justification for its rule prohibiting loans to prurient businesses — it is longstanding and in the public interest — is perfunctory, even if it passes muster under *Chevron. Camelot Banquet Rooms*, 2020 WL 2088637, at *8–9. And the prohibition against all lobbying is more obviously viewpoint neutral. But the size of the subsidy, and the impact on the recipient given the pandemic, does not alter the conclusion that the SBA's policy is a selective subsidy, not impermissible viewpoint discrimination aimed at the suppression

---

[35] Opp'n – ECF No. 48-1 at 39.

[36] *Id.* at 40.

[37] Reply – ECF No. 54 at 25.

[38] Brian Soucek, <u>Discriminatory Paycheck Protection</u>, 11 Calif. L. Rev. Online 319, 331 (2020).

United States District Court
Northern District of California

of dangerous ideas. The plaintiffs' argument is that the policy ought to be different, but that is not a ground to invalidate § 123.201(f).

In sum, the plaintiffs are not likely to succeed on their First Amendment claim that § 123.201(f) is an impermissible content-based and viewpoint-based restriction on speech.

### 4.2   Unconstitutionally Overbroad

The plaintiffs contend that § 123.201(f) is constitutionally overbroad because the SBA construed the word "prurient" to include lawful activities and protected expression.[39] The SBA responds that (1) § 123.201(f) does not restrict or prohibit speech (and instead permissibly does not subsidize it) and thus is not subject to invalidation on overbreadth grounds, and (2) even if an overbreadth challenge to a funding restriction were possible, the plaintiffs have not made the required showing for an overbreadth challenge.[40] The plaintiffs do not specifically challenge the SBA's argument in their reply brief.[41] They in any event are not likely to succeed on the merits of their facial challenge to § 123.201(f).

A court may evaluate a law as overbroad under the First Amendment "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotation omitted). "Although '[t]he concept of "substantial overbreadth is not readily reduced to an exact definition,' it generally means that we will not invalidate a statute on its face unless 'there [is] a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court.'" *Acosta v. City of Costa Mesa*, 718 F.3d 800, 811 (9th Cir. 2013) (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800-01 (1984)). "[A] statute's overbreadth [must] be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008). "[T]he mere fact that one can conceive of some impermissible applications of the statute is not sufficient to render it

---

[39] Mot. – ECF No. 33 at 32–33.

[40] Opp'n – ECF No. 48-1 at 42.

[41] Reply – ECF No. 54.

susceptible to an overbreadth challenge." *Taxpayers for Vincent*, 466 U.S. at 800. The plaintiffs "must demonstrate from the text of [the law] and from actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally." *N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 14 (1988). "Invalidation for overbreadth is a strong medicine that is not to be casually employed." *Williams*, 553 U.S. at 293 (cleaned up).

The plaintiffs have not met their burden. First, § 123.201(f) does not restrict or prohibit speech and instead permissibly refuses to subsidize it. *Regan,* 461 U.S. at 546. Second, even if an overbreadth challenge to a funding restriction were possible, the plaintiffs have not shown that there are a "substantial number of instances in which [§ 123.201(f)] cannot be applied constitutionally" and that the number is substantial in an absolute sense and in relation to § 123.201(f)'s "plainly legitimate sweep." *N.Y. State Club Ass'n*, 487 U.S. at 14; *Williams*, 553 U.S. at 292.

The plaintiffs are not likely to succeed on the merits of this argument.

### 4.3    Constitutional Standards of Obscenity

The plaintiffs contend that § 123.201(f) fails to conform to the constitutional standards of obscenity set forth in *Miller v. California*, 413 U.S. 15, 24 (1933).[42] The SBA responds that the Constitution does not require it to adopt the *Miller* test in its determination about whether to finance prurient businesses.[43] The plaintiffs do not specifically challenge the SBA's argument in their reply brief.[44] They in any event are not likely to succeed on the merits of the argument.

The *Miller* test is a three-prong test for identifying obscene material that the government may regulate without infringing on the First Amendment. *Miller*, 413 U.S. at 18, 24; *see Pope v. Illinois,* 481 U.S. 497, 501–03 & n. 3 (1987); *Smith v. United States*, 431 U.S 291, 300 n.6 (1977). It does not apply here. Section 123.201(f) does not restrict or prohibit speech and instead permissibly refuses to subsidize it. *Regan,* 461 U.S. at 546.

---

[42] Mot. – ECF No. 33 at 34–38.

[43] Opp'n – ECF No. 48-1 at 43.

[44] Reply – ECF No. 54.

United States District Court
Northern District of California

### 4.4   Doctrine of Unconstitutional Conditions and Prior Restraint

The plaintiffs contend that § 123.201(f) violates the doctrine of unconstitutional conditions and is a prior restraint because they must abandon their form of expression or forego a benefit available to other small businesses.[45] The SBA responds that § 123.201(f) does not restrict or prohibit speech (and instead permissibly does not subsidize it).[46] The plaintiffs do not specifically challenge the SBA's argument in their reply brief.[47] They in any event are not likely to succeed on the merits of the argument.

The Spending Clause, U.S. Const. Art. I, § 8, cl. 1, gives Congress "broad discretion to tax and spend for the 'general Welfare,'" including the authority to "impose limits on the use of [the] funds it appropriates" for programs such as the SBA's financial-assistance program "to ensure that th[e funds] are used in the manner Congress intends." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l Inc.*, 570 U.S. 205, 213 (2013); *see* 15 U.S.C. § 633(d) (SBA's authority to establish general policies "with reference to the public interest involved in the granting and denial of applications for financial assistance"). "As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to deny the funds. This remains true even when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev.*, 570 U.S. at 214 (citing *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (plurality opinion), and *Regan*, 461 U.S. at 546); *Am. Library Ass'n, Inc.*, 539 U.S. at 212 (plurality opinion) (rejecting argument by public libraries that conditioning funds for Internet access on installing filtering software did not violate the First Amendment because "[t]o the extent that libraries wish to offer unfiltered access, they are free to do so without federal assistance"); *Regan*, 461 U.S. at 546 (rejecting "the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State") (cleaned up). "At the same time, however, we have held that the Government may not deny a benefit to a person on a basis that infringes his

---

[45] Mot. – ECF No. 33 at 38–40.

[46] Opp'n – ECF No. 48-1 at 43–46.

[47] Reply – ECF No. 54.

constitutionally protected freedom of speech even if he has no entitlement to that benefit." *Id.* (cleaned up). "[T]he relevant distinction that has emerged from our cases is between conditions that define the limits of the government spending program — those that specify the programs that Congress wants to subsidize — and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Id.* at 214–15.

Thus, for example, Congress cannot condition a grant of funds to combat the treatment of HIV/AIDS on a recipient's having "'a policy explicitly opposing the legalization or practice of prostitution and sex trafficking.'" *Id.* at 208 (quoting 22 U.S.C. § 7631(a)), 221. And a college cannot terminate an untenured college professor based on his constitutionally protected expression because the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests[.]" *Perry v. Sinderman*, 408 U.S. 593, 597–98 (1972). By contrast, the "government is not required by the First Amendment to subsidize lobbying" and does not infringe First Amendment speech or regulate First Amendment activity by choosing not to pay for it. *Regan*, 461 U.S. at 546. Similarly, conditioning funds for Internet access on the installation of filtering software does not violate the First Amendment rights of libraries because they can offer unfiltered access without federal assistance. *Am. Library Ass'n, Inc.*, 539 U.S. at 212.

Again, this case falls in the *Regan* and *American Library* category. Section 123.201(f) does not restrict or prohibit speech and instead permissibly does not subsidize it.

### 4.5   Impermissibly Vague

The plaintiffs contend that § 123.201(f) is impermissibly vague because it does not give notice to them of acts that are prohibited (which means they risk perjury if they guess wrong on the prurience question on the loan applications), and it does not give guidance to the SBA to prevent discriminatory application of the regulation.[48] The SBA responds that § 123.201(f) does not restrict or prohibit speech and instead sets forth the terms for the SBA's exercise of its broad

---

[48] Mot. – ECF No. 33 at 40–42.

United States District Court
Northern District of California

1  discretion to determine whether it will subsidize speech (or not).[49] The plaintiffs are not likely to

2  succeed on the merits of their argument.

3     The void-for-vagueness doctrine is a due-process doctrine that requires a law to "(1) define the

4  offense with sufficient definiteness that ordinary people can understand what conduct is

5  prohibited[] and (2) establish standards to permit police to enforce the law in a non-arbitrary, non-

6  discriminatory manner." *Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997). "When

7  First Amendment freedoms are at stake, courts apply the vagueness analysis more strictly,

8  requiring statutes to provide a greater degree of specificity and clarity than would be necessary

9  under ordinary due process principles." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141,

10  1150 (9th Cir. 2001); *accord Smith v. Goguen*, 415 U.S. 566, 573 (1974).

11     Section 123.201(f) does not prohibit or regulate speech or require the plaintiffs do anything.

12  Instead, it embodies the SBA's policy not to subsidize the prurient businesses' speech. *All. For*

13  *Open Soc'y*, 570 U.S. at 215; *Rust*, 500 U.S. at 192–94. The controlling case thus is *National*

14  *Endowment for the Arts v. Finley*. In *Finley*, artists challenged the validity of a federal statute that

15  required the NEA "to tak[e] into consideration general standards of decency and respect for the

16  diverse beliefs and values of the American public" in determining whether to award grants. 524

17  U.S. at 572, 576–78. The district court and the court of appeals held that the provision "decency

18  and respect" was unconstitutionally vague because it "fail[ed] to adequately notify applicants of

19  what is required of them or to circumscribe NEA discretion." *Id.* at 578. The Supreme Court

20  reversed. *Id.* at 580.

21     The Court recognized that "[u]nder the First and Fifth Amendments, speakers are protected

22  from arbitrary and discriminatory enforcement of vague standards," and the provision "decency

23  and respect" was opaque. *Id.* at 588. And in a criminal context or in a regulatory scheme, the

24  provision "could raise substantial vagueness concerns." *Id.* But in the context of the grant

25  program, the Court did not invalidate the "decency and respect" provision because it was unlikely

26  that "speakers would be compelled to steer too far clear of any 'forbidden area.'" *Id.* Also, even if

27

28  _____
[49] Opp'n – ECF No. 48-1 at 47–49.

artists sometimes conformed their speech to the perceived decision-making criteria to obtain a grant, the "consequences of imprecision" were not "constitutionally severe" because the NEA was "acting as patron rather than as sovereign." *Id.* at 589.

The SBA contends that *Finley* establishes that the standard for evaluating laws related to subsidies for speech is less demanding than the standard for laws that penalize speech.[50] This contention is consistent with the analysis in this order: § 123.201(f) does not restrict or prohibit speech and instead does not subsidize it. The plaintiffs attempt to distinguish *Finley* on the ground that the SBA is not acting as a patron and instead is acting in its sovereign capacity to rescue the national economy from the COVID-19 pandemic.[51] But in its analysis of whether § 123.201(f) is an impermissible viewpoint restriction, the court already held that this scope-of relief argument is a disagreement with the policy and is not a ground to invalidate § 123.201(f). Also, the plaintiffs' alleged risk of perjury — by guessing wrong on the prurience question on the loan application — is ameliorated by the specific-intent scienter requirement for a perjury charge: a plaintiff must "willfully subscribe[] as true [a] material matter which he does not believe to be true." 17 U.S.C. § 1621(2); *see United States v. Lee*, 183 F.3d 1029, 1032–33 (9th Cir. 1999) (this scienter requirement ameliorates the vagueness concern); *United States v. Cook*, 497 F.2d 753, 759 (9th Cir. 1972) (perjury elements).

The plaintiffs are not likely to succeed on the merits of this argument.

## 5. Likelihood of Success on the Merits: Fifth Amendment Claim

The plaintiffs contend that § 123.201(f) violates the Fifth Amendment guarantees of equal protection and occupational liberty because it treats them differently than other applicants and denies them the ability to engage in their chosen occupations.[52] The SBA responds that (1) § 123.201(f) restricts only the use of federal funds, not the plaintiffs' own money, (2) it is not

---

[50] *Id.* at 48 (collecting district court cases from other districts).

[51] Reply – ECF No. 54 at 32.

[52] Mot. – ECF No. 33 at 42–44.

viewpoint-based or aimed at suppressing speech, and (3) it thus survives rational-basis review under the Fifth Amendment.[53] The SBA also contends that contemporary due-process jurisprudence does not recognize a due-process claim of a deprivation of occupational liberty and similarly survives rational-basis review.[54] In their reply, the plaintiffs respond only to the SBA's the occupational-liberty argument.[55] The plaintiffs are not likely to succeed on the merits of either argument.

In *Regan*, the lobbyist also claimed that denying it tax-exempt status under 26 U.S.C. § 501(c)(3) violated the Fifth Amendment. 461 U.S. at 545. The Supreme Court disagreed. Because there was no First Amendment violation, rational-basis review, not strict scrutiny, applied. *Id.* at 548–50. The lobbying restriction survived this review because Congress was not irrational when it decided that the public interest in promoting lobbying was not worth the taxpayer expense. *Id.* at 550; *accord Yursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359–60 (2009) (rational-basis review applied to state's refusal to make public-employee payroll deductions for union political activities because the state had not infringed the unions' First Amendment rights).

Because there is no First Amendment violation, and because the SBA is not regulating the prurient businesses and instead is applying a viewpoint-neutral funding restriction, rational-basis review applies, and the plaintiffs has the burden to negate the bases that might support § 123.201(f). (If the government were regulating the operation of the prurient businesses, then intermediate scrutiny would apply, and the government would have the burden of establishing a link between the regulated businesses and the causal effects. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 433–37 (2002).)

Under rational-basis review, the court must uphold the regulation "'if there is a rational relationship between the disparity of treatment and some legitimate government purpose.'" *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1279 (9th Cir. 2004) (quoting *Heller v. Doe*, 509 U.S.

---

[53] Opp'n – ECF No. 48-1 at 50–52.

[54] *Id.* at 52.

[55] Reply – ECF No. 54 at 34.

United States District Court
Northern District of California

312, 319–20 (1993)). It is "highly deferential" review. *Id.* "[A] classification must be upheld . . . if there is any reasonable conceivable state of facts that could provide a rational basis for the classification." *Heller*, 509 U.S. at 320 (cleaned up). Thus, a court may set classifications aside "only if they are based on reasons totally unrelated to the purpose of the State's goals and only if no grounds can be conceived to justify them." *Clements v. Fashing*, 457 U.S. 957, 963 (1982). The government has no "'obligation to produce evidence to sustain the rationality of a statutory classification;' rather, 'the burden is on the one attacking the legislative arrangement to negate every conceivable basis that might support it.'" *Kahawaiolaa*, 388 F.3d at 1280 (quoting *Heller*, 509 U.S. at 320).

Section 123.201(f) survives rational-basis review. The government proffers the secondary effects of adult-entertainment establishments.[56] *See Cntr. for Fair Pub. Policy v. Maricopa Cty.*, 336 F.3d 1153, 1164–65, 1166 (9th Cir. 2003) (secondary effects include crime rates, property values, the quality of neighborhoods, and illicit activity); *accord Gammoh v. City of La Habre* 395 F.3d 1114, 1124 (9th Cir. 2005) (effects on retail trade, blight, and quality of neighborhoods and commercial districts). The plaintiffs do not negate the government's bases.

The plaintiffs' occupational-liberty claim also is subject to rational-basis review, *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 997 (9th Cir. 2007), and fails for the same reason. Even if the claim were a cognizable substantive-due-process claim, the SBA's decision to not subsidize a business does not infringe on constitutional rights. *Rust*, 500 U.S. at 193.

### 6. Likelihood of Success on the Merits: Injunctive Relief From the SBA

The defendants contend that the plaintiffs are not likely to succeed on the merits of their claims because Congress has restricted the availability of injunctive relief against the SBA.[57] Courts are split on the issue.[58] The defendants suggest that "[i]t is unnecessary to resolve questions

---

[56] Opp'n – ECF No. 48-1 at 52.

[57] *Id.* at 52–53.

[58] *Id.* at 53 (collecting cases).

United States District Court
Northern District of California

surrounding the statute's reach at this time" because the plaintiffs have not established their entitlement to a preliminary injunction.[59] The court agrees and does not address the issue.

### 7.  Remaining Elements

Because the court holds that the plaintiffs are not likely to succeed on the merits of their claims, the court does not reach the other elements. *Cf. Camelot Banquet Rooms*, 2020 WL 2088637, at *12–13 (after finding a likelihood of success on the APA and First Amendment claims, the court found that the other elements for an injunction — irreparable harm, the balance of equities, and whether an injunction was in the public interest — were met).

## CONCLUSION

The court denies the plaintiffs' motion for a preliminary injunction.

This disposes of ECF No. 33.

**IT IS SO ORDERED.**

Dated: September 11, 2020

_____
LAUREL BEELER
United States Magistrate Judge

*United States District Court*
*Northern District of California*

---

[59] *Id.* at 53.